# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

TIMOTHY H. EDGAR
    Providence, RI[*]

RICHARD H. IMMERMAN
    700 Locust Street
    Philadelphia, PA 19106

MELVIN A. GOODMAN
    5002 Nahant Street
    Bethesda, Montgomery County, MD
    20816

ANURADHA BHAGWATI
    New York, NY[*]

MARK FALLON
    Brunswick, Georgia[*]

          *Plaintiffs*,

    v.

DANIEL COATS, in his official capacity as
Director of National Intelligence
    Office of the Director of National
    Intelligence
    Washington, DC 20511

GINA HASPEL, in her official capacity as
Director of the Central Intelligence Agency
    Central Intelligence Agency
    Washington, DC 20505

        *(continued on next page)*

Civil Action No. _____

---

[*] In a concurrently filed motion, Plaintiffs Timothy H. Edgar, Anuradha Bhagwati, and Mark Fallon have requested a waiver of their obligations under Local Rule 102.2(a) to provide their home addresses in the caption of this complaint.

PATRICK M. SHANAHAN, in his official
capacity as Acting Secretary of Defense
       Department of Defense
       1400 Defense Pentagon
       Washington, DC 20301

PAUL M. NAKASONE, in his official
capacity as Director of the National Security
Agency
       National Security Agency
       9800 Savage Road
       Fort Meade, MD 20755

       *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This is a challenge to a far-reaching system of prior restraints that suppresses a broad swath of constitutionally protected speech, including core political speech, by former government employees. The system, known as "prepublication review," exposes millions of former intelligence-agency employees and military personnel to possible sanction if they write or speak about their government service without first obtaining the government's approval. Under this system, government officials review and censor tens of thousands of submissions every year.

2.      As prominent legal scholars have noted, and as the government's own documents confirm, the system is "racked with pathologies." Jack Goldsmith & Oona Hathaway, *The Government's System of Prepublication Review Is Broken*, Wash. Post (Dec. 25, 2015), https://perma.cc/2JST-ZJ52. Many agencies impose prepublication review obligations on former employees without regard to their level of access to sensitive information. Submission requirements and review standards are vague, overbroad, and leave former employees uncertain or unaware of their obligations. Manuscript review frequently takes weeks or even months. Agencies' censorial decisions are often arbitrary, unexplained, and influenced by authors'

2

viewpoints. And favored officials are sometimes afforded special treatment, with their manuscripts fast-tracked and reviewed more sympathetically. As a result of the system's dysfunction, many would-be authors self-censor, and the public is denied access to speech by former government employees that has singular potential to inform public debate about government policy.

3.     This system of censorship cannot be squared with the First Amendment. The government has a legitimate interest in protecting bona fide national-security secrets, and several statutes impose after-the-fact criminal penalties on those who disclose classified information unlawfully. But the imposition of a prior restraint is an extreme measure—one that can be justified only in truly extraordinary circumstances and, even then, only when the restraint is closely tailored to a compelling government interest and accompanied by procedural safeguards designed to avoid the dangers of a censorship system. To survive First Amendment scrutiny, a requirement of prepublication review would have to, at a minimum, apply only to those entrusted with the most closely held government secrets; apply only to material reasonably likely to contain those secrets; provide clear notice of what must be submitted and what standards will be applied; tightly cabin the discretion of government censors; include strict and definite time limits for completion of review; require censors to explain their decisions; and assure that those decisions are subject to prompt review by the courts. The prepublication review system, in its current form, has none of these features.

4.     Plaintiffs Timothy H. Edgar, Richard H. Immerman, Melvin A. Goodman, Anuradha Bhagwati, and Mark Fallon are former employees of the Office of the Director of National Intelligence, the Central Intelligence Agency, and the Department of Defense. Between them, they served in the intelligence community and the military in a diversity of roles for almost

a century. All of them have drafted publications subject to prepublication review. Most of them have submitted written works for review in the past. All of them intend to continue writing works subject to review. And, without the intervention of this Court, all of them will be forced to choose between submitting material to an unconstitutional censorship regime and risking sanction in the future. They seek a declaration that Defendants' prepublication review regimes are unconstitutional and an injunction against the application of these regimes to them.

## Jurisdiction and Venue

5.      This action arises under the First and Fifth Amendments to the U.S. Constitution.

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over causes of action arising under the U.S. Constitution. The Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and under the Court's inherent equitable jurisdiction.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because one Plaintiff resides in this judicial district and Defendants are officers of the United States sued in their official capacities.

## Parties

8.      Timothy H. Edgar is an expert on cybersecurity and a former employee of the Office of the Director of National Intelligence ("ODNI"). He resides in Rhode Island. He has submitted written work to the ODNI in the past and at least some of his manuscripts have been referred to the Central Intelligence Agency ("CIA") and the National Security Agency ("NSA") for additional review.

9.      Richard H. Immerman is a historian with expertise in U.S. foreign relations and a former employee of the ODNI. He resides in Pennsylvania. He has submitted written work to the

ODNI in the past and at least one of his manuscripts has been referred to the CIA for additional review.

10.     Melvin A. Goodman is an expert on the former Soviet Union and a former employee of the CIA. He resides in Maryland. He has submitted written work to the CIA in the past and at least one of his manuscripts has been referred to the Department of Defense ("DOD") for additional review.

11.     Anuradha Bhagwati is a writer, activist, and Marine Corps veteran who founded SWAN, the Service Women's Action Network, an organization that raises awareness of and conducts advocacy on issues of sexual violence in the military and gender equality in the armed services. She resides in New York. She was not made aware of her prepublication review obligation until recently, and she has not submitted written work to the DOD in the past.

12.     Mark Fallon is an expert on counterterrorism, counterintelligence, and interrogation and a former employee of the Naval Criminal Investigative Service. He resides in Georgia. He has submitted written work to the DOD in the past, and at least two of his manuscripts have been referred to other DOD components and agencies outside of the DOD for additional review.

13.     Defendant Daniel Coats is the Director of National Intelligence. He has ultimate authority over the ODNI's prepublication review regime. He is sued in his official capacity.

14.     Defendant Gina Haspel is the Director of the CIA. She has ultimate authority over the CIA's prepublication review regime. She is sued in her official capacity.

15.     Defendant Patrick M. Shanahan is the Acting Secretary of Defense. He has ultimate authority over the DOD's prepublication review regime. He is sued in his official capacity.

16.     Defendant Paul M. Nakasone is the Director of the NSA, which is a component of the DOD. He has authority over the NSA's prepublication review regime. He is sued in his official capacity.

## Facts

### Origins and Metastasis of the Prepublication Review System

17.     Since its establishment in 1947, the CIA has required employees to sign secrecy agreements as a condition of employment and again upon their resignation from the agency. Although the terms of these agreements have varied over time, the agreements have generally prohibited CIA employees from publishing manuscripts without first obtaining the agency's consent.

18.     In the 1950s and 1960s, when comparatively few former CIA employees sought to publish manuscripts, the agency handled prepublication review informally through its Office of Security and Office of General Counsel. In the 1970s, however, partly as a result of the Vietnam War and the executive-branch abuses of power exposed and documented by the Church and Pike Committees, many more former agency employees began writing, often critically, about the agency and its activities. In 1976, in the wake of a Fourth Circuit ruling that allowed the CIA to enforce a prepublication review agreement against a former employee named Victor Marchetti, CIA Director George H.W. Bush established the Publications Review Board to review the non-official publications of current employees. The next year, when Stansfield Turner succeeded Bush as CIA Director, Turner expanded the Board's authority to reach publications by former employees.

