# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

TIMOTHY H. EDGAR, *et al.*,

       Plaintiffs,

    v.

DANIEL COATS, Director of National
Intelligence, *et al.*,

       Defendants.

Case No. 8:19-cv-00985 (GJH)

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 3

I.     Statutory and Regulatory Background ............................................................... 3

II.    This Lawsuit ....................................................................................................... 8

STANDARDS OF REVIEW ........................................................................................11

ARGUMENT ............................................................................................................... 12

I.     Plaintiffs Lack Standing to Bring their Claims. ............................................... 12

       A.     Plaintiffs Fail to Demonstrate a Future Injury that Is Concrete, Likely, and
              Redressable. ......................................................................................... 13

              1.     Plaintiffs Fail to Demonstrate Standing Based on the Risk of Delay ....... 14

              2.     Plaintiffs Fail to Demonstrate Standing Based on "Chill." ...................... 16

       B.     Even if Some Plaintiffs Have Standing to Pursue Some of Their Claims,
              They Lack Standing to Bring All of Their Claims. ............................... 20

              1.     Plaintiffs Lack Standing to Challenge the Categories of Persons and
                     Material Subject to Prepublication Review. ............................................. 20

              2.     Plaintiffs Lack Standing to Challenge Features of the Prepublication
                     Review Process that Apply Only to Current Employees. ......................... 21

              3.     Plaintiffs Lack Standing to Bring their Vagueness Claims. ..................... 22

       C.     Plaintiffs Lack Standing to Seek the Requested System-Wide Relief. ................. 23

II.    Plaintiffs' Claims Are Not Ripe. ...................................................................... 25

III.   The Complaint Fails to State a Claim on Which Relief Can Be Granted. ........................ 26

       A.     The Complaint Does Not Plausibly Allege That the Scope of Prepublication
              Review Violates the First Amendment. ................................................. 27

       B.     The Complaint Does Not Plausibly Allege that Prepublication Review
              Procedures Violate the First Amendment. .............................................. 29

1.    The System Provides Proper Notice of What Must Be Submitted and the Standards that Apply. ........................................................................ 30

2.    The System Properly Cabins Prepublication Review Decisions. ............. 31

3.    The System Establishes Reasonable Time Frames and Is Not Facially Invalid Because Reviews at Times Have Exceeded Thirty Days. ...................................................................................................... 32

4.    Reviewers Are Not Required to Offer Written Explanations for their Decisions. ............................................................................................... 34

5.    Judicial Review Is Available and the Government Does Not Bear the Burden of Initiating Review. ..................................................................... 35

C.    The Complaint Does Not Plausibly Allege Any Systemic   Infirmities That Implicate the First Amendment. ................................................... 35

D.    The Complaint Fails to State a Fifth Amendment Due Process Claim for Vagueness. ............................................................................................ 37

CONCLUSION ...................................................................................................... 39

# TABLE OF AUTHORITIES

**CASES**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ................................................................................ 25

*Abbott v. Pastides*,
  900 F.3d 160 (4th Cir. 2009) ......................................................... 13, 17, 20

*Alfred A. Knopf, Inc. v. Colby*,
  509 F.2d 1362 (4th Cir. 1975) .......................................................... 2, 19, 26

*Am. Library Ass'n v. Barr*,
  956 F.2d 1178 (D.C. Cir. 1992) ............................................................... 25

*Amnesty Int'l USA v. Clapper*,
  667 F.3d 163 (2d Cir. 2011) ................................................................... 19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................... 11

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979) ............................................................................... 13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................... 11

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................... 12

*Berntsen v. CIA*,
  618 F. Supp. 2d 27 (D.D.C. 2009) ...................................................... 8, 36

*Boening v. CIA*,
  579 F. Supp. 2d 166 (D.D.C. 2008) .................................................... 8, 36

*Bond v. United States*,
  742 F. App'x 735 (4th Cir. 2018) ............................................................ 16

*Carroll v. Nw. Fed. Credit Union*,
  No. 18-1434, 2019 WL 2089378 (4th Cir. May 13, 2019) ....................... 16

*CIA v. Sims*,
  471 U.S. 159 (1985) ........................................................................... 3, 24

*City Council of Los Angeles v. Taxpayers for Vincent*,
 466 U.S. 789 (1984) ................................................................................... 21

*City of Chicago v. Morales*,
 527 U.S. 41 (1999) ..................................................................................... 37

*City of Los Angeles v. Lyons*,
 461 U.S. 95 (1983) ..................................................................................... 15

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ................................................................................... 12

*Comite de Apoyo a los Trabajadores Agricolas  v. U.S. Dep't of Labor*,
 995 F.2d 510 (4th Cir. 1993) ..................................................................... 12

*Cooksey v. Futrell*,
 721 F.3d 226 (4th Cir. 2013) ..................................................................... 16

*Covenant Media of SC, LLC v. City of N. Charleston*,
 493 F.3d 421 (4th Cir. 2007) ..................................................................... 30

*DaimlerChrysler Corp. v. Cuno*,
 547 U.S. 332 (2006) ................................................................................... 12

*David v. Alphin*,
 704 F.3d 327 (4th Cir. 2013) .....................................................................11

*Day v. United Bank*,
 No. 16-975, 2018 WL 3707833 (D. Md. Aug. 3, 2018).............................. 12

*Dep't of Navy v. Egan*,
 484 U.S. 518 (1988) ............................................................................... 3, 24

*Elgabrowny v. Cent. Intelligence Agency*,
 No. 17-CV-00066 (TSC), 2019 WL 1440345 (D.D.C. Mar. 31, 2019) ............. 24, 25

*Fitzgibbon v. CIA*,
 911 F.2d 755 (D.C. Cir. 1990).............................................................. 24, 36

*Frank Krasner Enters. v. Montgomery Cty.*,
 401 F.3d 230 (4th Cir. 2005) ..................................................................... 12

*Franks v. Ross*,
 313 F.3d 184 (4th Cir. 2002) ..................................................................... 25

*Freedman v. Maryland*,
   380 U.S. 51 (1965) ................................................................................ 29

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ......................................................................... 24

*Greenville Women's Clinic v. S.C. Dept. of Health and Env'l Control*,
   317 F.3d 357 (4th Cir. 2002) ....................................................... 3, 37, 38

*Haig v. Agee*,
   453 U.S. 280 (1981) ............................................................................... 3

*Halpern v. FBI*,
   181 F.3d 279 (2d Cir. 1999) ................................................................. 36

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ................................................................................. 32

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003) ............................................................... 3

*Hu v. Chertoff*,
   No. S-06-2805 WBS EFB, 2007 WL 1515067 (E.D. Cal. May 22, 2007) ............ 34

*Jones v. Sears Roebuck & Co.*,
   301 F. App'x 276 (4th Cir. 2008) ......................................................... 14

*Kerns v. United States*,
   585 F.3d 187 (4th Cir. 2009) ............................................................... 11

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ............................................................................. 11

*Laird v. Tatum*,
   408 U.S. 1 (1972) ................................................................................. 17

*Lebron v. Rumsfeld*,
   670 F.3d 540 (4th Cir. 2012) .......................................................... 15, 16

*Lewis v. Casey*,
   518 U.S. 343 (1996) ...................................................................... 13, 14, 20

*Loving v. United States*,
   517 U.S. 748 (1996) ............................................................................. 24

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................................ 12, 16

*Lujan v. National Wildlife Federation,*
    497 U.S. 871 (1990) ...................................................................................... 20

*Lyng v. Northwest Indian Cemetery Protective Ass'n,*
    485 U.S. 439 (1988) ...................................................................................... 25

*McGehee v. Casey,*
    718 F.2d 1137 (D.C. Cir. 1983) .............................................................. *passim*

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) ...................................................................................... 13

*Miller v. Brown,*
    462 F.3d 312 (4th Cir. 2006) ........................................................................ 25

*Morrison v. Bd. of Educ. of Boyd Cty.,*
    521 F.3d 602 (6th Cir. 2008) ........................................................................ 19

*Namarra v. Mayorkas,*
    924 F. Supp. 2d 1058 (D. Minn. 2013) ........................................................ 34

*Peterson v. Nat'l Telcoms. & Info. Admin.,*
    478 F.3d 626 (4th Cir. 2007) ........................................................................ 13

*Pfeiffer v. CIA,*
    No. 91-736 (NHJ), 1994 WL 80869 (Mar. 3, 1994) ............................... 22, 38

*Raines v. Byrd,*
    521 U.S. 811 (1997) ...................................................................................... 12

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC,*
    713 F.3d 175 (4th Cir. 2013) .................................................................... 11, 14

*Sansotta v. Town of Nags Head,*
    724 F.3d 533 (4th Cir. 2013) ........................................................................ 25

*Sec'y of State For Defence v. Trimble Navigation Ltd.,*
    484 F.3d 700 (4th Cir. 2007) ........................................................................ 12

*Snepp v. United States,*
    444 U.S. 507 (1980) .............................................................................. *passim*

*South Carolina v. United States,*
   912 F.3d 720 (4th Cir. 2019) ........................................................................ 13, 14, 25

*Stillman v. CIA,*
   319 F.3d 546 (D.C. Cir. 2003) ........................................................................ 26, 34, 35

*Stillman v. CIA,*
   517 F. Supp. 2d 32 (D.D.C. 2007) .................................................................... 13, 29

*The Baltimore Sun Co. v. Ehrlich,*
   437 F.3d 410 (4th Cir. 2006) ............................................................................ 17, 18

*U.S. Telecom Ass'n v. FCC,*
   825 F.3d 674 (D.C. Cir. 2016) ............................................................................... 38

*United States v. Aguilar,*
   515 U.S. 593 (1995) ................................................................................................ 29

*United States v. L. A. Tucker Truck Lines, Inc.,*
   344 U.S. 33 (1952) .................................................................................................. 26

*United States v. Marchetti,*
   466 F.2d 1309 (4th Cir. 1972) ..................................................................... 24, 26, 33, 35

*United States v. Pappas,*
   94 F.3d 795 (2d Cir. 1996) .................................................................................... 26

*United States v. Rosen,*
   445 F. Supp. 2d 602 (E.D. Va. 2006) .................................................................. 28, 37

*United States v. Snepp,*
   595 F.2d 926 (4th Cir. 1979) ................................................................................... 1

*United States v. Snepp,*
   897 F.2d 138 (4th Cir. 1990) .................................................................................. 35

*Upstate Forever v. Kinder Morgan Energy Partners,*
   887 F.3d 637 (4th Cir. 2018) ..................................................................................11

*Veterans for Common Sense v. Shinseki,*
   678 F.3d 1013 (9th Cir. 2012) ............................................................................... 25

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
   455 U.S. 489 (1982) .......................................................................................... 37, 38

*Weaver v. U.S. Info. Agency*,
    87 F.3d 1429 (D.C. Cir. 1996)........................................................................ *passim*

*Wilson v. CIA*,
    586 F.3d 171 (2d Cir. 2009) ......................................................................... *passim*

*Wilson v. McConnell*,
    501 F. Supp. 2d 545 (S.D.N.Y. 2007) ....................................................... 8, 26, 28

**STATUTES**

50 U.S.C. § 3024 ................................................................................................ 3, 24

**RULES**

Fed. R. Civ. P. 8 ......................................................................................................11

Fed. R. Civ. P. 12....................................................................................................11

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

Exec. Order No. 12,333,
    46 Fed. Reg. 59,941 (Dec. 4, 1981) ................................................................. 6

Exec. Order No. 13,526,
    75 Fed. Reg. 707 (Dec. 29, 2009) .............................................................. *passim*