19.     The 1980s were a critical period in the evolution of prepublication review. In 1980, a divided Supreme Court decided *Snepp v. United States*, 444 U.S. 507 (1980), affirming the imposition of a constructive trust on proceeds earned by a former CIA officer who had

published a book without submitting it for review. The ruling—unsigned and issued without the

benefit of oral argument or even briefing on the merits—was widely criticized by prominent

voices across the political spectrum.

20.     Emboldened by *Snepp*, in 1983 President Reagan issued National Security

Decision Directive 84 ("Directive 84"), which mandated that intelligence agencies require all

persons authorized to access Sensitive Compartmented Information ("SCI") to sign a

nondisclosure agreement as a condition of access. The directive provided that "[a]ll such

agreements must include a provision for prepublication review to assure deletion of SCI and

other classified information." In a 1983 report, the General Accounting Office estimated that the

provision would affect approximately 128,000 people—in addition to an undisclosed number of

CIA and NSA employees.

21.     Directive 84 provoked an intense and bipartisan backlash in Congress. In October

1983, Senator Charles Mathias, Republican of Maryland, proposed a rider on a State Department

appropriations measure to delay the implementation of the directive's prepublication review

provision. Mathias told the Senate: "We must insure that the free speech rights of our most

experienced public servants are not restricted unnecessarily. . . . [C]ongressional consideration

must precede the implementation of the censorship plan." The House and Senate agreed, voting

to approve the rider in November. Two months later, Representative Jack Brooks, Democrat of

Texas, introduced legislation to prohibit most agencies from imposing prepublication review

requirements. The bill was referred to the House Committee on Post Office and Civil Service,

and subcommittee hearings were held in February. However, on March 20, 1984, one day before

the bill's formal consideration by the full committee, President Reagan suspended Directive 84's

prepublication review mandate. As a result, Brooks's bill was removed from the full committee's

schedule. As a 1988 report of the House Committee on Government Operations, chaired by

Brooks, noted: "It appeared as if there would be no need for legislation prohibiting

prepublication review contracts because the Administration had decided not to implement that

policy."

22.     President Reagan's suspension of the prepublication review mandate did not,

however, suspend agencies' existing prepublication review requirements or prohibit the agencies

from imposing new ones. The agencies continued to require employees to sign Form 4193, a

standard-form contract that the Reagan administration had introduced in 1981 without informing

Congress, and that imposed essentially the same prepublication review obligations that Directive

84 would have imposed. A General Accounting Office survey found that, at the end of 1985, at

least 240,776 individuals had signed SCI nondisclosure agreements with prepublication review

requirements, and an updated survey from 1988 found that about 450,000 current and former

employees had signed such agreements. Neither survey included employees (current or former)

of the CIA or the NSA.

23.     Over the past five decades, the prepublication review system has expanded on

every axis.

24.     First, more agencies impose prepublication review requirements on their former

employees. When the Supreme Court decided *Snepp*, the only U.S. intelligence agencies that

imposed prepublication review obligations on former employees were the CIA and the NSA.

Today, every U.S. intelligence agency imposes a lifetime prepublication review requirement on

at least some subset of former employees.

25.     Second, these agencies impose prepublication review obligations on more

categories of people. Most agencies once imposed lifetime prepublication review obligations

only on individuals with access to SCI, and the number of employees with SCI was "a very small fraction of Government employees who [had] access to classified information generally," as Deputy Assistant Attorney General Richard K. Willard testified in 1983. Now, however, many agencies impose such obligations even on employees who have never had access to SCI or to classified information of any kind. Whereas the DOD, for example, once imposed lifetime prepublication review obligations only on employees with access to SCI—111,167 people in 1983—it now imposes these obligations on all 2.9 million of its employees, including civilian employees, active duty military personnel, and reservists.

26.     Third, the amount of information that is classified has expanded dramatically. In 1980, the year *Snepp* was decided, original and derivative classification authorities made 16 million classification decisions. In 2017, they made 49.5 million. The increase in the number of classified secrets has meant a corresponding expansion in the reach of prepublication review regimes—an expansion that is of especial concern because, as is widely acknowledged, a substantial fraction of classified secrets is classified improperly or unnecessarily.

27.     Fourth, agency prepublication review regimes have become increasingly complex. The CIA prepublication review obligations that the Supreme Court considered in *Snepp* were purely contractual. Today, the intelligence agencies impose prepublication review requirements through a confusing tangle of contracts, regulations, and policies. Moreover, the basic features of prepublication review—including submission and review standards, review timelines, and appeals processes—vary widely across agencies, which further complicates the process for former employees who must submit to more than one agency, and also for those who submit to only one agency but are told, as they very often are, that their manuscript has been referred to other agencies for additional review. Against this background, former employees frequently have

9

difficulty determining what their submission obligations are, and what standards will be applied to their manuscripts.

28.     Fifth, the amount of material being submitted for prepublication review has steadily increased. For example, in 1977, the CIA received 43 submissions for prepublication review. In 2015, by contrast, the agency received more than 8,400 submissions for prepublication review, including about 3,400 manuscripts, according to a draft report of the CIA Inspector General obtained by the American Civil Liberties Union ("ACLU") and the Knight First Amendment Institute at Columbia University ("Knight Institute") under the Freedom of Information Act ("FOIA"). Another document released under FOIA indicates that the number of pages reviewed by the CIA each year increased from about 1,000 in the mid-1970s to 150,000 in



2014. Other agencies have seen similarly dramatic increases.

*Figure 1: Graph from CIA Inspector General report produced to the ACLU and the Knight Institute in FOIA litigation*

29.     <u>Finally</u>, in part because so much more material is submitted to them, agencies now take much more time to complete their reviews. In a 1983 congressional hearing, then– Chairman of the CIA's Publications Review Board Charles Wilson testified that the CIA's 30-day time limit for completion of reviews was "met in virtually all cases but a very few," and that the average review took just 13 days. Review takes much longer today, perhaps because staffing has not kept pace with the sharp increase in submissions. According to the draft CIA IG report cited above, "[w]ith today's volumes, complexity, and drive for immediacy, [the Publications Review Board] is struggling with achieving timeliness, and to some extent thoroughness/quality." The report states: "[B]ook-length manuscripts received today are currently projected to take over a year because of the complexity and large book backlog."

30.     In part because of the expansion described above, and in part because of factors described more fully below, the prepublication review system has become dysfunctional. Recognizing this, in 2017 the House and Senate Intelligence Committees instructed the DNI to prepare, within 180 days of enactment of the Intelligence Authorization Act for that year, a new prepublication review policy that would apply to all intelligence agencies and that would "yield timely, reasoned, and impartial decisions that are subject to appeal." The new policy, the committees said, should require each intelligence agency to develop and maintain a prepublication review policy that identifies the individuals whose work is subject to prepublication review, provides guidance on the types of information that must be submitted for review, provides for a "prompt and transparent" appeals process, includes guidelines for the assertion of "interagency equities," and summarizes the measures the agency may take to enforce its policy. Twenty-three months have passed, however, and the DNI has not published or formulated such a policy.

**Defendants' Prepublication Review Regimes**

31.      Defendants' prepublication review regimes differ in their particulars, but each of them restrains far more speech than can be justified by any legitimate government interest.