H.R. Rep. No. 114-573 (May 18, 2016) ................................................................ 37

**OTHER AUTHORITIES**

AR 13-10, Agency Prepublication Review of Certain Material Prepared for Public
    Dissemination,
    https://assets.documentcloud.org/documents/5767103/AR-13-10-Agency-Prepublication-
    Review-of-Certain.pdf ................................................................................ *passim*

CIA, Keeping Secrets Safe: The Publication Review Board,
    https://www.cia.gov/about-cia/publications-review-board ...................................... 7

DOD, Form DD 1847,
    https://fas.org/sgp/othergov/dd18471.pdf ............................................................. 4

DOPSR, Prepublication Review Process,
    https://www.esd.whs.mil/DOPSR/ ............................................................... *passim*

Form 4414,
     https://fas.org/sgp/othergov/intel/sf4414.pdf ................................................................. *passim*

HAC, Authority and Responsibilities,
     https://history.state.gov/about/hac/intro ................................................................................. 9

Knight Columbia, Government's Own Documents Show that Prepublication Review is Broken,
     https://knightcolumbia.org/news/governments-own-documents-show-prepublication-review-
     broken ................................................................................................................................. 15

NSA/CSS, Policy 1-30,
     https://www.nsa.gov/resources/everyone/prepub/ ......................................................... 7, 8, 14, 12

ODNI, Pre-Publication Review,
     https://www.dni.gov/index.php/who-we-are/organizations/enterprise-capacity/ic-cio/ic-cio-
     related-menus/ic-cio-related-links/pre-publication-review................................................ *passim*

Protecting Secrets, CIA's Prepublication Review Process,
     https://assets.documentcloud.org/documents/5767124/Protecting-Secrets-CIA-s-
     Prepublication-Review.pdf.................................................................................................. 15

Standard Form 312,
     https://fas.org/sgp/othergov/sf312.pdf ......................................................................... *passim*

## INTRODUCTION

Plaintiffs are former service members and officials of the Central Intelligence Agency ("CIA"), the Office of the Director of National Intelligence ("ODNI"), and the Department of Defense ("DoD") (collectively, with the National Security Agency, the "Agencies") who were entrusted with access to classified information during their government careers.  As a condition of that access, Plaintiffs signed lifelong nondisclosure agreements promising that, prior to publishing any material  concerning specified topics, they would give the Agencies an opportunity to review the draft publication to ensure that its disclosure would not reveal classified information, a process known as "prepublication review."  Now that Plaintiffs have left government service, they seek to enjoin their prepublication review obligations under the First and Fifth Amendments on the theory that the system applies to too many persons and too many types of works, lacks clear standards, and fails to impose procedural requirements they believe are constitutionally mandated.  Their Complaint, however, suffers from numerous jurisdictional and substantive deficiencies, and it should be dismissed.

*First*, Plaintiffs lack standing.  They seek to invalidate the Agencies' prepublication review systems as a whole, but they do not contend that prepublication review is generally unconstitutional; nor could they, as the Supreme Court and the Fourth Circuit have long held that such review "is an 'entirely appropriate' exercise" of the government's mandate to "'protect intelligence sources and methods from unauthorized disclosure[.]'"  *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) (quoting *United States v. Snepp*, 595 F.2d 926, 932 (4th Cir. 1979)).  To avoid that binding precedent, Plaintiffs purport to challenge only certain features of how the system is administered, but they fail to show that those features are likely to cause them any concrete future harm.  They have written and published extensively while adhering to their prepublication review obligations.  They allege no difficulties finding publishers.  Should they disagree with a prepublication review decision in the future, they possess both administrative and judicial remedies to enforce their rights, though they have only rarely exercised their administrative remedies in the past and have never sought judicial review.  And their amorphous claims of "chill" to their speech

1

– which largely amount to a mere preference not to use the existing remedies available to them to contest individual prepublication review decisions – cannot support standing to press their legal theories.  Nor do Plaintiffs have standing to seek the system-wide injunction they request, which is far broader than necessary to redress the limited deficiencies they allege and would unduly infringe on the authority of the Executive Branch.

*Second*, Plaintiffs' claims should be dismissed for lack of ripeness.  The claims are not fit for judicial review because Plaintiffs do not challenge any specific prepublication review decision, and their theories are therefore presented in abstract terms based on how they believe the system has malfunctioned in the past and thus may in the future.  Evaluating those claims would require the Court either to engage in a series of hypotheticals about the fact-specific functioning of the system across a range of circumstances or to undertake review of past prepublication decisions that do not present live disputes.  Because administrative and judicial remedies are available to challenge any prepublication review decision that may affect Plaintiffs in the future, they will suffer no hardship by awaiting the presentation of a concrete dispute.

*Third*, Plaintiffs' Complaint fails to state a claim on which relief can be granted.  Employees who enter secrecy agreements have no First Amendment rights to publish classified information, *see Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975), and there is little doubt that the maintenance of a prepublication review system to ensure that persons with nondisclosure obligations do not publish classified information improperly or inadvertently is lawful under *Snepp.*  Courts have consistently applied *Snepp* across a range of circumstances to reject First Amendment theories similar to those that Plaintiffs press here.  Plaintiffs' reliance on a handful of conclusory assertions about the incorrectness of isolated past prepublication review determinations cannot overcome that settled case law.  Rather, the remedy for case-by-case errors is the one that already exists: the right to appeal any adverse decision with the Agencies and, failing that, to seek judicial review.  Plaintiffs' vagueness challenge also should be rejected because the nondisclosure agreements used by the Agencies make clear that the purpose of prepublication review, as it pertains to former employees such as Plaintiffs, is to protect against the unauthorized disclosure

2

of classified information, which is itself subject to a comprehensive set of rules and protocols that the courts have repeatedly deemed constitutional.  Plaintiffs have not explained why that purpose, or the guidelines through which it is implemented, are unclear, much less do they show that such guidelines are so unclear as to "trap the innocent" or facilitate "arbitrary and discriminatory enforcement."  *Greenville Women's Clinic v. S.C. Dept. of Health and Envtl. Control*, 317 F.3d 357, 366 (4th Cir. 2002) (citation omitted).  For all these reasons, set forth further below, the Complaint should be dismissed.

## BACKGROUND

I.     **Statutory and Regulatory Background**

"[N]o governmental interest is more compelling than the security of the Nation."  *Haig v. Agee*, 453 U.S. 280, 307 (1981).  In furtherance of that compelling interest, the Executive Branch classifies national security information according to its sensitivity and strictly limits its access.  *See Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988).  The authority of the Executive Branch to do so flows from the constitutional role of the President as Executive and Commander in Chief, *id.*, and is supported by other authority, including the National Security Act of 1947, as amended, which provides that the "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1); *see also CIA v. Sims*, 471 U.S. 159, 168-69 (1985) (noting the Executive Branch's "very broad authority to protect all sources of intelligence information from disclosure"); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003) (emphasizing the "primacy of the Executive in controlling . . . classified information").

Classification decisions are governed by a comprehensive set of guidelines prescribed by executive order and regulation.  Most notably, Executive Order 13,526 "prescribes a uniform system for classifying, safeguarding, and declassifying national security information."  Exec. Order No. 13,526, Classified National Security Information, 75 Fed. Reg. 707 (Dec. 29, 2009). Pursuant to Executive Order 13,526, information may be originally classified only if, among other things, an official with "classification authority" decides that its release could result in damage to

3

the national security and it relates to one or more specified subject matters, such as "military plans, weapons systems, or operations"; "foreign government information"; and "intelligence activities (including covert action), intelligence sources or methods, or cryptology." *Id.* §§ 1.1, 1.4.

As a condition of access to classified information, the Executive Branch requires employees with such access to sign an approved nondisclosure agreement. *See, e.g.*, Exec. Order No. 13,526 § 4.1(a)(2). Standard Form ("SF") 312 and Form 4414 are two such agreements, among others. *See* Compl. ¶¶ 32(a)-(b), 38(a)-(b), 44(a)-(b), 50(a)-(b), ECF No. 1.[1] SF 312, entitled Classified Information Nondisclosure Agreement, generally must be signed by any employee with access to "classified information," defined as information that has been "classified under the standards of Executive Order 13526" (or other authority), or "that meets [those standards] and is in the process of a classification determination[.]" SF 312 § 1.[2] SF 312 obligates the employee to preserve the secrecy of classified information and to confirm with authorized officials if she is uncertain about the classification status of information she wishes to disclose. *See id.* §§ 1, 3.

Employees who obtain access to a special subset of classified information known as Sensitive Compartmented Information ("SCI") generally sign Form 4414, entitled Sensitive Compartmented Information Nondisclosure Agreement. Form 4414 reiterates many of the secrecy obligations contained in SF 312 and also states, in relevant part, that "[i]n consideration of being granted access to SCI[,] . . . I hereby agree to submit for security review by the Department or Agency that last authorized my access to such information or material, any writing or other preparation . . . that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that I have reason to believe are derived from SCI, that I contemplate disclosing

---

[1] The Complaint also refers to DoD Form 1847.1, which is substantively identical to Form 4414. *See* https://fas.org/sgp/othergov/dd_1847_1.pdf (last visited June 13, 2019).

[2] *See* https://fas.org/sgp/othergov/sf312.pdf (last visited June 13, 2019).

. . . or that I have prepared for public disclosure."  Form 4414 § 4.[3]  This prepublication review

obligation applies "during the course of [the employee's] access to SCI and thereafter," and the

employee agrees not to "disclose the contents of such preparation to . . . any person not authorized

to have access to SCI until [the employee] receive[s] written authorization from the Department

or Agency . . . that such disclosure is permitted."  *Id.*  Form 4414 further states the employee's

understanding that "the purpose of [prepublication review] is to give the United States a reasonable

opportunity to determine whether the preparation submitted . . . sets forth any SCI."  *Id.* § 5.

The CIA also uses its own secrecy agreement form, Compl. ¶ 32(c), under which an

employee agrees "never [to] disclose in any form or any manner" information obtained during the

course of employment that is marked as classified or that the employee knows to be classified or

undergoing a classification determination.  *See* Decl. of Antoinette B. Shiner, Ex. A ("CIA Secrecy

Agreement").  As with Form 4414, the CIA Secrecy Agreement includes a lifelong prepublication

obligation.  The obligation extends to any writing or other work that "contains any mention of

intelligence data or activities" or that might be based on classified information.  CIA Secrecy

Agreement § 5.

In signing one or more of these non-disclosure agreements, employees generally

acknowledge that the government "may seek any remedy available to it" to enforce its rights under

the agreements, including a court order prohibiting disclosure as well as criminal and civil

sanctions.  *See* SF 312 §§ 3, 6-7; Form 4414 §§ 6-7; *see also* CIA Secrecy Agreement ¶¶ 10-12

(setting forth similar terms).  Employees also assign to the government all rights, royalties, and

remunerations that result from unauthorized disclosure in violation of the agreements.  *See*

Standard Form 312 § 5; Form 4414 § 13; CIA Secrecy Agreement ¶ 12.  Prior to signing SF 312

and Form 4414, employees may discuss any questions with a briefing officer and request access

to the legal materials governing classified information.  *See* SF 312 § 12; Form 4414 § 11.  Upon

---

[3] *See* https://fas.org/sgp/othergov/intel/sf4414.pdf (last visited June 13, 2019).

departure from government service, employees undergo a debriefing process in which an officer reiterates their prepublication review obligations.  *See* SF 312 at 2; Form 4414 at 2.

Each Agency operates its own prepublication review process but coordinates that process with other agencies whose classified information might be implicated in a particular submission. A brief description of the Agencies' processes and protocols, as they relate to former employees, is set forth below.