<u>CIA</u>

32.      The CIA imposes overlapping submission requirements that, taken together, are vague, confusing, and overbroad.

a.   Through Standard Form 312, "Classified Information Nondisclosure Agreement," the CIA requires all agency employees with access to classified information who are "uncertain about the classification status of information" to "confirm from an authorized official that the information is unclassified before [they] may disclose it." *See* Standard Form 312 § 3.

b.   Through Form 4414, "Sensitive Compartmented Information Nondisclosure Agreement," the CIA requires all agency employees with access to SCI to submit for prepublication review "any writing or other preparation in any form, including a work of fiction, that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that [the author has] reason to believe are derived from SCI." *See* Form 4414 § 4.

c.   Through the standard CIA secrecy agreement—a document that has not been released publicly but that is summarized on the CIA's website—the agency requires all CIA officers, as a condition of employment, to submit for prepublication review "any and all materials they intend to share with the public that are intelligence related."

d.   Finally, through Agency Regulation ("AR") 13-10, "Agency Prepublication Review of Certain Material Prepared for Public Dissemination," the CIA requires

12

all "former Agency employees and contractors, and others who are obligated by

CIA secrecy agreement," to submit for prepublication review any material "that

mentions CIA or intelligence data or activities or material on any subject about

which the author has had access to classified information in the course of his

employment or other contact with the Agency." *See* AR 13-10 § 2(b)(1), (e)(1).

e.   A document provided by the CIA to the ACLU and the Knight Institute in FOIA

litigation states that the agency "will not provide a copy of a secrecy agreement or

nondisclosure agreement to an author who requests one they signed," even though

such agreements "are typically not classified."

33.   The CIA's prepublication review regime fails to meaningfully cabin the discretion

of the agency's censor, the Publications Review Board. Collectively, Standard Form 312, Form

4414, the CIA secrecy agreement, and AR 13-10 give the Board discretion to censor information

that it claims is classified without regard to, for example, whether disclosure of the information

would actually cause harm to the nation's security, whether the former employee acquired the

information in question in the course of employment, whether the information is already in the

public domain, and whether any legitimate interest in secrecy is outweighed by the public

interest in disclosure. In addition, when the Board refers manuscripts to other agencies for

review, other agencies censor manuscripts submitted by former CIA employees on the basis of

review standards that are not disclosed. *See* SF-312 § 3; Form 4414 §§ 4–5; AR 13-10 § 2(c)(1),

(f)(2).

34.   The breadth and vagueness of the CIA's review standards invite capricious and

discriminatory enforcement, and in practice the Board's censorship decisions are often arbitrary

or influenced by the author's viewpoint. For example, former intelligence-community employees

who wrote books criticizing the CIA's torture of prisoners apprehended in the "war on terror" have complained publicly that their books were heavily redacted even as former CIA officials' supportive accounts of the same policies were published without significant excisions of similar information. In 2012, the CIA opened an internal investigation into whether the agency's prepublication review regime was being misused to suppress speech critical of the agency. According to the *Washington Post*, the investigation was sparked by "growing concern in the intelligence community that the review process is biased toward agency loyalists, particularly those from the executive ranks." The CIA has not released or publicly described the investigation's findings.

35.     The CIA's prepublication review regime does not require the Publications Review Board to provide authors with reasons for its decisions, even in unclassified form, and on information and belief the Board generally does not do so.

36.     The CIA's prepublication review regime fails to assure prompt agency review. To the extent that the regime provides deadlines for review or the adjudication of appeals, these deadlines are merely aspirational. As noted above, the CIA itself estimates that review of book-length manuscripts will take a year—a duration of time that dissuades would-be authors from setting pen to paper and dissuades would-be publishers from signing book contracts with former agency employees. In some cases, review has taken considerably longer than one year. For example, a manuscript by former CIA analyst Nada Bakos was reportedly under review for almost twice that time.

37.     The CIA's prepublication review regime also fails to require the government to initiate judicial review of censors' decisions and fails to guarantee that review is prompt.

<u>DOD</u>

38.     The DOD imposes overlapping submission requirements that, taken together, are vague, confusing, and overbroad.

a. As a prerequisite to accessing classified information, the DOD requires employees to sign Standard Form 312, which is described above.

b. As a prerequisite to accessing SCI, the DOD requires employees to sign Form 4414, which is described above, DD Form 1847-1, "Sensitive Compartmented Information Nondisclosure Statement," or both. Like Form 4414, DD Form 1847-1 requires all agency employees with access to SCI to submit for prepublication review "any writing or other preparation in any form, including a work of fiction, that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that [the author has] reason to believe are derived from SCI." *See* DD Form 1847-1 § 4.

c. The DOD has also adopted Directive 5230.09, "Clearance of DoD Information for Public Release," and Instruction 5230.29, "Security and Policy Review of DoD Information for Public Release," which together require all former agency employees and all former active or reserve military service members to submit for prepublication review "any official DoD information intended for public release that pertains to military matters, national security issues, or subjects of significant concern to [the agency]." The directive defines "official DoD information" to encompass "[a]ll information that is in the custody and control of the Department of Defense, relates to information in the custody and control of the Department, or was acquired by DoD employees as part of their official duties or because of their official status within the Department." Such information must be submitted for

review if, for example, it "[i]s or has the potential to become an item of national

or international interest"; "[a]ffects national security policy, foreign relations, or

ongoing negotiations"; or "[c]oncerns a subject of potential controversy among

the DoD Components or with other federal agencies." *See* Directive 5230.09

§ 4(b); *id.* Glossary, pt. II; Instruction 5230.29 § 3; *id.* Enclosure 3 § 1. As a

"Frequently Asked Questions" document issued by the DOD emphasizes, "[a]ll

current, former, and retired DoD employees and military service members

(whether active or reserve) who have had access to DoD information or facilities,

must submit DoD information intended for public release . . . for review and

clearance."

39.     The DOD's prepublication review regime fails to meaningfully cabin the

discretion of the agency's review board, the Defense Office of Prepublication and Security

Review. Collectively, Standard Form 312, Form 4414, DD Form 1847-1, and the DOD's

directive and instruction give the DOD's review board discretion to censor information without

regard to, for example, whether the information is classified, whether disclosure of the

information would actually cause harm to the nation's security, whether the former employee

acquired the information in question in the course of employment, whether the information is

already in the public domain, and whether any legitimate interest in secrecy is outweighed by the

public interest in disclosure. For example, the DOD's directive and instruction seem to

contemplate that submissions from former employees may be subject to both "security review"

(intended to "protect[] classified information, controlled unclassified information, or unclassified

information that may individually or in aggregate lead to the compromise of classified

information or disclosure of operations security") and "policy review" (which seeks to "ensure[]

that no conflict exists with established policies or programs of the DoD or the U.S.

Government"). In addition, when the DOD's review board refers manuscripts to other agencies

for review, other agencies censor manuscripts submitted by former DOD employees on the basis

of standards that are not disclosed. *See* SF-312 § 3; Form 4414 §§ 4–5; DD Form 1847-1 §§ 4–5;

Instruction 5230.29 § 3; *id.* Enclosure 3 § 1.