DoD's prepublication review process is conducted by the Defense Office of Prepublication and Security Review ("DOPSR") and guided by two sets of DoD Instructions ("DoDI's): DoDI 5230.29 and DoDI 5230.09.  With respect to submissions from "former DoD employees" and other "non-DoD sources," the instructions provide for DOPSR to conduct a "security review" to "ensure that classified information is not disclosed."  DoDI 5230.29, Enc. 2 § 2(e).  DOPSR has a website that explains the prepublication review process and provides examples of what types of information must be submitted, submission and review guidelines, contact information, and hyperlinks to the applicable DoD instructions.[4]

ODNI's prepublication review process is conducted by the prepublication review team within ODNI's Information Management Division and guided by ODNI Instruction 80.04. Instruction 80.04 states that ODNI's prepublication review process is intended to fulfill ODNI's "security obligation and legal responsibility under EO 12333 and EO 13526 to safeguard sensitive intelligence information and prevent its unauthorized publication[.]"  *Id.* § 6.  The Instruction also clarifies that, in the case of any conflict between the scope of review contained in "this Instruction and an NDA, the NDA shall govern."  *Id.* § 6.  ODNI has a website on prepublication review that further explains the process and provides hyperlinks to Instruction 80.04, a prepublication review brochure, a set of Frequently Asked Questions, and contact information.[5]

---

[4] *See* https://www.esd.whs.mil/DOPSR/ (last visited June 13, 2019).

[5] *See* https://www.dni.gov/index.php/who-we-are/organizations/enterprise-capacity/ic-cio/ic-cio-related-menus/ic-cio-related-links/pre-publication-review (last visited June 13, 2019)

The CIA's prepublication review process is conducted by the CIA Publications Review Board ("PRB") and guided by Agency Regulation ("AR") 13-10.[6]  AR 13-10 provides that the purpose of prepublication review, as it relates to former employees, "is to ensure that information damaging to the national security is not disclosed inadvertently[.]"  AR 13-10 § 2(b)(2); *see also id.* § 2(f)(2) ("The PRB will review material proposed for publication . . . solely to determine whether it contains any classified information.").  While the PRB may impose additional review criteria for "current employees and contractors," those criteria do not apply to former employees. *Id.* § 2(g)(2).    Like DoD and ODNI, the CIA has a website on prepublication review, which explains the purpose of such review, describes the types of materials that must be submitted, and provides contact information and hyperlinks to additional information.[7]

The prepublication review process of the National Security Agency ("NSA") is conducted by the NSA/Central Security Service ("CSS") and guided by NSA/CSS Policy 1-30.[8]  Policy 1-30 defines the purpose of prepublication review as it pertains to non-NSA/CSS personnel (including former employees) as seeking to "determine that information proposed for public release contains no protected information."  Policy 1-30 §§ 1(a), 30.  Like the other Agencies, NSA/CSS has a website that describes the prepublication review process, explains what must be submitted, and provides submission guidelines, a hyperlink to Policy 1-30, and contact information.[9]

All of the Agencies strive to respond to prepublication review submissions within 30 business days and within shorter time frames for certain works, though they acknowledge that review may take longer, depending on various factors such as the length or complexity of a submission, the extent of classified information it implicates, or the number of agencies that must

---

[6] AR 13-10 is publically available at https://assets.documentcloud.org/documents/5767103/AR-13-10-Agency-Prepublication-Review-of-Certain.pdf (last visited June 13, 2019).

[7] *See* https://www.cia.gov/about-cia/publications-review-board (last visited June 13, 2019).

[8] None of the Plaintiffs is a former NSA employee and none are alleged to have signed a nondisclosure agreement with NSA.  However, they allege that their submissions were referred to NSA for review on occasion.  Compl. ¶ 63.

[9] *See* https://www.nsa.gov/resources/everyone/prepub/ (last visited June 13, 2019).

review it.  *See* DoDI 5230.29 Encl. 3 § 3(a); ODNI Instruction 80.04 § 6(C); A.R. 13-10 § 2(d)(4); NSA/CSS Policy 1-30 § 6(b)(6).  All of the Agencies also provide an administrative appeals process by which individuals can contest initial review decisions.  DoDI 5230.29 Encl. 3 § 4(b); A.R. 13-10 § 2(h); ODNI Instruction 80.04 § 6(E); NSA/CSS Policy 1-30 § 7.  Individuals dissatisfied with an Agency's prepublication review decisions can pursue judicial review.  *See, e.g.*, *Berntsen v. CIA*, 618 F. Supp. 2d 27, 29-31 (D.D.C. 2009) (reviewing and upholding CIA's prepublication review decision against First Amendment challenge); *Boening v. CIA*, 579 F. Supp. 2d 166, 170-71 (D.D.C. 2008) (same), *Wilson v. McConnell*, 501 F. Supp. 2d 545, 552-60 (S.D.N.Y. 2007) ("*Wilson I*") (same), *aff'd Wilson v. CIA*, 586 F.3d 171, 178 (2d Cir. 2009) ("*Wilson II*").

## II.    This Lawsuit

Plaintiffs' Complaint does not allege that any of the Plaintiffs presently has any manuscript or material pending in prepublication review, nor do Plaintiffs seek relief as to any specific prepublication review decision.  Instead, they contend that the Agencies' prepublication review regimes as a whole violate the First Amendment because the regimes purportedly suffer from various procedural deficiencies.  *See* Compl. ¶ 3.  The Complaint also contends that the Agencies' prepublication review regimes violate the Fifth Amendment because "they fail to provide former government employees with fair notice of what they must submit" and "invite arbitrary and discriminatory enforcement."  *Id.* ¶ 121.  In support of these theories, Plaintiffs rely largely on allegations about their own experiences with prepublication review.

Plaintiff Timothy Edgar, now at Brown University, worked for ODNI from 2006 until 2013 as counsel and in other roles, and he held a Top Secret/SCI clearance. *Id.* ¶¶ 58, 59.  Since leaving ODNI, Mr. Edgar has submitted for prepublication review blog posts and op-eds that appeared in major publications and a book entitled *Beyond Snowden:  Privacy, Mass Surveillance, and the Struggle to Reform the NSA*, which drew on his personal experiences at ODNI.  *Id.* ¶¶ 61, 62.  The book's manuscript allegedly was approved with redactions within three months of submission to ODNI.  *Id.* ¶ 62.  Mr. Edgar avers that he plans to continue publishing on matters relating to intelligence and cybersecurity, and anticipates submitting some of these works for prepublication

review. *Id.* ¶ 65.  He fears, however, that delays associated with prepublication review will hinder his career and impede his participation in public debate and that Agency reviewers will treat him less favorably if his writing is critical of the government. *Id.* ¶ 66.

Plaintiff Richard Immerman, a retired Temple University professor, worked for ODNI from 2007 to 2009 as an Assistant Deputy Director of National Intelligence and presently serves as Chairman of the Historical Advisory Committee ("HAC"). *Id.* ¶¶ 69-70.[10]   He holds a Top Secret/SCI clearance, having signed nondisclosure agreements with ODNI and later with the CIA to perform his HAC duties. *Id.* ¶ 71.  He avers that, since leaving ODNI, he has submitted various materials to ODNI for prepublication review, including a manuscript of his book, *The Hidden Hand: A Brief History of the CIA*. *Id.* ¶¶ 71, 73.  The manuscript allegedly was approved with redactions in less than six months. *Id.* ¶ 75.  Professor Immerman pursued an administrative appeal of the prepublication review team's decision, which resulted in a partial reversal and partial affirmance of the original decision. *Id.* ¶ 78.  He did not seek judicial review and his book was published in 2014. *Id.*  Professor Immerman states that he plans to continue publishing on the influence of intelligence on policymaking and strategic arms negotiations but believes that prepublication review "will diminish the value of [his] work" and make it more difficult for him to contribute to public debate in a timely way. *Id.* ¶¶ 79-80.

Plaintiff Melvin Goodman, who is now semi-retired and teaches at Johns Hopkins University, worked as a CIA analyst and division chief and taught at the National War College until 2004. *Id.* ¶¶ 81-82.   He held a Top Secret/SCI clearance for much of his 42 years of government service. *Id.* ¶¶ 83, 84.  He states that, since leaving the CIA, he has submitted multiple works for prepublication review, including nine books. *Id.* ¶ 85.  All of these books were reviewed in less than two months except for *Whistleblower at the CIA*, which allegedly took eleven months.

---

[10] The HAC is an advisory committee of the Department of State that makes recommendations concerning a documentary series on foreign relations, advises on declassification procedures, and conducts random sampling of State Department records that remain classified after 30 years.  Its members are granted security clearances to complete these tasks.  *See* HAC, Authority and Responsibilities, https://history.state.gov/about/hac/intro (last visited June 12, 2019).

*Id.* ¶ 89.  Mr. Goodman met with the PRB to discuss required modifications to his manuscript for *Whistleblower at the CIA*, but he declined to seek formal review and his book was published in 2017.  *Id.* ¶¶ 89, 91.  Mr. Goodman avers that he intends to continue publishing on intelligence matters but is concerned that the CIA "will demand that he redact material unwarrantedly" and that delays associated with prepublication review will jeopardize his book contracts and participation in public debate.  *Id.* ¶ 93.

Plaintiff Anuradha Bhagwati, founder of an advocacy network for Service women, served in the Marine Corps from 1999 to 2004 and signed a nondisclosure agreement with DoD.  *Id.* ¶¶ 94-95.  She has published multiple opinion pieces and a book, *Unbecoming: A Memoir of Disobedience*, about her experiences with misogyny, racism, and sexual violence in the military.  *Id.* ¶¶ 94, 97.  Ms. Bhagwati has never submitted writings for prepublication review and has no plans to do so in the future because she states that she is certain her future writings will not contain classified information.  *Id.* ¶¶96, 99.

Plaintiff Mark Fallon, now a consultant, worked for the Naval Criminal Investigative Service for three decades and chaired the High-Value Detainee Interrogation Group Research Committee from 2011 until 2016.  *Id.* ¶ 100.  Since leaving government service, Mr. Fallon has submitted many works for prepublication review, including a book, *Unjustifiable Means*, about the Bush administration's policies on interrogation and torture.  *Id.* ¶¶ 103-04.  Mr. Fallon avers that he had hoped to publish *Unjustifiable Means* in January 2017, but was contacted in October 2016 by a DoD official who had seen an advertisement for the book and advised via email that Mr. Fallon was required to submit his manuscript for prepublication review.  *Id.* ¶ 106.  Mr. Fallon states that he submitted his manuscript to DoD three months later, and within one week, DoD informed him that it had completed its review.  *Id.* ¶¶ 106-108.  However, because the manuscript required review by other agencies, Mr. Fallon avers that ten months passed before the manuscript was cleared, with modifications.  *Id.* ¶¶ 108, 110.  Mr. Fallon disagreed with certain modifications but did not appeal the decision and his book was published on October 24, 2017.  *Id.* ¶ 111.  Mr. Fallon has "submitted numerous shorter works for prepublication review" since then and plans to

continue submitting works but believes the process to be "haphazard and opaque" and "lack[ing]
[in] accountability." *Id.* ¶¶ 113-17.