40.     The breadth and vagueness of the DOD's review standards mean that the DOD

review board's decisions are frequently arbitrary and that the DOD and DOD components often

disagree as to what must be censored. For example, when former reserve Army officer Anthony

Shaffer submitted his memoir for review, the Army reviewed the manuscript and cleared it with

modest changes. Several months later, however, the Defense Intelligence Agency saw a copy,

showed it to the NSA and other agencies, and decided that some 250 passages had to be

redacted. Redactions included information that was readily available on Wikipedia as well as

other publicly available information, such as the name and abbreviation of the Iranian

Revolutionary Guard Corps and the fact that "sig int" means "signals intelligence."

41.     The DOD's prepublication review regime does not require the DOD's review

board to provide authors with reasons for its decisions, even in unclassified form, and on

information and belief the review board generally does not do so.

42.     The DOD's prepublication review regime fails to assure prompt agency review.

To the extent that the regime provides deadlines for review or the adjudication of appeals, these

deadlines are merely aspirational. As documents produced to the ACLU and the Knight Institute

in FOIA litigation show, the DOD's prepublication review process frequently takes many weeks

or even months. *See* Instruction 5230.29, Enclosure 3 §§ 3(a), 4(b). For example, in 2014 former

ODNI and Defense Intelligence Agency officer Michael Richter lodged an administrative appeal

with the DOD that took over seven months to adjudicate. This, despite the fact that the appeal "require[d] analysis of one sentence, in one paragraph, citing one document"—and the author's insistence that he had "only learned of [the excised] information by virtue of having access to the New York Times website."

43.     The DOD's prepublication review regime also fails to require the government to initiate judicial review of censors' decisions and fails to guarantee that review is prompt.

<u>NSA</u>

44.     The NSA imposes overlapping submission requirements that, taken together, are vague, confusing, and overbroad.

a.   As a prerequisite to accessing classified information, the NSA requires employees to sign Standard Form 312, which is described above.

b.   As a prerequisite to accessing SCI, the NSA requires employees to sign Form 4414, which is described above.

c.   The NSA has also adopted NSA/CSS Policy 1-30, "Review of NSA/CSS Information Intended for Public Release," which requires all former NSA employees to submit for prepublication review any material, other than a resume or other job-related document, "where [it] contains official NSA/CSS information that may or may not be UNCLASSIFIED and approved for public release." "Official NSA/CSS information" is defined to include "[a]ny NSA/CSS, DoD, or IC information that is in the custody and control of NSA/CSS and was obtained for or generated on NSA/CSS' behalf during the course of employment or other service, whether contractual or not, with NSA/CSS." While the policy does not define "approved for public release," it seems to contemplate that information

may be unclassified but not approved for release. *See* NSA/CSS Policy 1-30 §§ 2, 6(b), 29.

45.     The NSA's prepublication review regime fails to meaningfully cabin the discretion of the agency's censors, known as Prepublication Review Authorities. Indeed, the NSA's policy does not directly address what information may be censored. Collectively, Standard Form 312, Form 4414, and the NSA's policy give reviewing officials discretion to censor information without regard to, for example, whether the information is classified, whether disclosure of the information would actually cause harm to the nation's security, whether the former employee acquired the information in question in the course of employment, whether the information is already in the public domain, and whether any legitimate interest in secrecy is outweighed by the public interest in disclosure. In addition, when the NSA refers manuscripts to other agencies for review, other agencies censor manuscripts submitted by former NSA employees on the basis of standards that are not disclosed. *See* SF-312 § 3; Form 4414 §§ 4–5; NSA/CSS Policy 1-30 § 12(e).

46.     In part because of the breadth and the vagueness of the NSA's review standards, the censorship decisions of reviewing officials are often arbitrary. For example, in 2017 former NSA employee and contractor Thomas Reed Willemain published a memoir "motivated, in part by a hope that [he] could counter the intensely negative views of the NSA in the media and popular fiction." According to a blogpost that Willemain wrote for a national-security website, NSA censors made redactions that "sometimes border[ed] on the ridiculous," excising facts that were publicly available, including facts that were "obvious and apparent." In one instance, they redacted a fact that the agency had previously declassified in a court filing.

47.     The NSA's prepublication review regime does not require reviewing officials to provide authors with reasons for their decisions at first instance, even in unclassified form, and on information and belief reviewing officials generally do not do so.

48.     The NSA's prepublication review regime provides no assurance of prompt agency review. Although the regime provides a firm deadline for adjudication of appeals, it does not include one for initial determinations. As documents produced to the ACLU and the Knight Institute in FOIA litigation show, review frequently takes many weeks or even months.

49.     The NSA's prepublication review regime also fails to require the government to initiate judicial review of censors' decisions and fails to guarantee that review is prompt.

<u>ODNI</u>

50.     The ODNI imposes overlapping submission requirements that, taken together, are vague, confusing, and overbroad.

    a.  As a prerequisite to accessing classified information, the ODNI requires employees to sign Standard Form 312, which is described above.

    b.  As a prerequisite to accessing SCI, the ODNI requires employees to sign Form 4414, which is described above.

    c.  As a prerequisite to accessing information or material "that is classified, or is in the process of a classification determination," the ODNI requires employees to sign Form 313, "Nondisclosure Agreement for Classified Information," which directs them to submit for prepublication review "any writing or other preparation in any form" which "contains any mention of intelligence data or activities, or which contains any other information or material that might be based upon [information or material that is classified, or is in the process of a classification

determination, and that was obtained pursuant to the agreement].” *See* Form 313 §§ 3, 5.

    d.   The ODNI has also adopted Instruction 80.04, “ODNI Pre-publication Review of Information to be Publicly Released,” which requires all former agency employees, regardless of their level of access to sensitive information, to submit “all official and non-official information intended for publication that discusses the ODNI, the IC [Intelligence Community], or national security.” *See* ODNI Instruction 80.04 § 6.

51.    The ODNI’s prepublication review regime fails to meaningfully cabin the discretion of the agency’s censor, the Director of the Information Management Division. Collectively, Standard Form 312, Form 4414, Form 313, and the ODNI’s instruction give the Director discretion to censor information without regard to, for example, whether the information is classified, whether disclosure of the information would actually cause harm to the nation’s security, whether the former employee acquired the information in question in the course of employment, whether the information is already in the public domain, and whether any legitimate interest in secrecy is outweighed by the public interest in disclosure. Indeed, the ODNI’s instruction imposes no limitations whatsoever on the Director’s power to censor. It states only that “the goal of pre-publication review is to prevent the unauthorized disclosure of information, and to ensure the ODNI’s mission and the foreign relations or security of the U.S. are not adversely affected by publication.” In addition, when the Director refers manuscripts to other agencies for review, other agencies censor manuscripts submitted by former ODNI employees on the basis of standards that are not disclosed. *See* SF-312 § 3; Form 4414 §§ 4–5; ODNI Instruction 80.04 § 3.

21

52.     The breadth and vagueness of the ODNI's review standards invite capricious and discriminatory enforcement.

53.     The ODNI's prepublication review regime does not require the Director of the Information Management Division to provide reasons for his or her decisions, and on information and belief the Director generally does not do so.

54.     The ODNI's prepublication review regime provides no assurance of prompt agency review. To the extent that the regime provides deadlines for review or the adjudication of appeals, these deadlines are merely aspirational. As documents produced to the ACLU and the Knight Institute in FOIA litigation show, review frequently takes many weeks or even months.

55.     The ODNI's prepublication review regime also fails to require the government to initiate judicial review of censors' decisions and fails to guarantee that review is prompt.