## STANDARDS OF REVIEW

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges
a federal court's jurisdiction over the subject matter of the complaint.   The plaintiff bears the
burden of establishing that the court has subject matter jurisdiction to grant the relief requested.
*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).   Where a plaintiff's
jurisdictional allegations are challenged as insufficient on their face, a court must assess whether
the well-pleaded facts, standing alone, are sufficient to plead a plausible claim of jurisdiction. *See
S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175,
181-82 (4th Cir. 2013).   In so doing, the court accepts the well-pleaded factual allegations as true
but does not accept factual allegations "that constitute nothing more than 'legal conclusions' or
'naked assertions.'" *David v. Alphin*, 704 F.3d 327, 333 (4th Cir.2013) (quoting *Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009)).   Where a motion "challenges the veracity of the facts underpinning
subject matter jurisdiction, the trial court may go beyond the complaint . . . and resolve the disputed
jurisdictional facts." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint.   The
"complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that
is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 570 (2007)).   This standard is not met by "labels and conclusions," *Twombly*, 550 U.S. at 555;
rather, the factual allegations must "provide sufficient detail" to show "a more-than-conceivable
chance of success on the merits." *Upstate Forever v. Kinder Morgan Energy Partners*, 887 F.3d
637, 645 (4th Cir. 2018) (citation omitted).   "[W]here the well-pleaded facts do not permit the
court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has
not 'shown'– 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P.
8(a)(2)).   In deciding whether the plausibility standard is met, a court generally accepts as true the
well-pleaded factual allegations and any reasonable inferences drawn from those allegations but

11

not "conclusory statements or legal conclusions, even when couched as allegations of fact." *Day v. United Bank*, No. 16-975, 2018 WL 3707833, at *3 (D. Md. Aug. 3, 2018). The court may independently consider any materials incorporated by reference in the complaint or otherwise integral to the plaintiff's claims. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

## ARGUMENT

### I.    Plaintiffs Lack Standing to Bring their Claims.

Standing to sue is a jurisdictional prerequisite that derives from "the Constitution's limitation on Article III courts' power to adjudicate 'cases and controversies.'" *Frank Krasner Enters. v. Montgomery Cty.*, 401 F.3d 230, 234 (4th Cir. 2005) (citations omitted). The requirement is built on separation-of-powers principles and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *see also Comite de Apoyo a los Trabajadores Agricolas (CATA) v. U.S. Dep't of Labor*, 995 F.2d 510, 513 (4th Cir. 1993) (the standing doctrine "prevent[s] the judiciary from encroaching upon the constitutional domains of the elected branches of government"). The standing inquiry is "especially rigorous when reaching the merits of a dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

The "irreducible constitutional minimum" of standing requires a plaintiff to demonstrate an "injury in fact" that is: (1) concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) fairly traceable to the challenged action of the defendant, and not the result of independent action of a third party not before the court; and (3) redressable by a decision in the plaintiff's favor. *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). A plaintiff must satisfy these requirements "for each claim he seeks to press" and "'for each form of relief' sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted). Where, as here, a plaintiff seeks prospective relief, the plaintiff "may not rely on prior harm to establish Article III standing." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th

12

Cir. 2018) (citation omitted).  Rather, the plaintiff must show a "realistic danger of sustaining a direct injury" in the future.  *Peterson v. Nat'l Telcoms. & Info. Admin.*, 478 F.3d 626, 632 (4th Cir. 2007) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see also South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) (plaintiff's future injury must "be *palpable* and *imminent*") (emphasis added).  Similarly, to demonstrate standing to seek declaratory relief, the plaintiff must establish a live and ongoing dispute that is "definite and concrete, touching the legal relations of parties having adverse legal interests" and capable "of specific relief through a degree of a conclusive character."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted).

### A.   Plaintiffs Fail to Demonstrate a Future Injury that Is Concrete, Likely, and Redressable.

"The Supreme Court has already decided that a prepublication review requirement imposed on a government employee with access to classified information is not an unconstitutional prior restraint."  *Stillman v. CIA*, 517 F. Supp. 2d 32, 38 (D.D.C. 2007) (citing *Snepp*, 444 U.S. at 510).  Thus, the sole fact that Plaintiffs are subject to a prepublication review obligation is inadequate to establish their standing here.  *See Lewis v. Casey*, 518 U.S. 343, 350 (1996) (the "mere[] . . . status of being subject to a governmental institution that [is allegedly] not organized or managed properly" is not sufficient to establish standing).  Rather, Plaintiffs "must go one step further and demonstrate that *the alleged shortcomings*" of the system will likely lead to "actionable harm," *id.* at 351 (emphasis added), *i.e.*, harm that is concrete and amenable to specific and conclusive relief.  *MedImmune, Inc.*, 549 U.S. at 127; *see also Abbott*, 900 F.3d at 176 (standing to bring facial First Amendment challenge exists only where there is a "credible threat of enforcement" against conduct that is "arguably protected by the First Amendment but . . . proscribed by [a] policy [plaintiffs] wish to challenge.").  They fail to do so.

As to Ms. Bhagwati, she has not had any interaction with the prepublication review system at all.  She has never submitted her writings for review, never intends to do so in the future, and has never been threatened with enforcement of her prepublication review obligations.  *See Jones*

*v. Sears Roebuck & Co.*, 301 F. App'x 276, 282 (4th Cir. 2008) (plaintiffs lacked standing to challenge arbitration provision where defendant "neither invoked nor threatened to invoke" that provision).   Indeed, she does not claim that her work has ever related to material triggering her prepublication review obligation in the first place, nor does she suggest that her future work will do so.   *See* Compl. ¶ 99.   She therefore lacks standing.   *See S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 182 (plaintiff could not demonstrate standing based "simply [on its status as] a party to the contract" because a "plaintiff must still demonstrate *personal harm . . .* traceable to the challenged provisions").

The remaining Plaintiffs also fail to demonstrate the requisite "palpable and imminent" injury.   *South Carolina*, 912 F.3d at 726.   Although they have previously submitted works for prepublication review, they do not identify any future concrete harm they are likely to encounter as a result of the deficiencies they allege.   They have written and published extensively while adhering to their prepublication review obligations, and they intend to continue doing so.   They nevertheless rely on a handful of prior experiences to pose two theories of standing:   potential for publication delay and "chill" to their speech.   Both theories, however, are inadequate.

### 1.   Plaintiffs Fail to Demonstrate Standing Based on the Risk of Delay.

To support the first theory, Plaintiffs point to prior instances in which the prepublication review process for some of the Plaintiffs took longer than they anticipated, which required them to push back publication dates and caused friction with their publishers.   *See* Compl. ¶¶ 64, 89, 107-12.   Those allegations do not, however, show that Plaintiffs are likely to encounter a delay in the future or that, if they do, they will suffer any concrete harm.

First, it is speculative whether prepublication review of Plaintiffs' future submissions will be delayed.   Each of the Agencies expressly aims to complete its review within 30 business days, and within shorter periods for certain types of materials.   *See* Form 4414 § 5; DoDI 5230.29 Encl. 3 § 3(a); ODNI Instruction 80.04 § 2(C); A.R. 13-10 § 2(d)(4); NSA/CSS Policy 1-30 § 12(f).   Plaintiffs note that these deadlines are not met in every circumstance, but that fact is not itself sufficient to show that prepublication review is likely to be delayed in the future.   *See Lebron v.*

14

*Rumsfeld*, 670 F.3d 540, 561 (4th Cir. 2012) ("Time and again, the [Supreme] Court has reiterated that 'past exposure to [allegedly] illegal conduct does not in itself show a present case or controversy regarding injunctive relief[,]' . . . [a]nd it is equally insufficient for a plaintiff . . . to observe that the challenged conduct is repeatable" or "common" (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 106 (1983)). Indeed, the very report that Plaintiffs cite as supporting their theory that the Agencies are "struggling with achieving timeliness" states that data for 2015 "show[ed] that [the CIA] meets the 30-day guideline in *more than 90 percent of submissions*," and "completes academic reviews *in an average of 6 days.*" Protecting Secrets, CIA's Prepublication Review Process (undated, approved for release Apr. 6, 2017) ("CIA Report"), at 8 (emphasis added).[11] The CIA Report also noted that timeliness is a priority for the government because, among other things "[r]educed timeliness" increases "the likelihood [that authors] will bypass the review process" and risk "public exposure of classified information." CIA Report at 5. Unsurprisingly then, Plaintiffs themselves allege no specific delays as to their prior non-book submissions and only a few instances in which review of their book-length submissions were delayed. *See* Compl. ¶¶ 61, 72, 85 (discussing submission of numerous writings, including academic papers, articles, op-eds, public talks, and blog posts, none of which appear to have been delayed). While the CIA Report acknowledged that "[b]ook-length manuscripts received today are currently projected to take over a year," it noted that PRB had recently increased its staff by 33% and was "[d]iverting some . . . resources to manuscripts" to address that issue. CIA Report, at 8-10.[12] Thus, it remains to be seen whether the Agencies' review of any future submission of the Plaintiffs will be delayed.

---

[11]  *Available at* https://assets.documentcloud.org/documents/5767124/Protecting-Secrets-CIA-s-Prepublication-Review.pdf (last visited June 13, 2019). Plaintiffs' counsel cites to this report on its website. *See* https://knightcolumbia.org/news/governments-own-documents-show-prepublication-review-broken (last visited June 13, 2019).

[12]  Professor Immerman is the only Plaintiff who avers a specific intention to publish a book in the future. *See* Compl. ¶ 79. As to the remaining Plaintiffs, any "some day intentions" to publish another book – "without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the actual or imminent injury that our

Also speculative is whether any hypothetical future delay will cause any concrete harm to any Plaintiff.  Of the numerous writings Plaintiffs have submitted for prepublication review since leaving government service, they allege that delayed review of only two book-length manuscripts caused difficulties during the publication process.  *See* Compl. ¶ 89 (Mr. Goodman's publication of *Whistleblower at the CIA*); *id.* ¶ 112 (Mr. Fallon's publication of *Unjustifiable Means*).  And only one of these two is alleged to have culminated in any concrete harm in the form of travel costs and expenses incurred by Mr. Fallon when he canceled promotional events.  *Id.* ¶ 112.  Those harms, however, are alleged to have resulted from misinformation allegedly provided by Mr. Fallon's friends and a DOPSR employee and Mr. Fallon's own failure to plan for the prepublication review process, not from the specific deficiencies alleged in this lawsuit.  Indeed, Mr. Fallon failed to submit his manuscript until January 2017, the eve of his publication date and three months after a different DOPSR employee advised that he was required to do so.  *Id.* ¶¶ 106-07.  But, even assuming that the Agencies' review processes were to blame for the disruption to Mr. Fallon's publication schedule, that single "past exposure to [allegedly] illegal conduct does not in itself show a present case or controversy" to seek the declaratory and injunctive relief that Plaintiffs seek here.  *Lebron*, 670 F.3d at 561.

## 2.    Plaintiffs Fail to Demonstrate Standing Based on "Chill."

Plaintiffs' claims of standing based on "chill" to their First Amendment activities are similarly inadequate.  In the First Amendment context, standing may sometimes be established by a showing of "self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression," *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (citation omitted), but not under the circumstances alleged here.  To the contrary, "subjective or speculative accounts" of a chilling effect "are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Bond v. United States*, 742 F. App'x 735, 737 (4th Cir. 2018) (citation omitted).  "The chilling effect must have some objective manifestation," *id.*, and be

_____

cases require."  *Lujan*, 504 U.S. at 564; *see also Carroll v. Nw. Fed. Credit Union*, No. 18-1434, 2019 WL 2089378, at *2 (4th Cir. May 13, 2019) (same).

"likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Abbott*, 900 F.3d at 169 (citation omitted).[13]  Plaintiffs' allegations fail this standard.