**Plaintiffs**

<u>Timothy H. Edgar</u>

56.     Timothy H. Edgar, a resident of Rhode Island, is an expert on cybersecurity and a former employee of the ODNI. He is currently a Senior Fellow at the Watson Institute for International and Public Affairs and Academic Director of the Executive Master's Program in Cybersecurity at Brown University.

57.     Earlier in his career, Mr. Edgar was a visiting fellow at the Watson Institute (from 2013 to 2015), a fellow and adjunct lecturer at Boston University (from 2014 to 2015), and an adjunct professor at Georgetown University Law Center (from 2012 to 2013). Prior to his government service, he was National Security Policy Counsel at the American Civil Liberties Union (from 2001 to 2006). He received a B.A. in History from Dartmouth College and a J.D. from Harvard Law School.

58.     Mr. Edgar was an employee of the ODNI from 2006 to 2013. From June 2006 to August 2009, he served in the newly created position of Deputy for Civil Liberties, supporting the Director of National Intelligence by reviewing new surveillance authorities, government watchlists, and sensitive programs. From August 2009 to November 2010, he was detailed to the White House National Security Staff as Director of Privacy and Civil Liberties, focusing on cybersecurity, open government, and data privacy initiatives. From November 2010 to December 2012, he was a Senior Associate General Counsel at the ODNI. He formally resigned from the agency in June 2013.

59.     Mr. Edgar obtained a Top Secret/Sensitive Compartmented Information ("TS/SCI") security clearance in 2006. He signed a nondisclosure agreement with the ODNI in order to obtain this security clearance. He held his TS/SCI clearance continuously until June 2013.

60.     As an employee of the ODNI, Mr. Edgar submitted for review official material prepared for public appearances that he made on behalf of the government. He also submitted syllabi for courses that he taught in his personal capacity at Brown University in 2013 and Georgetown University Law Center in 2012.

61.     Since leaving the ODNI, Mr. Edgar has submitted to the ODNI blog posts and op-eds that have appeared in major publications, including the *Guardian*, the *Los Angeles Times*, the *Wall Street Journal*, and the *Lawfare* national-security blog, where he is a contributing editor.

62.     On October 10, 2016, Mr. Edgar submitted via e-mail to the ODNI's prepublication review office a manuscript for the book *Beyond Snowden: Privacy, Mass Surveillance, and the Struggle to Reform the NSA*. Although some portions of the manuscript

were based on his personal experiences, Mr. Edgar relied on and cited in the manuscript declassified documents for pertinent details.

63.    After Mr. Edgar submitted the manuscript, the ODNI informed him that it had referred the manuscript to both the CIA and the NSA for additional review. Despite multiple inquiries, he was unable to communicate directly with reviewing officials at the CIA and the NSA.

64.    On January 12, 2017, the ODNI informed Mr. Edgar that he could publish the manuscript only if he redacted or excised certain material. Some of the redactions related to events that had taken place, or issues that had arisen, after Mr. Edgar had left government. Others related to facts that were widely discussed and acknowledged though perhaps not officially confirmed. Although he disagreed with some of the mandated redactions, Mr. Edgar decided against challenging them because, partly as a result of the three-month review, he had already pushed back his publication date from the spring to the fall, and he worried that pushing the publication date back further would make some of the analysis and insights in his book outdated or less relevant to ongoing public debates. In addition, because he believed that maintaining a good relationship with reviewers at the ODNI was important to getting future manuscripts cleared in a timely fashion, he believed it would be counterproductive to challenge requested edits or redactions because doing so could harm that relationship.

65.    Mr. Edgar plans to continue writing about matters relating to intelligence and cybersecurity, and he anticipates submitting at least some of this writing to the ODNI for prepublication review. Given the subjects he writes about, Mr. Edgar expects that any manuscripts he submits to the ODNI for review may also be referred to the NSA, the CIA, or other agencies, as happened with his now-published book.

66.     Mr. Edgar believes that the ODNI's current prepublication review regime requires him to submit far more than he should be required to submit. He finds the ODNI's submission requirements to be vague and confusing, and as a result he is uncertain as to the exact scope of his submission obligations. He also fears that the delay associated with prepublication review, including interagency referrals, will hinder his career as an academic and impede his ability to participate effectively in public debate on matters involving his areas of expertise. The delay and uncertainty associated with prepublication review has dissuaded him from writing some pieces that he would otherwise have written, and has caused him to write others differently than he would otherwise have written them. Based on his knowledge of other former employees' experiences with prepublication review, and his understanding of the broad discretion that the prepublication review system invests in government censors, he believes that the ODNI, the CIA, and the NSA might have taken longer to review his book if they had perceived the book to be unsympathetic to the intelligence community. He is concerned that government censors will be less responsive to him if he writes books that are perceived to be critical.

### Richard H. Immerman

67.     Richard H. Immerman, a resident of Pennsylvania, is a historian with expertise in U.S. foreign relations and a former employee of the ODNI. He was a professor of history at Temple University for over two decades before he retired in 2017. He is now Professor of History, Emeritus; Edward J. Buthusiem Family Distinguished Faculty Fellow in History, Emeritus; and Marvin Wachman Director Emeritus of the Center for the Study of Force and Diplomacy.

68.     Earlier in his career, Professor Immerman was the Francis W. DeSerio Chair of Strategic Intelligence, Department of National Security and Strategy, at the U.S. Army War College. He was also the 40th President of the Society for Historians of American Foreign

Relations. He has published twelve books on U.S. foreign policy, intelligence, and national security, as well as dozens of book chapters and academic articles. He received a B.A. in Government from Cornell University, an M.A. in U.S. History from Boston College, and a Ph.D. in U.S. Diplomatic History from Boston College.

69.     Professor Immerman joined the ODNI on a temporary sabbatical from his faculty position at Temple University. From 2007 to 2009, he served as the Assistant Deputy Director of National Intelligence, Analytic Integrity and Standards, in which capacity he was responsible for establishing mechanisms to improve analytic integrity and standards across the intelligence community. During the same period, he served as the Analytic Ombudsman for the ODNI, working with analysts on a confidential basis to raise concerns about the production of finished intelligence products. His chief priorities were to address allegations of politicization and/or the suppression of dissent.

70.     Shortly after returning to Temple University in 2009, Professor Immerman accepted an invitation to serve on the Department of State's Advisory Committee on Historical Diplomatic Documentation (often referred to as the Historical Advisory Committee, or "HAC"). In 2010, he became chairman of the HAC, a position he continues to hold. The HAC's primary responsibility is overseeing publication of the *Foreign Relations of the United States* book series.

71.     Professor Immerman obtained a TS/SCI security clearance through the ODNI in 2007. He signed a nondisclosure agreement with the ODNI in order to obtain this security clearance. In 2011 or 2012, Professor Immerman signed a separate nondisclosure agreement with the CIA because of his ongoing responsibilities with the HAC.

72.     Since leaving the ODNI, Professor Immerman has submitted to the ODNI book manuscripts, articles, papers, public talks, and academic syllabi.

73.     On January 25, 2013, Professor Immerman submitted via e-mail to the ODNI's prepublication review office a manuscript for the book *The Hidden Hand: A Brief History of the CIA*. The manuscript did not refer, directly or indirectly, to any classified information that Professor Immerman obtained in the course of his employment with the ODNI or the Department of State, and Professor Immerman cited public sources for all factual propositions.