Plaintiffs' claims of chill are belied by the fact that they have published extensively and intend to continue doing so notwithstanding the systemic inadequacies they allege.  Specifically, since leaving the government, "Mr. Edgar has submitted to the ODNI blog posts and op-eds that have appeared in major publications, including the Guardian, the Los Angeles Times, the Wall Street Journal, and the Lawfare national security blog," as well as a book, and he "plans to continue writing about matters relating to intelligence and cybersecurity."  Compl. ¶¶ 61, 65.  Mr. Immerman has submitted "book manuscripts, articles, papers, public talks, and academic syllabi" and "plans to continue publishing academic articles, books, and op-eds, at least some of which will trigger prepublication review obligations."  *Id.* ¶¶ 61, 65, 72, 79.  Mr. Goodman has likewise "submitted multiple works to the CIA for prepublication review," including numerous books, and he plans to continue writing and submitting "those portions of any future manuscripts that deal with intelligence matters."  *Id.* ¶¶ 85, 93.  And Mr. Fallon "has published op-eds, articles, columns, and a book" since leaving government service, many of which he submitted for prepublication review, and he "plans to continue submitting to the DoD any draft op-eds, articles, columns, and books that he writes in the future."  *Id.* ¶¶ 103, 115.[14]  Thus, far from supporting Plaintiffs' conclusory claims of chill, the Complaint refutes them.  *See The Baltimore Sun Co. v. Ehrlich*, 437

---

[13] Thus, in *Cooksey*, where state officials had contacted the plaintiff and directed him to change the content of his website pursuant to a state law regulating the provision of nutritional advice, the officials' actions were held to create an objectively reasonable chilling effect.  But the court in *Cooksey* also observed that a chilling effect cannot "'arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or . . . concomitant fear that . . . the agency might in the future take some other and additional action detrimental to that individual.'" *Id.* at 236 (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)).  The court thus reiterated that "'allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *Id.* (quoting *Laird*, 408 U.S. at 13-14).

[14] Ms. Bhagwati does not claim to be chilled, perhaps because she has "published more than a dozen op-eds and opinion pieces about her experiences in the military and her military advocacy work" and "plans to continue her advocacy through written publications and public appearances." Compl. ¶¶ 97, 99.

F.3d 410, 419 (4th Cir. 2006) (rejecting claims of chill where record established that plaintiffs "have not been chilled from expressing themselves" because they "continued to write stories for The Sun, to comment, to criticize, and otherwise to speak" notwithstanding the "inconvenience" they alleged).

To the extent Plaintiffs claim that, but for prepublication review, they would publish even more extensively or their writings would be different from those they are currently writing, that alleged chill is not objectively reasonable.  It is alleged to flow not only from the potential "delay" of prepublication review, Compl. ¶¶ 66, 118, but also from the "burden" and "uncertainty" of review, *id.* ¶¶ 66, 80, and the desire to "maintain[] a good relationship with reviewers," "avoid conflict," and avert "unjustified objections."  *Id.* ¶¶ 64, 92, 118.  A plaintiff cannot reasonably claim an Article III injury based on a mere preference to avoid potential disagreement, the possibility of delays in the publication process, or uncertainty.  *See The Baltimore Sun*, 437 F.3d at 419 (rejecting similar claims of chill as "inconsistent with the journalist's accepted role in the 'rough and tumble' political arena" and not representative of "a reporter of ordinary firmness").

Nor are such claims of chill redressable.  No relief that the Court can enter would ensure that the prepublication review process will be certain, free of conflict, or definitively resolved to Plaintiffs' satisfaction within a set time period.  Even if the Court were to order that the Agencies' *initial* reviews be completed within 30 days, a final decision could still extend far longer due to administrative appeals and the possibility of judicial review, and Plaintiffs may still be dissatisfied at the conclusion of the process.  Prepublication review matters are inherently fact-specific and dependent upon the substance and scope of the submission, nature of the information at issue and number of agencies involved.  A lengthy submission that touches on highly classified topics involving multiple agencies will necessarily take more time to review.  To the extent Plaintiffs find the publishing process to be more stressful, burdensome, or uncertain as a result, that is an unavoidable consequence of publishing works that relate to their prior employment dealing with classified matters and the obligation they knowingly undertook as a condition of their access to classified information.  It is not a concrete harm redressable in this case.

Any claim of chill based on Plaintiffs' purported fears that reviewers "will be less responsive" if their writings "are perceived to be critical" of the government, Compl. ¶¶ 66, 92, is equally flawed. It has no basis in any action by the Agencies and "courts presume that [government officials] properly discharge[] their official duties" absent "clear evidence to the contrary," *Alfred A. Knopf, Inc.*, 509 F.2d at 1368 (citation omitted).[15] Thus, Plaintiffs' subjective fear that the government might treat them less favorably because of the content of their writings cannot support standing. *See Amnesty Int'l USA v. Clapper*, 667 F.3d 163, 179-80 (2d Cir. 2011) (Raggi, J., dissenting from denial of *en banc* review) ("plaintiffs profess *only a fear* of [certain government conduct], which is plainly insufficient to establish standing" (emphasis added)); *Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 608-10 (6th Cir. 2008) (plaintiff lacked standing "where he assumed[,] . . . without any specific action by [the defendant] that were he to speak, punishment would result").

Plaintiffs' claims of chill also ring hollow because "if publication without the change could be punished after the fact[,] . . . then presumably the employee is not made worse off by having advance notice of the government's view." *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1441 (D.C. Cir. 1996). Indeed, in light of the civil and criminal penalties that exist for unauthorized disclosure of classified information, any chill to the speech of former employees would likely be *greater* without a prepublication review process. As Plaintiffs acknowledge, on several prior occasions, they believed that their works did not contain classified information, but the Agencies disagreed. *See, e.g.*, Compl. ¶¶ 64, 78, 88, 111. Prepublication review was the mechanism through which those disagreements were resolved, enabling Plaintiffs to publish without fear that they might later be subject to civil or criminal penalties, a constructive trust on their earnings, or an injunction prohibiting dissemination of their works. Enjoining the Agencies from "continuing to enforce [their] prepublication review regimes" – the sweeping injunction Plaintiffs seek, Compl. at 41 –

---

[15] Indeed, the CIA's regulation expressly provides that "[p]ermission to publish will not be denied solely because the material may be embarrassing to or critical of the Agency." A.R. 13-10 § 2(f)(2).

would require authors to take steps on their own to avoid even the chance of these adverse effects, which in turn would lead to a *greater* risk of chill.

**B.     Even if Some Plaintiffs Have Standing to Pursue Some of Their Claims, They Lack Standing to Bring All of Their Claims.**

Had Plaintiffs plausibly alleged standing to challenge certain attributes of the prepublication review system, that still would not give them a "passport to explore the constitutionality" of the entire system.   *Abbott*, 900 F.3d at 179 n.10.   "The actual-injury requirement would hardly serve the purpose . . . of preventing courts from undertaking tasks assigned to the political branches if once a plaintiff demonstrated harm from one particular inadequacy in government administration," the court were authorized to address "all inadequacies in that administration."   *Lewis*, 518 U.S. at 357; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (a plaintiff may not "seek wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the Halls of Congress, where programmatic improvements are normally made").   Thus, Plaintiffs must establish a concrete injury flowing from *each* alleged deficiency of the system they assert.   *See Abbott*, 900 F.3d at 179 n.10.   They have not done so here.

**1.     Plaintiffs Lack Standing to Challenge the Categories of Persons and Material Subject to Prepublication Review.**

First, Plaintiffs fail to establish standing to press their theory that prepublication review must apply "only to those entrusted with the most closely held government secrets" and "only to material reasonably likely to contain those secrets."   Compl. ¶ 3.   That is because Plaintiffs *were* entrusted with the most closely held government secrets and they have shown that their writings *are* reasonably likely to contain those secrets (except Ms. Bhagwati, who has not shown that her writing is subject to prepublication review to begin with).   When in government service, Plaintiffs were given access to Secret and Top Secret information, as well as SCI, and their roles involved reviewing surveillance authorities, government watch lists, and sensitive programs; analyzing intelligence and intelligence products; and overseeing criminal, tactical, and counterterrorism

20

efforts.  *See* Compl. ¶¶ 58, 59, 69-71, 82, 83, 95, 96, 100-102.  Moreover, Professor Immerman and Mr. Fallon aver that they are *still* entrusted with access to classified information as a result of Professor Immerman's ongoing work for the HAC and Mr. Fallon's consulting work.  *See id.* ¶¶ 71, 100, 102.  Thus, whether or not prepublication review must "apply only to those entrusted with the most closely held government secrets," *id.* ¶ 3, it still will apply to Plaintiffs.  They therefore lack standing to claim injury from the absence of such a limitation.

Similarly, by every indication, the work of Plaintiffs (other than Ms. Bhagwati) is reasonably likely to contain classified information.  Each of them writes on topics that relate directly to their work for the government, such as surveillance, *id.* ¶¶ 58, 62 (Mr. Edgar); the CIA, foreign relations, and the impact of intelligence on policy, *id.* ¶¶ 69, 70, 73, 79 (Professor Immerman); international relations, international security, and the CIA, *id.* ¶¶ 81, 82, 89 (Mr. Goodman); and criminal investigations, interrogation, counterterrorism, and counterintelligence, *id.* ¶¶ 100-01, 104, 113 (Mr. Fallon).  Moreover, they allege that their submissions have frequently been returned by the Agencies with redactions and excisions, *id.* ¶¶ 64, 75, 88, 110, demonstrating that their work is likely to contain classified information.  Thus, even if Plaintiffs were correct that the system requires some authors to submit materials that may not be likely to contain classified information, Plaintiffs have not shown themselves to be such authors.  They therefore have no standing to challenge this alleged deficiency.[16]

---

[16] To the extent Plaintiffs seek to rely on the "overbreadth" doctrine to pursue this theory, such reliance would be misplaced because Plaintiffs cannot show "a realistic danger" of "significant[] compromise [to] recognized First Amendment protections of parties not before the Court[.]"  *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).  The only former employees affected by prepublication review are those who have voluntarily undertaken a prepublication review obligation as a condition of accessing classified information and thus have no First Amendment right to forego prepublication review.  *Snepp*, 444 U.S. at 511.

2.      **Plaintiffs Lack Standing to Challenge Features of the Prepublication Review Process that Apply Only to Current Employees.**

Plaintiffs similarly lack standing to challenge aspects of the prepublication review systems that apply only to current employees and/or the release of "official" government information, as those aspects do not apply to them in their capacity as former employees.

For example, in support of their claim that DoD's prepublication review regime is "vague, confusing, and overbroad," Plaintiffs rely on provisions of a DoD regulation discussing "security review" requirements and "policy review." Compl. ¶ 38(c)-39. However, the security review requirements discussed in those provisions apply to "DoD personnel" – *i.e.*, current DoD employees and active duty Service members. *See* DoDI 5230.29 Encl. 3 § 1 (stating applicability to "[o]fficial DoD information that is prepared *by or for DoD personnel*") (emphasis added); DoDI 5230.09 § G.2 (defining "DoD personnel"). The "policy review" requirements likewise apply only to "[i]nformation released *officially*" by DoD personnel. DoDI 5230.09 § 1.2(e) (emphasis added); *see also* DoDI 5230.29, Encl. 3 § 1 (distinguishing between "security review" and "policy review"). In contrast, the regulations make clear that "*former* DoD employees" are required to "use the DoD prepublication review process *to ensure that information they intend to release to the public does not compromise national security as required by the nondisclosure agreements*." DoDI 5230.09 § 1.2(g) (emphasis added). The nondisclosure agreements themselves provide that submissions of prior employees must undergo only "security review" to determine whether the intended publication contains classified materials. Form 4414 § 4; *see also* SF 312 § 3. Thus, DoD requirements that pertain to reviews other than for classified information purposes, Compl. ¶¶ 38(c), 39, are inapplicable to former employees. *See Pfeiffer v. CIA*, No. 91-736 (NHJ), 1994 WL 80869, at * 6 (D.D.C. Mar. 3, 1994) (rejecting similar claims and dismissing for lack of standing because challenged regulation did "not purport to control [plaintiff's] actions as a former employee" but rather "'sets forth policy governing . . . release of . . . information *in the possession of the agency*'" (emphasis in original)). Plaintiffs therefore lack standing to challenge those requirements.