74.     The ODNI acknowledged receipt three days after Professor Immerman submitted the manuscript, but it took almost three months before Professor Immerman was informed that the agency had referred part of his manuscript to the CIA for additional review. Several weeks later, the ODNI informed him that the CIA was reviewing the entire manuscript. He contacted the CIA, but personnel at that agency were unable to provide him with information about the status of the agency's review or the contact information of any reviewing officials.

75.     On July 12, 2013, nearly six months after Professor Immerman's initial submission, the ODNI informed Professor Immerman that he could publish his manuscript only with extensive redactions mandated by the CIA. All of the mandated redactions related to information for which Professor Immerman had cited public sources. Some redactions related to information that had been published previously by government agencies themselves, including the CIA. Many of them related to events that had taken place, or issues that had arisen, after Professor Immerman had left government. In some instances, the ODNI directed Professor Immerman to excise citations to newspaper articles that he had come across in the course of his research. In other instances, the ODNI directed Professor Immerman to delete entire passages relating to information that he had obtained from public sources. For example, the ODNI directed him to excise numerous portions of the manuscript relating to the CIA's use of drones.

The agency also instructed him to redact words communicating judgments and arguments that he considered fundamental to his conclusions as a trained historian.

76.     The ODNI did not provide Professor Immerman with any explanation for the CIA's mandated redactions.

77.     Professor Immerman appealed the agency's prepublication review determination to the ODNI's Information Management Division. Several weeks later, that office informed him that he could publish a significant portion of the text that the prepublication review office had previously instructed him to redact.

78.     In September 2013, Professor Immerman arranged to meet with two reviewing officials from the CIA in person. At this meeting, the officials agreed with Professor Immerman that some of the redactions were unnecessary, and they authorized him to publish additional text with revised wording, but they reaffirmed their view that other redactions were necessary. Although Professor Immerman disagreed, he decided to publish *The Hidden Hand* with these remaining redactions to avoid further delay, and his book was in fact published in 2014. In the end, after his persistent challenges and communications with reviewing officials at the ODNI and the CIA, Professor Immerman received approval to publish roughly eighty percent of the material that the agencies had originally redacted. The process of prepublication review took ten months and would have taken longer if Professor Immerman had not ultimately decided to publish the manuscript rather than to continue to challenge redactions that he believed to be unjustified.

79.     Professor Immerman plans to continue publishing academic articles, books, and op-eds, at least some of which will trigger prepublication review obligations under the ODNI's current prepublication review regime. For example, Professor Immerman is in the process of

drafting an academic article about the influence of intelligence on the policy-making process. He is also conducting research on the contribution of intelligence to negotiations on strategic arms limitation from the Nixon through Reagan administrations, and intends to write a book on the subject. He anticipates submitting these manuscripts for prepublication review.

80.     But for the dysfunction of the prepublication review system, however, Professor Immerman would publish more. Professor Immerman believes that the ODNI's prepublication review regime requires him to submit for review far more than he should be required to submit; that the ODNI's and the CIA's arbitrary and unjustified redactions will diminish the value of any work that he does submit; and that the time required for prepublication review will make it more difficult for him to contribute in a timely way to public debates. He has considered writing academic articles using the research he has already conducted for his book, and he has considered writing op-eds about the intelligence community and the current administration. Concerns about the burdens and uncertainties associated with prepublication review, however, have dissuaded him from writing these pieces.

Melvin A. Goodman

81.     Melvin A. Goodman, a resident of Maryland, is an expert on the former Soviet Union and its foreign policy in developing countries that were not aligned with either the Western Bloc or the Eastern Bloc during the Cold War. He spent forty-two years in government service, including as a division chief in the CIA and a professor of international security at the National War College. Now semi-retired, he teaches courses in international relations at Johns Hopkins University, and writes books and opinion columns about international security. Mr. Goodman holds a B.A. in history from Johns Hopkins University, an M.A. in history and a

Ph.D. in diplomatic history from Indiana University, and an M.A. in military science from the National War College.

82.     Mr. Goodman began his government career in 1955 as a cryptographer for the U.S. Army, coding and deciphering sensitive messages. From 1966 to 1990, he served in the CIA as an analyst, senior analyst, branch chief, and division chief in the Directorate of Intelligence on Soviet Foreign Policy. During that service, from 1974 to 1976, he spent two years on detail at the Department of State. The primary focus of his work was on Soviet foreign policy in non-aligned countries, including in the Middle East, Asia, and Africa. From 1986 to 2004, Mr. Goodman was a professor at the National War College, where he served as Director of the National Security Program.

83.     Mr. Goodman held a TS/SCI security clearance throughout his entire government career. His clearance level never changed during his government service. His clearance expired in 2006, two years after he retired from the National War College.

84.     When Mr. Goodman joined the CIA in 1966 and first gained his security clearance, he signed a secrecy agreement that contained a provision relating to prepublication review. The provision required "specific prior approval by the Agency" of any "publication of any information or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of [his] employment by the Agency."

85.     Since leaving the CIA, Mr. Goodman has submitted multiple works to the CIA for prepublication review.

86.     At times, Mr. Goodman has not submitted for review shorter pieces of writing, such as op-ed articles, that were time-sensitive and that he was confident did not contain classified information or other information that he had obtained during his employment with the

CIA. On at least six occasions after publishing an op-ed, Mr. Goodman received letters from the CIA reminding him of his prepublication review obligations. One such letter, sent in 2009, threatened to refer the matter to the Department of Justice, stating: "The Agency is consulting with the Department of Justice to evaluate the legal remedies it has to ensure that you comply with your secrecy agreement."

87.     Mr. Goodman has published nine books and has submitted each manuscript to the CIA for prepublication review. The agency has referred one of these manuscripts to other agencies, including the DOD and the Department of State, for additional review. He repeatedly asked the CIA for the contact information of the reviewers at these other agencies, but the CIA declined to provide them to him. These departments were even slower than the CIA in reviewing the manuscript.

88.     Generally, the CIA has sent Mr. Goodman's manuscripts back to him in the mail with redactions, edits, and suggestions for alternative language. Frequently, Mr. Goodman believed the CIA's redactions were overbroad and unjustified. He has often sent the agency "reclamas"—that is, requests asking agency staff to reconsider their proposed redactions and edits—explaining the reasons why publication should be allowed. Typically, the agency has failed to respond to these reclamas.

89.     For most of Mr. Goodman's books, the prepublication review process typically took less than two months. In 2017, however, the CIA took eleven months to review a manuscript of his latest book, *Whistleblower at the CIA*. In the manuscript, Mr. Goodman provided an account of his experience as a senior CIA analyst. The lengthy review process caused significant difficulties with Mr. Goodman's publisher, which at one point threatened to cancel his book contract in part because of the delays.

90.     Mr. Goodman believes that all of the changes to *Whistleblower at the CIA* that the agency demanded were intended to spare the agency embarrassment, not to protect classified information. In various passages of the draft manuscript, Mr. Goodman discussed widely reported aspects of U.S. government policy, including the government's recent use of armed drones overseas. Mr. Goodman's commentary was not based on personal knowledge of these activities—which Mr. Goodman did and does not have, as he has lacked access to CIA information since 1986—but was based on press accounts, which he cited in his manuscript. The agency demanded that he not discuss these matters in his manuscript at all. The agency did not provide any written explanation for its demands.

91.     Because the excisions and changes to the manuscript demanded by the CIA were so substantial, Mr. Goodman decided not to file a reclama but rather to meet in person with the CIA's censor. His efforts to persuade the agency to reconsider its demands, however, were unsuccessful. Mr. Goodman reluctantly removed all of the passages that the censor had flagged.