Also inapplicable to Plaintiffs are provisions of NSA's policy that relate to "official NSA/CSS information," which Plaintiffs again cite as support for their theory that the system is "vague, confusing, and overbroad."   *Id.* 44(c).   "Official NSA/CSS Information" is information that, among other things, "*is in the custody and control of NSA/CSS.*"   NSA Policy 1-30 § 29 (emphasis added).   It therefore appears to have no application to Plaintiffs (except to the extent it describes classified information) as none of the Plaintiffs worked for NSA.   Plaintiffs therefore lack standing to challenge that provision as well.

### 3.      Plaintiffs Lack Standing to Bring their Vagueness Claims.

Plaintiffs also fail to demonstrate standing to press their vagueness claim.   Although they allege generally that they are confused about the scope of their prepublication review obligations, they identify no circumstance in which such uncertainty has caused, or is likely to cause, any tangible harm.   None contend that, as a result of any lack of clarity, they failed to submit works and were later sanctioned.   On the contrary, the Complaint demonstrates that Plaintiffs generally have been well aware of when they needed to submit materials for prepublication review and have adhered to those obligations.   *See* Compl. ¶¶ 72, 73, 85, 87, 92.[17]

The only Plaintiff who alleges any specific instance of uncertainty about his obligations is Mr. Fallon, who states that he was confused about whether to submit his manuscript for *Unjustifiable Means*.   *Id.* ¶¶ 105-06.   However, Mr. Fallon admits that his confusion stemmed from incorrect advice he received from friends and allegedly from a DOPSR employee via telephone. *Id.* ¶¶ 105-06.   His confusion did not stem from the text of the nondisclosure agreements or any written guidance.   Moreover, notwithstanding his initial uncertainty, Mr. Fallon ultimately received appropriate guidance from DOPSR via email, submitted his manuscript for review, obtained clearance, and published his book.   *Id.* ¶¶ 106, 107, 111.   And he now knows that he can obtain guidance from DOPSR should he have questions in the future.   Thus, Plaintiffs have not

---

[17] While Mr. Goodman alleges that he declined to submit materials on occasion, he admits to having done so purposefully because the pieces were time-sensitive and not due to uncertainty about his obligation.   Compl. ¶ 86.

demonstrated any likelihood of concrete harm as a result of any vagueness they assert. They therefore lack standing to bring this claim. *See McGehee v. Casey*, 718 F.2d 1137, 1147 (D.C. Cir. 1983) ("[a] litigant cannot properly challenge a rule for vagueness when it clearly applies to him" (citation omitted)).

### C.   Plaintiffs Lack Standing to Seek the Requested System-Wide Relief.

Plaintiffs also lack standing to seek the system-wide injunction they request. They challenge only specific features of how the prepublication review system operates, but they seek, not to improve the system consistent with their theories, but rather to prohibit the enforcement of prepublication review obligations altogether by discarding the entire system. *See* Compl. at Prayer for Relief ¶ 2 (seeking to enjoin the Agencies from "enforce[ing] [their] prepublication review regimes against Plaintiffs, or any other person"). They lack standing to do so. The Supreme Court has consistently reiterated that a plaintiff lacks standing to seek a remedy that is broader than "the inadequacy that produced [any] injury in fact[.]" *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018).

Plaintiffs' requested injunction also is beyond this Court's jurisdiction because it would violate separation of powers principles. "[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996). The responsibility for protecting the national security and preserving "the appearance of confidentiality so essential to" our foreign relations is committed to the Executive Branch, not the judiciary. *Snepp*, 444 U.S. at 509 (upholding prepublication review obligation); *see also Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (protection of "intelligence sources, methods and operations is entrusted to the [Executive Branch], not to the courts" (citation omitted)); 50 U.S.C. § 3024(i) (providing that ODNI "shall protect intelligence sources and methods from unauthorized disclosure"). Enjoining the Agencies from maintaining a system to enforce prepublication review obligations would thus conflict with well-established law. It also would severely impair the Executive Branch's ability to protect national security, risking harm to the nation's secrets, relationships with foreign governments, and intelligence sources. *See Sims*, 471 U.S. at 175 ("We seriously doubt whether a potential intelligence source will rest assured

knowing that judges, who have little or no background in the delicate business of intelligence gathering" will oversee protection of classified information).   That outcome cannot be squared with the Constitution's commitment of national security to the Executive Branch.   *See Egan*, 484 U.S. at 529 (courts are "reluctant to intrude upon the authority of the Executive in . . . national security affairs."); *United States v. Marchetti*, 466 F.2d 1309, 1317-18 (4th Cir. 1972) (the "conduct of . . . the national defense [is] an executive function beyond the control of the judicial power"); *Elgabrowny v. Cent. Intelligence Agency*, No. 17-CV-00066 (TSC), 2019 WL 1440345, at *14 (D.D.C. Mar. 31, 2019) (same).   The Court therefore lacks jurisdiction to entertain Plaintiffs' claim for injunctive relief.

## II.   Plaintiffs' Claims Are Not Ripe.

Plaintiffs' claims should also be dismissed for lack of ripeness.   As with standing, ripeness bears upon the Court's subject matter jurisdiction.   *See Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013).   The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."   *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).   "The question of whether a claim is ripe 'turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"   *South Carolina*, 912 F.3d at 730 (citation omitted).   To be fit for judicial review, a controversy should be presented in a "clean-cut and concrete form" and be "final and not dependent on future uncertainties."   *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006); *see also Franks v. Ross*, 313 F.3d 184, 195 (4th Cir. 2002).   This inquiry is especially rigorous where a case involves constitutional questions.   *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) (courts should "avoid reaching constitutional questions in advance of the necessity of deciding them").

Plaintiffs' claims are not fit for review.   Plaintiffs do not take issue with any current prepublication review decision, and their abstract fears about how the system might operate in the

future are therefore divorced from any immediate, concrete factual setting. "Courts cannot make well-informed decisions when legal issues do not arise out of the facts of a real case." *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1197 (D.C. Cir. 1992). Such is the case here where the process and outcome of any specific prepublication review submission, and the balance of interests involved, necessarily depend on numerous fact-specific circumstances. *See Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1027-28 (9th Cir. 2012) (court lacked jurisdiction over claim that delays and lack of procedural safeguards in administration of healthcare violated the Due Process Clause because, among other things, "there is no way for the district court to resolve whether the VA acted in a timely and effective manner . . . without evaluating the circumstances of individual veterans and their requests for treatment, and determining whether the VA handled those requests properly").[18]

Plaintiffs cannot claim any hardship from withholding a decision in this case. If they are aggrieved by the prepublication review process in the future, they can pursue their administrative remedies and seek judicial review. Plaintiffs point to no advantage to litigating these issues in their current abstract form over waiting for a specific controversy, other than their apparent desire to be categorically relieved of their prepublication review obligations (which, as discussed *supra* at 23-25, they are not entitled to in any event). Their claims are, therefore, unripe.

### III.     The Complaint Fails to State a Claim on Which Relief Can Be Granted.

Plaintiffs' Complaint also should be dismissed because it fails to state a claim on which relief can be granted. "[I]t is well settled that a person's First Amendment right to freedom of speech yields to the government's 'compelling interest' in preventing the publication or dissemination of classified information." *Wilson I*, 501 F. Supp. 2d at 551 (citing *Snepp*, 444 U.S.

---

[18] Any inquiry based on prior decisions would be especially improper here, given that in many of the circumstances alleged in the Complaint, Plaintiffs failed to pursue their administrative remedies and thus did not give the agency an opportunity to correct any mistakes in the first instance. *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (holding that generally, "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.").

at 509 n.3); *Alfred A Knopf, Inc.*, 509 F.2d at 1370; *Marchetti*, 466 F.2d at 1315-16).  Thus, "once a government employee signs an agreement not to disclose information properly classified pursuant to executive order, that employee 'simply has no first amendment right to publish' such information." *Wilson II*, 586 F.3d at 183-84 (citing *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) ("*Stillman II*"); *United States v. Pappas*, 94 F.3d 795, 801 (2d Cir. 1996)).  Indeed, "even in the absence of an express agreement," the government may protect its compelling interests "by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment."  *Snepp*, 444 U.S. at 510 n.3 & 511 n.6.  Thus, the only question in evaluating the constitutionality of the Agencies' prepublication review regimes is whether those regimes are a "reasonable means for protecting" the government's compelling interest in protecting classified information.  *Id.* at 510 n.3; *see also Weaver*, 87 F.3d at 1440 (applying similar standard).  The Agencies' regimes clearly satisfy this standard.

### A.     The Complaint Does Not Plausibly Allege That the Scope of Prepublication Review Violates the First Amendment.

Plaintiffs allege that the system violates the First Amendment because it purportedly applies to former employees who have not been entrusted with access to the government's "most closely held government secrets" and to information that is not "reasonably likely to contain" such secrets.  Compl. ¶ 3.  They are wrong, both as to the types of former employees and works subject to prepublication review and as to what the First Amendment requires.

First, prepublication review, as it applies to former employees, *is* limited to employees that have been entrusted with the government's most closely held secrets – *i.e.*, those who have signed nondisclosure agreements with the government and thereby gained access to classified information.  To the extent Plaintiffs believe it to be otherwise, they misread the regulations, confusing the broader set of review obligations applicable to current employees and the release of "official" Agency information with the national security review obligation applicable to the private

writings of former employees.  *See supra* at 22-23 (discussing regulatory provisions cited in the Complaint that are inapplicable to former personnel).[19]

To the extent Plaintiffs use the phrase "most closely held government secrets" to mean that prepublication review should apply only to former employees that possessed access to some unspecified *subset* of classified information, such as Top Secret information or SCI, there is no legal basis for such a claim.  Classification reflects an official determination that unauthorized disclosure could harm the national security.  *See* Exec. Order No. 13,526 § 1.1(a).  It also represents an official determination that the information at issue must be "closely held."  *See id.* § 4.1(a) (providing, without qualification, that a person may not access classified information unless an agency head or designee approves their "eligibility for access," they sign an approved nondisclosure agreement, they have a "need-to-know," and they have undergone training on proper safeguarding); *see also United States v. Rosen*, 445 F. Supp. 2d 602, 623-24 (E.D. Va. 2006) ("access to classified information is restricted to a small number of people and accordingly is 'closely held'"), *aff'd*, 557 F.3d 192 (4th Cir. 2009). Thus, when the Supreme Court concluded in *Snepp* that "the Government has a compelling interest in protecting the secrecy of information important to our national security," it did not limit that interest to the government's "most closely held" secrets, but rather held that it applied to *any* classified information.  444 U.S. at 510.