92.     In a recently submitted manuscript, Mr. Goodman self-censored and avoided discussing certain public-source information about current CIA Director Gina Haspel. Mr. Goodman would have liked to discuss information about Ms. Haspel that he learned as a member of the public, not as a former agency employee. However, he chose not to include any such content in the manuscript in order to avoid conflict with and delays from the agency's prepublication review office.

93.     Consistent with his practice in the past, Mr. Goodman intends to submit those portions of any future manuscripts that deal with intelligence matters. He remains concerned that CIA censors will demand that he redact material unwarrantedly, as it did with his last book, and

that the delay associated with prepublication review will jeopardize his book contracts and render his publications less relevant to quickly evolving public debates.

Anuradha Bhagwati

94.     Anuradha Bhagwati, a resident of New York, is a writer, activist, and former Marine Corps officer. She is the founder of SWAN, the Service Women's Action Network, a member-driven community advocacy network for service women. She is also the founder of and an instructor at Yoga for Vets NYC, the longest-running yoga and meditation program for military servicemembers and veterans in New York City. She recently published *Unbecoming: A Memoir of Disobedience*, a memoir that centers on her confrontation of misogyny, racism, and sexual violence during her military service, as well as her advocacy on related issues after leaving the Marines. Ms. Bhagwati received a B.A. in English from Yale University and an M.P.P. from the Harvard University Kennedy School of Government. She is currently pursuing an M.F.A. in creative writing from Hunter College in New York City.

95.     After beginning graduate school, Ms. Bhagwati left academia and joined the Marine Corps in October 1999. Shortly after joining the Marines, she attended officer training at Officer Candidates School in Quantico, Virginia. In 2001, she became a communications officer, and from 2001 to 2002 Ms. Bhagwati served as a platoon commander of a radio platoon in Okinawa, Japan. Between 2002 and 2004, she became an executive officer and company commander of a training company at Marine Combat Training Battalion, School of Infantry (East), at Camp LeJeune, North Carolina. After leaving the Marines in 2004, Ms. Bhagwati served in the Individual Ready Reserve for three years.

96.     Ms. Bhagwati obtained a Secret security clearance after graduating from the Communications Information Systems Officer Course and getting assigned to her first unit as a platoon commander. As a former DOD employee, Ms. Bhagwati is subject to the prepublication

review requirement imposed by Directive 5230.09 and Instruction 5230.29. Until recently, Ms. Bhagwati was not aware of that prepublication review obligation. She learned of that obligation on the eve of the publication of her recent memoir through conversations with undersigned counsel.

97.     Ms. Bhagwati is a frequent and vocal public advocate for the rights of servicemembers and veterans. She has advocated on military issues on Capitol Hill, testifying before Congress alongside high-ranking military officers, and she has worked with DOD employees in relevant policy offices on issues of sexual assault and discrimination in the military. She has published more than a dozen op-eds and opinion pieces about her experiences in the military and her military advocacy work, in publications like the *New York Times*, the *Washington Post*, *Politico*, and *Foreign Affairs*. She has appeared on national television multiple times discussing issues related to her advocacy.

98.     In March 2019, Ms. Bhagwati published *Unbecoming: A Memoir of Disobedience*, a chronicle of her time in the Marines that includes policy recommendations and advocacy based on her own experiences with misogyny, racism, and sexual violence in the military. Like all of her published work and public advocacy, the memoir was heavily influenced by her personal experiences as a servicewoman.

99.     Ms. Bhagwati plans to continue her advocacy through written publications and public appearances. She has no plans to submit any future work to prepublication review, because she is certain that her future publications, as with her prior ones, will not contain classified information. Nonetheless, under the current regime, the DOD might at any point choose to sanction her for failing to submit to prepublication review.

Mark Fallon

100.    Mark Fallon, a resident of Georgia, is an expert on counterterrorism, counterintelligence, and interrogation who has spent more than three decades in government service, principally with the Naval Criminal Investigative Service ("NCIS"). After retiring from government service in 2010, he served as the Chair of the High-Value Detainee Interrogation Group ("HIG") Research Committee between 2011 and 2016. He currently serves as a consultant for government agencies, academic researchers, lawyers, and non-governmental organizations. He holds a B.S. from Roger Williams College (now Roger Williams University).

101.    Mr. Fallon joined the NCIS in 1981 after having spent two years at the U.S. Marshals Service. At the NCIS, he worked on a broad array of criminal, counterterrorism, and counterintelligence investigations. Over a period of 27 years, he served in a number of field positions at the NCIS, from street agent to Special Agent in Charge, and served on numerous joint-service assignments and task forces. After the attacks of September 11, 2001, he served as the Deputy Commander and Special Agent in Charge of the Criminal Investigation Task Force to investigate alleged terrorists for trials before military commissions. He also served as the Tactical Commander for the NCIS USS Cole Task Force, which was responsible for investigating the attack on the USS Cole in Yemen; as a special advisor to the Office of the Secretary of the Navy in the establishment of the Office for the Administrative Review of Detained Enemy Combatants; and as a special advisor to U.S. Central Command. Mr. Fallon was the NCIS Deputy Assistant Director for counterterrorism from 2004 to 2005, when he became the NCIS Deputy Assistant Director for Training and Director of the NCIS Training Academy. In 2008, he was appointed to the Senior Executive Service. From 2008 to 2010, he served as the Assistant Director of the Federal Law Enforcement Training Center within the Department of Homeland Security.

102.    Mr. Fallon obtained a Top Secret security clearance in 1981, upon joining the

NCIS, and held it continuously until departing the Department of Homeland Security in 2010. He

obtained a TS/SCI security clearance during his career at the NCIS. He then obtained a TS/SCI

security clearance again in 2011, when beginning work for the HIG, and in 2017, for consulting

work he engages in with the U.S. government.

103.    Since he left government service, Mr. Fallon has published op-eds, articles,

columns, and a book. He has submitted many of these to the DOD for prepublication review.

104.    In 2016, Mr. Fallon completed a book, *Unjustifiable Means*, about the George W.

Bush administration's policies relating to the interrogation and torture of prisoners, and about the

experience of public servants like him who had opposed the policies. He believed his assessment

of the torture policies, and his account of his experience in government, could help the public

better evaluate proposals relating to interrogation and serve as a template for leadership training

for other officials to make critical leadership decisions during crisis. The book relied on

information declassified by the government and on the voluminous public record relating to the

Bush administration's policies and their consequences. Mr. Fallon was confident that the book

did not contain properly classified information.

105.    When he began writing *Unjustifiable Means* in 2014, Mr. Fallon consulted former

NCIS colleagues about whether he was required to submit the manuscript for prepublication

review. One advised him that he had not submitted his own manuscript, and the others advised

that they did not believe he was required to submit it.

106.    Through his own research, Mr. Fallon learned of the Defense Office of

Prepublication and Security Review. That office advised him over the telephone in June 2016

that the prepublication review process was "voluntary" and intended to aid authors. On

October 4, 2016, however, he received an email from a DOD official who claimed that she had

noticed on Amazon.com that *Unjustifiable Means* was forthcoming and asked whether he had

submitted it. The official stated that Mr. Fallon was required to submit his works for review. The

official also enclosed the DOD's prepublication review directive and instruction in her email. On

January 3, 2017, the official advised him by email that, while DOD policies provide that review

will be completed within 30 to 45 working days, "the truth is that in most cases it takes a bit

longer."