Plaintiffs' theory that the system is impermissible because it extends to works that are not "reasonably likely to contain" classified information is similarly foreclosed by *Snepp*.  The prepublication review obligation at issue in *Snepp* extended to "'any information or material relating to the [CIA], its activities, or intelligence activities generally, either during or after the term of [Snepp's] employment.'"  *Id.* at 765 (citing nondisclosure agreement).  That standard in

---

[19] As to current employees, "there is nothing unreasonable in the application of [prepublication review] to all agency employees – even ones without direct access to classified information" because "even employees without such direct access may inadvertently, and even unknowingly, come into contact with classified information."  *Weaver*, 87 F.3d at 1441, 1443.  "Indeed, the review process may be particularly important in precisely such cases, as unintended recipients of information are especially likely to have no idea that their material may harbor damaging disclosures."  *Id.* at 1443.

no way limited the obligation to material "reasonably likely" to contain classified information, yet the district court, the Fourth Circuit, and the Supreme Court, had no trouble concluding that it was consistent with the First Amendment. *Id.* at 508-509 & n.3. In fact, the Supreme Court emphasized that the propriety of prepublication review "*does not depend* upon whether [a submission] actually contain[s] classified information" because the former employee must give the *government* "an opportunity to determine whether the material . . . would compromise classified information or sources." 444 U.S. at 511 (emphasis added). As the Supreme Court explained:

> [A] former intelligence agent's publication of unreviewed material relating to intelligence activities can be detrimental to vital national interests *even if the published information is unclassified. When a former agent relies on his own judgment about what information is detrimental, he may reveal information that the CIA – with its broader understanding of what may expose classified information and confidential sources – could have identified as harmful.*

*Snepp*, 444 U.S. at 512-13 (emphasis added). The Supreme Court thus concluded that the employee was "obligat[ed] to submit his material [for prepublication review] – classified or not." *Id.* at 513 (emphasis added). That holding disposes of Plaintiffs' claims here.

### B.     The Complaint Does Not Plausibly Allege that Prepublication Review Procedures Violate the First Amendment.

Plaintiffs also advance a number of theories relating to the procedures by which prepublication review is conducted. Specifically, they contend that the Agencies' regimes violate the First Amendment because the regimes purportedly do not "provide clear notice of what must be submitted and what standards will be applied; [do not] tightly cabin the discretion of government censors; [do not] include strict and definite time limits for completion of review; [do not] require censors to explain their decisions;" and do not "require the government to initiate judicial review of [prepublication review] decisions." Compl. ¶¶ 3, 37. These claims fail as a matter of law.

As an initial matter, Plaintiffs' theory that the First Amendment requires these procedures appears to be based on *Freedman v. Maryland*, 380 U.S. 51 (1965), which held that censorship of

motion pictures is a prior restraint on speech and therefore must be subject to strict safeguards.  *Id.* at 58-60.  However, "when a government employee 'voluntarily assume[s] a duty of confidentiality, governmental restrictions on disclosure are not subject to the same stringent standards that would apply to efforts to impose restrictions on unwilling members of the public.'"  *Wilson II*, 586 F.3d at 183 (quoting *United States v. Aguilar*, 515 U.S. 593, 606 (1995)).  Courts have therefore repeatedly held that prepublication review is not a prior restraint of the type at issue in *Freedman*.  *See Stillman*, 517 F. Supp. 2d at 38 ("prepublication review requirement imposed on a government employee with access to classified information is not an unconstitutional prior restraint" (citations omitted)); *Wilson II*, 586 F.3d at 183 (prepublication review "is not . . . a 'system of prior restraints' in the classic sense" (citation omitted)); *Weaver*, 87 F.3d at 1440 (traditional prior restraint analysis inappropriate where government acts under its authority as an employer).  Accordingly, *Freedman* is inapplicable.[20]  Rather, as explained above, the only proper inquiry here is whether the Agencies' prepublication review procedures are a "reasonable means" of protecting the Agencies' compelling interests against unauthorized disclosure of classified information.  *Snepp*, 444 U.S. at 510 n.3.  They are.

> **1.      The System Provides Proper Notice of What Must Be Submitted and the Standards that Apply.**

Plaintiffs contend that the system fails to provide clear notice of what must be submitted and the applicable standards of review, but the nondisclosure agreements they cite provide clear notice on both fronts.

First, the agreements provide specific notice of what types of work must be submitted.  For example, SF 312 requires submission if the former employee is "uncertain about the classification status" of the work.  SF 312 § 3.  The CIA Secrecy Agreement requires submission of any material

---

[20] Even apart from this authority, *Freedman* would not apply.  Prepublication review serves only to protect against unauthorized disclosure of classified information, and therefore presents categorically different considerations from those in *Freedman*.  *See Covenant Media of SC, LLC v. City of N. Charleston*, 493 F.3d 421, 431-35 (4th Cir. 2007) (noting that *Freedman* applies only where the "government has adopted a regulation of speech *because of disagreement with the message it conveys*" (emphasis added, citations omitted)).

that "contains any mention of intelligence data or activities" or that might be based on information the employee knows to be classified or undergoing a classification determination. CIA Secrecy Agreement § 5. Form 4414 requires submission of any work that "contains or purports to contain any SCI or description of activities that produce or relate to SCI" or that the former employee has "reason to believe [is] derived from SCI." Form 4414 § 4. Plaintiffs fail to explain how these standards – or any standards contained in other nondisclosure agreements used by the Agencies – are unclear. As explained above, they are at least as narrow and precise as those upheld in *Snepp*. *See supra* at 28-29.

The nondisclosure agreements also provide clear notice of the standard by which submissions are reviewed. Indeed, employees that sign the agreements expressly affirm their understanding that the Agency will review the submission to determine whether it contains any information the employee has agreed not to disclose. *See* CIA Secrecy Agreement § 6 (acknowledging that the purpose of prepublication review is "*to determine whether [the submission] . . . contains any information or material that I have agreed not to disclose*" (emphasis added)); Form 4414 § 4 (same as to SCI); SF 312 § 3 (stating that the purpose of submission is to "*confirm . . . that the information is unclassified*" (emphasis added)). To the extent Plaintiffs seek to introduce ambiguity into these agreements by relying on regulatory provisions that apply only to current employees, they have misconstrued those regulations as applicable to their submissions when they are not. *See supra* at 22-23. This theory should therefore be dismissed.

## 2. The System Properly Cabins Prepublication Review Decisions.

For the same reasons, Plaintiffs' claim that the system does not "tightly cabin the discretion of [reviewers]," Compl. ¶ 3, also fails. The purpose of the prepublication review process (as it relates to former employees) is to ensure that classified information is not disclosed. *See Wilson II*, 586 F.3d at 185 ("CIA regulations provide that '[t]he PRB will review material proposed for publication or public dissemination *solely* to determine whether it contains any classified information." (citing A.R. 13-10 § 2(f)(2) (emphasis in *Wilson II*)); *McGehee*, 718 F.2d at 1142 ("McGehee's secrecy agreement applies only when he seeks to publish 'classified

information'").[21]  That inquiry, in turn, is guided by the definition of "classified information" contained in the agreements as well as the comprehensive standards set forth in Executive Order 13,526.  *See* SF 312 § 1.  To be sure, the Executive Branch's determination as to whether particular information is classified – *i.e.*, whether disclosure would cause harm to national security – involves an exercise of judgment by the Executive Branch to which courts routinely defer.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010); *Wilson II*, 586 F.3d at 185; *McGehee*, 718 F.2d at 1148.  But whether the requirement for prepublication review constitutes a system of prior restraint turns on whether there are standards delineated for the exercise of that judgment – and here those standards exist in the applicable executive orders.  Thus, in *McGehee*, the D.C. Circuit rejected claims that, like the Plaintiffs' claims here, challenged the "constitutionality of the CIA's substantive criteria and scheme for deciding how to classify, and thereby censor, writings of former agents."  718 F. 2d at 1141.  In so doing, the D.C. Circuit held that the standards set forth in the nondisclosure agreements, the then-relevant Executive Order, and other guidance properly cabined reviewers' discretion.  *Id.* at 1143-45.  The same conclusion follows here.  The fact that an agency makes a determination as to what information is classified in a manuscript submitted by a former employee does not render the review system a prior restraint.  *Snepp*, 444 U.S. at 509 n.3.

### 3. The System Establishes Reasonable Time Frames and Is Not Facially Invalid Because Reviews at Times Have Exceeded Thirty Days.

Plaintiffs' claim that the system is unconstitutional because it lacks "strict and definite time limits" also fails as a matter of law.  As discussed above, the Agencies seek to complete prepublication review within specific time frames.  Both Form 4414 and the regulations set benchmarks for the completion of prepublication review within thirty business days and shorter

---

[21] Other discrete categories of sensitive information exist that require protection by law, such as personally identifiable information.  Plaintiffs do not suggest that they have ever sought to publish such information (much less do they assert a First Amendment right to do so), but to the extent a draft submission contained such information, an Agency's ability to require redaction would hinge on the legal authority requiring protection and the fiduciary obligations the Supreme Court recognized in *Snepp*, 444 U.S. at 510 & 515 n.1, rather than on any particular regulation or nondisclosure agreement providing for prepublication review.

time frames for certain works.  *See supra* at 7-8, 14-15.  Meeting these deadlines is a high priority for the Agencies, because (among other things) undue delay increases the risk that authors will publish without completing prepublication review, which could result in the release of classified information.  *Id.* at 15.  But, as noted above, the amount of time needed to review any specific submission is fact-specific and dependent on numerous factors that the Agencies cannot control, such as the length of a submission, the extent of classified information that it contains, the number and complexity of other submissions pending before the Agency, the number of other agencies that must be consulted before the submission can be cleared, and the extent to which the author follows the proper protocols to facilitate review.  *See, e.g.*, A.R. 13-10 § 2(6)(C); DoDI 5230.29, Encl. 3 § 3(a).  Given these realities, the Agencies' ability to use prepublication review to ensure that classified information is not released cannot turn on rigid one-size-fits-all time constraints. Recognizing that fact, the D.C. Circuit in *Weaver* expressly declined to impose a specific time limit on prepublication review.  *See Weaver*, 87 F.3d at 1443 ("We have found no case holding that a review process – or indeed any form of prior restraint, even one including substantive prohibition of speech – in the context of an employment relationship is constitutionally invalid for want of a specific deadline on action").

To be sure, the Fourth Circuit's decision in *Marchetti* did state that "[w]e should think that, in all events, the maximum period for responding after the submission of material for approval should not exceed thirty days."  *Marchetti*, 466 F.2d at 1317.  But in such dicta, the court never suggested – as do Plaintiffs – that the government's inability to adhere to the thirty-day time frame in every circumstance renders the system categorically invalid on its face.  And even if the statement had not been dicta, it would not appear to survive *Snepp*, which did not impose any time limit on prepublication review.

Moreover, any observation in *Marchetti* as to what seemed reasonable under particular circumstances in 1977 cannot be transposed across the board, especially in today's information age.  Indeed, perhaps because the statement in *Marchetti* was dicta, it did not consider any fact-specific circumstances that necessarily bear on the time frame necessary for prepublication review.