107.     Mr. Fallon submitted his manuscript to the DOD's review board the following

day. He had intended to publish the book at the start of the Trump administration in order to

contribute to the public debate about torture, which had become a major issue during the 2016

U.S. presidential campaign. However, after considering both the time period specified in the

DOD's policies and the additional information provided in the DOD official's January 3, 2017

email, Mr. Fallon and his publisher agreed to a publication date of March 7, 2017.

108.     On January 11, 2017, the DOD's review board informed Mr. Fallon that its

review of his manuscript was complete but that the manuscript would have to be reviewed by

other agencies as well. The reviewing official in charge of reviewing Mr. Fallon's book refused

to tell him which agencies. When he told that officer that the book was scheduled to be published

on March 7, 2017, however, the officer assured Mr. Fallon that the DOD would do everything it

could to complete review by that date.

109.     Prior to his planned publication date, Mr. Fallon emailed the reviewing official at

least eight times. In these emails, he reminded the officer that delay would force his publisher to

push back his publication date, and that pushing back the publication date would require him to

cancel book tours, signing events, and speaking engagements. Mr. Fallon continued to regularly contact the DOD's review board about his manuscript.

110.    The DOD informed Mr. Fallon that review of his book was complete on August 25, 2017—eight months after he submitted it. Even then, however, the DOD told Mr. Fallon that he could not publish the book without making 113 separate excisions. In Mr. Fallon's view, the excisions were arbitrary, haphazard, and inconsistent, and, at least in some instances, seemingly intended to protect the CIA from embarrassment. Some of them related to material that had been published in unclassified congressional reports. Some were news articles Mr. Fallon had cited.

111.    Although Mr. Fallon believed that all of the excisions were unnecessary and unjustified, he decided not to challenge them to avoid pushing back his publication date again. Senior government officials, including President Trump, had been musing publicly about resurrecting torture policies, and it was important to Mr. Fallon that his book be published while it was still possible to influence the public debate on this subject. The book was ultimately published on October 24, 2017.

112.    Mr. Fallon's prepublication review experience with *Unjustifiable Means* was so time-consuming, costly, and exhausting that he is unsure whether he is willing to embark on writing another book. Mr. Fallon was in fact forced to cancel events and travel, and to incur personal costs as a result. His publisher threatened to cancel his contract for non-delivery and told him that publishing books by government officials was "not worth it" because of the unpredictability of the prepublication review process. The review process was so stressful for Mr. Fallon that for a time he discontinued certain consulting work while he waited for the review to be completed. Mr. Fallon also paid a premium after the book was cleared in order for his

editors to work to finalize publication on a tight timeframe. And his publisher informed him that the delayed publication date made it less likely that bookstores would choose to carry or promote the book.

113.    Mr. Fallon has submitted numerous shorter works for prepublication review since the publication of *Unjustifiable Means*. For example, Mr. Fallon is currently in the process of publishing a manuscript titled *The HIG Project: The Road to Scientific Research on Interrogations* as a chapter in a forthcoming book titled *Interrogation and Torture: Research on Efficacy and Its Integration with Morality and Legality*. Mr. Fallon and his co-author contracted with the book's editors to provide a draft of the chapter by November 1, 2018. Mr. Fallon submitted the chapter for DOD review on August 10, 2018, and he and his co-author followed up with the office repeatedly over a period of several months. On December 11, 2018, more than a month after Mr. Fallon's draft deadline, the ACLU and the Knight Institute sent a letter to the DOD's review board on Mr. Fallon's behalf, expressing concerns about the delay. On January 14, 2019, the Defense Intelligence Agency's review board informed Mr. Fallon's co-author that the DOD's review board was waiting for a response from the FBI.

114.    On February 11, 2019, prepublication review of *The HIG Project* was completed, and the chapter was cleared for publication with redactions. All of the redacted material, however, was material that Mr. Fallon had heard at unclassified public meetings with the HIG Research Committee. Mr. Fallon believes that the redactions were motivated by political disagreement with Mr. Fallon and his co-author's perspective on torture and work on the HIG Research Committee.

115.    Mr. Fallon plans to continue submitting to the DOD any draft op-eds, articles, columns, and books that he writes in the future.

116.    In Mr. Fallon's experience, prepublication review has been haphazard and opaque, and communication from the DOD has been sporadic and unhelpful.

117.    In Mr. Fallon's experience, the personnel in the DOD's review board appear to have no control or influence over the other agencies to which they send authors' works for review, and there appears to be a lack of accountability from those offices to the DOD.

118.    Mr. Fallon's experiences with prepublication review continue to negatively impact him and deny him the opportunity to contribute to the public debate over breaking news. He would like to publish op-eds in newspapers about current affairs, but his experiences with the review process have discouraged him from trying to do so because of potential delays and unjustified objections by the agency. Mr. Fallon has declined offers to author op-eds and write articles on topics of public concern in response to breaking news because such events require an immediate response in light of the ever-changing news cycle. In addition, Mr. Fallon is unsure how his prepublication review obligations apply in academia—for example, whether he must submit for review edits he makes to the work of other people, or whether an entire piece written by someone else becomes subject to review if he adds one or two sentences. This uncertainty hinders Mr. Fallon's work and his ability to engage with his colleagues.

119.    Finally, Mr. Fallon worries that the government will retaliate against him by stripping his security clearance if he does not strictly comply with prepublication review requirements. This is especially concerning to Mr. Fallon because his consulting work depends on his access to classified information.

## Causes of Action

120.    Defendants' prepublication review regimes violate the First Amendment because they invest executive officers with sweeping discretion to suppress speech and fail to include procedural safeguards designed to avoid the dangers of a censorship system.

121.    Defendants' prepublication review regimes are void for vagueness under the First and Fifth Amendments because they fail to provide former government employees with fair notice of what they must submit for prepublication review and of what they can and cannot publish, and because they invite arbitrary and discriminatory enforcement.

### Request for Relief

1.    Declare that Defendants' prepublication review regimes violate the First and Fifth Amendments to the Constitution;

2.    Enjoin Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from continuing to enforce Defendants' prepublication review regimes against Plaintiffs, or any other person;

3.    Award Plaintiffs their costs and reasonable attorneys' fees in this action; and

4.    Grant Plaintiffs such other relief as this Court may deem just and proper.

April 2, 2019                                    Respectfully submitted,

Brett Max Kaufman[*]                            Jameel Jaffer[*]
Vera Eidelman[*]                                Alex Abdo[*]
Naomi Gilens[*]                                 Ramya Krishnan[*]
American Civil Liberties Union Foundation       Knight First Amendment Institute
125 Broad Street, 18th Floor                      at Columbia University
New York, NY 10004                              475 Riverside Drive, Suite 302
T: 212.549.2500                                 New York, NY 10115
F: 212.549.2654                                 T: 646.745.8500
bkaufman@aclu.org                               jameel.jaffer@knightcolumbia.org
veidelman@aclu.org                              alex.abdo@knightcolumbia.org
ngilens@aclu.org                                ramya.krishnan@knightcolumbia.org


  /s/ *David R. Rocah*
─────────────────────────────
David R. Rocah (Bar No. 27315)
American Civil Liberties Union Foundation
  of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
T: 410.889.8555
F: 410.366.7838
rocah@aclu-md.org                               *Counsel for Plaintiffs*

[*] *pro hac vice* application forthcoming