For example, it did not consider a scenario where a manuscript must be submitted to other agencies for review, which necessarily adds time to the process.  Nor did it contemplate the growth of prepublication review that Plaintiffs themselves emphasize: whereas "in 1977, the CIA received [only] 43 submissions," the Agencies now receive many thousands of submissions per year. Compl. ¶ 28.  The magnitude of those submissions requires the Agencies to make discretionary judgments about how best to allocate resources between prepublication review and other important Agency functions.  In making those judgments, the Agencies are not constitutionally required to prioritize the desire of former employees to publish information related to their prior classified employment over other important national security interests. *See Weaver*, 87 F.3d at 1442 ("we do not think those who have secured formal [government] roles . . . have a transcendent interest in instant publication of statements made on agency-related matters").  Indeed, any such holding would impermissibly intrude upon the Executive Branch's broad authority and ability to protect the national security. *Cf. Namarra v. Mayorkas*, 924 F. Supp. 2d 1058, 1065-66 (D. Minn. 2013) ("If the Court were to inquire into the reasonableness of the pace of adjudication[,] . . . it would have to examine . . . how the Secretary has chosen to allocate her time and resources . . . and what national security and foreign policy concerns may be affecting the Secretary's decisionmaking," an inquiry that "would not only be unwise, but [] is jurisdictionally prohibited"); *Hu v. Chertoff*, No. S-06-2805 WBS EFB, 2007 WL 1515067, at *5-6 (E.D. Cal. May 22, 2007) ("Judicial inquiry into the reasons for a delay is particularly improper in contexts where, as here, national security may be implicated").  Plaintiffs' time-limit theories should therefore be rejected as a matter of law.

### 4. Reviewers Are Not Required to Offer Written Explanations for their Decisions.

Plaintiffs also are incorrect to contend that the system is unconstitutional because it does not require Agency reviewers to explain their decisions.  When the Agencies exercise their authority under a nondisclosure agreement to require changes to a manuscript as a condition to publication, the explanation is that the material is classified.  More specifically, it meets the criteria of one of the categories of the Executive Order on classification under which disclosure would

cause harm to national security and either has already been classified or is undergoing a classification determination.  To the extent Plaintiffs are suggesting that the Agency must explain *why* the information is classified, such explanations are likely to reveal classified information that the former employee is not authorized to receive.  *See Stillman II*, 319 F.3d at 548-49 (noting that the reasons for the CIA's prepublication review decisions were classified).  In recognition of that fact, the D.C. Circuit has held that judicial review of prepublication review decisions should be conducted on the basis of *ex parte, in camera* review of classified affidavits.  *McGehee*, 718 F.2d at 1149; *see also Stillman II*, 319 F.3d at 548 (reversing lower court's decision to order disclosure of CIA's reasons absent a finding that the court was unable to "resolve the classification [determination] ex parte").  And where the Government may submit that explanation to a court *ex parte,* nothing supports any requirement that it must provide a classified explanation to the requester during the administrative process.  Rather, the appropriate procedural protections come in the form of authors' ability to meet with Agency reviewers and discuss any concerns, and – failing that – to seek judicial review.  *See McGehee*, 718 F.2d at 1148-49; *Marchetti*, 466 F.2d at 1317 (noting availability of judicial review).  Plaintiffs' approach, in contrast, would require exposure of classified information to former employees, and it should be rejected as a matter of law.  *See Stillman II*, 391 F.3d at 548.

### 5.    Judicial Review Is Available and the Government Does Not Bear the Burden of Initiating Review.

Plaintiffs' contention that the burden must be on the agency to seek judicial review of a prepublication review decision, Compl. ¶ 37, also fails on its face.  In *Marchetti*, the Fourth Circuit rejected that very claim:  "Because of the sensitivity of the area[,] . . . we find no reason to impose the burden of obtaining judicial review upon the CIA.  It ought to be on [the author]."  466 F.2d at 1317.   The Fourth Circuit reaffirmed that holding in *Snepp*, concluding that "[i]f [the author] wishes to publish a manuscript in spite of the Agency's denial of approval[,] . . . then *he* must institute an action for judicial review[.]"  *United States v. Snepp*, 897 F.2d 138, 141-43 (4th Cir.

1990) (emphasis added).  This claim should therefore be rejected.[22]

### C.      The Complaint Does Not Plausibly Allege Any Systemic Infirmities That Implicate the First Amendment.

Plaintiffs also advance a handful of allegations about the purported dysfunction of the system, all of which are similarly inadequate to state a facial First Amendment claim.

Plaintiffs contend that the system is unconstitutional because, in individual cases, reviewers have sometimes required excision or redaction of information that was publically available. Compl. ¶¶ 42, 46, 64, 75, 90, 110.  But again, in each of those prior cases, the reviewers' decisions were subject to judicial challenge on those very grounds to ascertain whether the information at issue was classified and those decisions are not before this Court.  Moreover, to the extent Plaintiffs are suggesting that information cannot be classified if it is public, they are wrong.  Courts have "unequivocally recognized that the fact that information resides in the public domain does *not* eliminate the possibility that further disclosures can cause harm[.]"  *Fitzgibbon*, 911 F.2d at 766 (emphasis added); *see also Halpern v. FBI*, 181 F.3d 279, 294 (2d Cir. 1999) (the question whether information is properly classified "is generally unaffected by whether the information has entered the realm of public knowledge").  Only an official acknowledgement or disclosure of information by the Government of the specific information at issue places it in the public domain.  *Fitzgibbon*, 911 F.2d at 765.  Otherwise, particularly where unlawful leaks of highly classified information may occur, the purported "public" availability of information does not foreclose the Government from continuing to protect that information or related information.  *Id.*; *see also Wilson II*, 586 F.3d at 186.  Thus, courts have repeatedly rejected claims of authors who challenged prepublication review determinations on the ground that the information was already public.  *See, e.g.*, *Wilson II*, 586 F.3d at 187-96; *Berntsen*, 618 F. Supp. 2d at 30; *Boening*, 579 F. Supp. 2d at 170-71.

Plaintiffs also provide no support for their conclusory assertions that prepublication review decisions are "influenced by authors' viewpoints."  Compl. ¶ 2.  As noted above, the Agencies'

---

[22] To the extent Plaintiffs claim that the system must ensure that judicial review is "prompt," Compl. ¶ 3, they fail to explain how such assurance is within the power of the Agencies.

authority to require modifications to the works of former employees centers on whether information is classified, and Executive Order 13,526 expressly states that information shall not be classified to "prevent embarrassment . . . or [] prevent or delay the release of information that does not require protection in the interest of national security." Exec. Order. No. 13,526 § 1.7; *see also* A.R. 13-10(f)(2) ("Permission to publish will not be denied solely because the material may be embarrassing to or critical of the Agency."). Thus, there is no support for this claim, and to the extent former employees think they have been censored for political reasons, they may seek administrative and judicial review of the agency's action.

Plaintiffs additionally suggest that the prepublication review system is constitutionally deficient because in 2016, "the House and Senate Intelligence Committees instructed the DNI to prepare . . . a new prepublication review policy . . . that would 'yield timely, reasoned, and impartial decisions that are subject to appeal.'" Compl. ¶ 30. But the Committee Report on which Plaintiffs rely in no way suggests that the current system is unconstitutional. Rather, the Committee's primary "concern[] [was] that current and former [intelligence community] personnel have published written material without completing mandatory pre-publication review procedures or have rejected changes required by the review process, *resulting in the publication of classified information*." H.R. Rep. No. 114-573 (May 18, 2016) (emphasis added). Thus, the joint efforts of the political branches to improve the prepublication review system does not bolster Plaintiffs' claims.

For all of the foregoing reasons, Plaintiffs' First Amendment claims should be dismissed.

### D.     The Complaint Fails to State a Fifth Amendment Due Process Claim for Vagueness.

Finally, Plaintiffs' contention that prepublication review protocols are unconstitutionally vague under the Fifth Amendment also fails as a matter of law.  "The vagueness doctrine is premised on the principle that due process of law requires the government to provide potential defendants fair warning that their conduct may be proscribed[.]"  *United States v. Rosen*, 445 F. Supp. 2d 602, 617 (E.D. Va. 2006) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)).

But a "regulation is not void for vagueness unless it is so unclear . . . that it 'may trap the innocent by not providing fair warning[.]'" *Greenville Women's Clinic*, 317 F.3d at 366 (citation omitted).[23] Moreover, the vagueness inquiry is less stringent for "civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.'" *Vill. of. Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-499 (1982).

The Complaint alleges no facts indicating that prepublication review "trap[s] the innocent by not providing fair warning." *Greenville Women's Clinic*, 317 F.3d at 366. Prepublication review standards are clearly set forth in the applicable nondisclosure agreements in which employees specifically affirm their understanding of those standards. *See supra* at 4-6. Indeed, Plaintiffs identify no specific contractual or regulatory language they believe is impermissibly vague or explain why that is so, other than their invocation of regulatory provisions that do not apply to them. *See* Compl. ¶¶ 38(c), 44(c), and *supra* at 22-23. Moreover, conclusory allegations notwithstanding, the Complaint generally shows that Plaintiffs have understood their prepublication review obligation and properly submitted their works for classification review in accordance with the terms of their nondisclosure agreements. Those facts themselves foreclose Plaintiffs' vagueness challenge. *See Pfeiffer*, 1994 WL 80869, at *5-6 (rejecting vagueness challenge where plaintiff did not "challenge any specific legal provisions" but simply alleged "uncertainty of his particular factual situation" and in any event, knew "full well that he may be held liable for disclosing classified information").

Any vagueness concerns also cannot support a Fifth Amendment claim because former employees can "clarify the meaning of" their contractual obligations "by [their] own inquiry, or by resort to an administrative process." *Vill. of Hoffman Estates*, 455 U.S. at 498. The Complaint demonstrates that at least one of the Plaintiffs has done just that: when Mr. Fallon was uncertain

---

[23] The vagueness doctrine may also be implicated if a law is so standardless that it enables "'arbitrary and discriminatory enforcement.'" *Greenville Women's Clinic*, 317 F.3d at 366. As explained above, that concern is not implicated here because prepublication review is guided by the purpose of preventing the publication of classified and legally protected information. *See supra* at 30-32.

about his obligation to submit his book manuscript for prepublication review, he contacted DOPSR and obtained guidance regarding submission, Compl. ¶ 106, as the Agencies' websites encourage of anyone who is uncertain about their obligations.  When an agency gives a regulated party the option to test the lawfulness of its conduct before the party undertakes potentially unlawful action, vagueness concerns under the due process clause are not implicated.  *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 738 (D.C. Cir. 2016) ("the opportunity to obtain prospective guidance" alleviates any "concerns about [a rule's] allegedly unconstitutional vagueness).  Plaintiffs' vagueness claim should therefore be dismissed.

*       *       *       *

At bottom, Plaintiffs' lawsuit amounts to little more than repurposing a handful of prior grievances about the functioning of prepublication review into an ill-conceived facial challenge to a system that courts already have upheld as lawful in order to protect national security.  Plaintiffs offer no credible allegation that prepublication review has impermissibly suppressed protected speech in even one instance, much less that it is systematically doing so.  On the contrary, Plaintiffs have written extensively on the very topics that implicate their prepublication review obligation; they intend to continue such writing; their work has appeared in major newspapers and other publications, as well as in book form; and where they have disagreed with a prepublication review determination, they have been able to appeal those decisions within the Agencies (which they have done with success) or, failing that, seek judicial review (which they have never felt the need to do).  And where they have been unsure about their prepublication review obligations, they have been able to obtain guidance from the Agencies.  The purported "flaws" in the system they identify fail to state any valid First Amendment claim but reflect requirements that are well-founded in fact and law.  Even if imperfect in some particular applications, the prepublication review system properly balances the interests of authors against the Government's compelling interest in protecting national security.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

39

Dated: June 14, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ANTHONY COPPOLINO
Deputy Director
Federal Programs Branch

*/s/ Serena Orloff*
SERENA M. ORLOFF
California Bar No. 260888
Trial Attorney
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street NW, Room 12512
Washington, D.C. 20005
Telephone: (202) 305-0167
Fax: (202) 616-8470
Serena.M.Orloff@usdoj.gov

*Attorneys for Defendants*