TIMOTHY H. EDGAR et al.,

    *Plaintiffs*,

  v.

DANIEL COATS, in his official capacity as
Director of National Intelligence, et al.,

    *Defendants*.

Case No. 8:19-cv-00985 (GJH)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Brett Max Kaufman[*]
Vera Eidelman[*]
Naomi Gilens[*]
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: 212.549.2500
F: 212.549.2654
bkaufman@aclu.org
veidelman@aclu.org
ngilens@aclu.org

David R. Rocah (Bar No. 27315)
American Civil Liberties Union Foundation of
 Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
T: 410.889.8555
F. 410.366.7838
rocah@aclu-md.org

Jameel Jaffer[*]
Alex Abdo[*]
Ramya Krishnan[*]
Knight First Amendment Institute at
 Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: 646.745.8500
jameel.jaffer@knightcolumbia.org
alex.abdo@knightcolumbia.org
ramya.krishnan@knightcolumbia.org

[*] admitted *pro hac vice*

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... iii

Introduction ..................................................................................................................... 1

Background ....................................................................................................................... 3

Argument ........................................................................................................................... 6

I.    The Court has jurisdiction over Plaintiffs' claims. ...................................................... 6

    A.    Plaintiffs have standing. ................................................................................ 6

        1.    Plaintiffs have standing because they are subject to government licensing schemes that invest executive officers with overly broad discretion to suppress speech. ...................................................... 7

        2.    Plaintiffs have standing because Defendants' prepublication review regimes have a chilling effect on protected speech. ................ 11

        3.    Plaintiffs have standing because they face a credible threat of sanctions for non-compliance. ............................................................ 14

        4.    Plaintiffs' injuries are redressable. ..................................................... 15

    B.    Plaintiffs' claims are ripe for review. ............................................................. 16

II.    Defendants' prepublication review regimes violate the First Amendment. ................ 17

    A.    Because they are prior restraints, Defendants' prepublication review regimes are presumptively unconstitutional. .................................................. 17

    B.    Defendants' submission and censorship standards are vague, subjective, and overly broad. ....................................................................... 19

        1.    Submission standards. ......................................................................... 20

        2.    Censorship standards. ......................................................................... 25

    C.    Defendants' prepublication review regimes lack constitutionally required procedural safeguards. ..................................................................... 29

        1.    The policies do not require review within a specified, brief period. ................................................................................................ 29

        2.    The policies do not ensure prompt judicial review. ........................... 30

    D.    *Snepp* does not change this analysis. ............................................................ 31

III.    Defendants' prepublication review regimes are void for vagueness under the Fifth Amendment. ............................................................................................38

Conclusion ...........................................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*11126 Balt. Boulevard, Inc. v. Prince George's Cty.*, 58 F.3d 988 (4th Cir. 1995) ...................... 8

*Alexander v. United States*, 509 U.S. 544 (1993) ......................................................... 17

*Am. Civil Liberties Union v. Clapper*, 785 F.3d 787 (2d Cir. 2015) ............................................ 16

*Babbitt v. Farm Workers*, 442 U.S. 289 (1979)................................................................ 14

*Baggett v. Bullitt*, 377 U.S. 360 (1964)................................................................. 39

*Balt. Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006) ................................................ 13

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).................................................... 18

*Benham v. City of Charlotte*, 635 F.3d 129 (4th Cir. 2011) ........................................... 11, 12, 13

*Blankenship v. Manchin*, 471 F.3d 523 (4th Cir. 2006)................................................. 13

*Boumediene v. Bush*, 553 U.S. 723 (2008) .................................................................. 16

*Chesapeake B & M, Inc. v. Harford Cty.*, 58 F.3d 1005 (4th Cir. 1995)............................... 29, 30

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ....................... 7, 8

*Connick v. Myers*, 461 U.S. 138 (1983)................................................................. 14, 19, 37

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) ........................................................................................... 13

*Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013) ............................................ 11, 12, 15, 16

*Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421 (4th Cir. 2007) ........................................................................................ 9, 19

*Cox v. Louisiana*, 379 U.S. 536 (1965)................................................................. 26

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435 (4th Cir. 2011).................... 3

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012).......................................... 38

*Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992)............................................ 7, 10, 20

*Freedman v. Maryland*, 380 U.S. 51 (1965)....................................................... passim

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990)........................................... 29, 30

*Gentile v. State Bar*, 501 U.S. 1030 (1991) ............................................................ 22, 38

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)............................................................ 38

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ............................................................ 16

*Harman v. City of N.Y.*, 140 F.3d 111 (2d Cir. 1998) ............................................................ 36

*Hill v. Colorado*, 530 U.S. 703 (2000) ............................................................ 38

*Janus v. AFSCME*, 138 S. Ct. 2448 (2018) ............................................................ 36, 37

*John Doe, Inc. v. Mukasey*, 549 F.3d 861 (2d Cir. 2009) ............................................................ 31

*Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018) ............................................................ 11, 14

*Lyng v. Nw. Cemetery Protective Ass'n*, 485 U.S. 439 (1988) ............................................................ 17

*Mansoor v. Trank*, 319 F.3d 133 (4th Cir. 2003)............................................................ 19

*McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983) ............................................................ 26, 27, 35

*N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999) ............................................................ 12

*N.Y. Times Co. v. United States* (*Pentagon Papers*), 403 U.S. 713 (1971) ............................................................ 27

*Nat'l Fed'n of Fed. Emps. v. United States*, 695 F. Supp. 1196 (D.D.C. 1988)............................................................ 23

*New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495 (10th Cir. 1995) ............................................................ 17

*New York v. Ferber*, 458 U.S. 757 (1982) ............................................................ 8

Order, *United States v. Snepp*, No. 78-92-A (E.D. Va. 1978), 1979 U.S. S. Ct. Briefs LEXIS 6 ............................................................ 32

*Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971)............................................................ 18

*Overbey v. Mayor of Balt.*, No. 17-2444, 2019 WL 3022327 (4th Cir. July 11, 2019) ............................................................ 19

*Peachlum v. City of York*, 333 F.3d 429 (3d Cir. 2003) ............................................................ 17

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)............................................................ 35

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973)............................................................ 18

*Preston v. Leake*, 660 F.3d 726 (4th Cir. 2011)............................................................ 15

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) .................................................................... 9

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) ................................................... 28, 37

*Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) ............................ 18, 20, 29, 30

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) ............................................................. 38

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) ............................... passim

*Snepp v. United States*, 444 U.S. 507 (1980) ..................................................... passim

*Snepp v. United States*, 595 F.2d 926 (4th Cir. 1979) ............................................. 32

*South Carolina v. United States*, 912 F.3d 720 (4th Cir. 2019) ............................... 16

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ............................ 14, 15, 17

*Thornhill v. Alabama*, 310 U.S. 88 (1940) ........................................................ 7, 16

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548 (1973) ...... 35

*United States v. Hoechst Celanese Corp.*, 128 F.3d 216 (4th Cir. 1997) .................. 38

*United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972) ...................... 18, 26, 31, 36

*United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004) ...................................... 16

*United States v. Nat'l Treasury Emps. Union* (*NTEU*), 513 U.S. 454 (1995) ............. 2, 27, 35, 37

*United States v. Snepp*, 456 F. Supp. 176 (E.D. Va. 1978) ...................................... 32

*United States v. U.S. Dist. Court* (*Keith*), 407 U.S. 297 (1972) ............................. 16, 27

*United States v. Williams*, 553 U.S. 285 (2008) ...................................................... 29

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ...... 39

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................... 9

*Weaver v. U.S. Info. Agency*, 87 F.3d 1429 (D.C. Cir. 1996) ................................... 35

*Wernsing v. Thompson*, 423 F.3d 732 (7th Cir. 2005) ............................................. 36

*Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006) ................................................ 37

*Zweibon v. Mitchell*, 516 F.2d 594 (D.C. Cir. 1975) ............................................... 27

**Other Authorities**

115 Cong. Rec. H3300 (daily ed. May 3, 2017) (statement of Rep. Nunes) ............................ 3, 22

115 Cong. Rec. S2750 (daily ed. May 4, 2017) (statement of Sen. Burr) ................................ 3, 23

28 C.F.R. § 17.18 (2019) ......................................................................................................... 31

Fed. R. Civ. P. 62 ...................................................................................................................... 15

**INTRODUCTION**

This case challenges a far-reaching system of prior restraints that suppresses core political speech by millions of former intelligence-agency employees and military personnel. Under this system, known as "prepublication review," agency officials review and censor tens of thousands of submissions every year. As prominent legal scholars have noted, this system is "racked with pathologies." Compl. ¶ 2. Many agencies impose prepublication review obligations on former employees without regard to their level of access to sensitive information. Submission requirements and review standards are vague, confusing, and overly broad. Manuscript review frequently takes weeks or even months, without any firm timelines. And the agencies' censorial decisions are often arbitrary, unexplained, and influenced by authors' viewpoints. This system violates the First and Fifth Amendments.

The government's argument that Plaintiffs lack standing to challenge the system is wrong. Plaintiffs have standing because they have alleged that they are subject to a government licensing scheme that invests executive officers with overly broad discretion to suppress speech. They also have standing because they have alleged that the vagueness and breadth of Defendants' prepublication review regimes has a chilling effect on speech. And they have standing because they face a credible threat of sanctions if they fail to submit their work for review. Each of these reasons is independently sufficient to satisfy Article III.

The government also errs in contending that Plaintiffs' complaint fails to state a claim. As licensing schemes, Defendants' prepublication review regimes are archetypal prior restraints, and any system of prior restraints comes to court carrying a heavy presumption of unconstitutionality. It is well established that a licensing scheme can be constitutional only if it includes narrow, objective, and definite standards to cabin official discretion, *Shuttlesworth v. City of Birmingham*,

394 U.S. 147 (1969), and robust procedural safeguards designed to mitigate the harms associated with prior restraint, *Freedman v. Maryland*, 380 U.S. 51 (1965). Defendants' prepublication review regimes fail on both counts.

The government relies heavily on *Snepp v. United States*, 444 U.S. 507 (1980), in which the Supreme Court allowed the CIA to impose a constructive trust on the book proceeds of a former CIA agent who had deliberately flouted prepublication review obligations, but *Snepp* can't bear the weight that the government places on it. First, the *Snepp* Court addressed the First Amendment only in passing, and it did not have occasion to consider whether the CIA's submission and review standards satisfied constitutional requirements, whether the CIA's prepublication review regime included constitutionally mandated procedural safeguards, or whether the First Amendment would permit agencies other than the CIA to impose prepublication review requirements on their former employees. Second, the regimes that Plaintiffs challenge here are dramatically different from the one that the Court considered cursorily in *Snepp*: Over the past four decades, the system of prepublication review has expanded on nearly every axis. Third, fifteen years after it decided *Snepp*, the Supreme Court made clear that prior restraints imposed on even current employees must be subject to essentially the same level of scrutiny as prior restraints imposed in other contexts. *United States v. Nat'l Treasury Emps. Union* (*NTEU*), 513 U.S. 454 (1995). The regimes Plaintiffs challenge here cannot survive even the "reasonableness" review that the Court applied in *Snepp*; they certainly cannot survive the more exacting level of scrutiny the Court described in *NTEU*.

The government has a legitimate interest in safeguarding national security secrets, but it must pursue this end using means that are consistent with the Constitution. The First and Fifth Amendments might permit a prepublication review system that applied only to those entrusted

with the most closely held government secrets; that extended only to material reasonably likely to contain those secrets; that provided clear notice of submission and review standards; that tightly cabined the discretion of government censors; that included strict and definite time limits for the completion of review; and that assured that censors' decisions would be subject to prompt review by the courts. Defendants' regimes, however, have none of these characteristics. Notably, both congressional intelligence committees have recently recognized many of these deficiencies. *See* 115 Cong. Rec. H3300–01 (daily ed. May 3, 2017) (statement of Rep. Nunes); 115 Cong. Rec. S2750 (daily ed. May 4, 2017) (statement of Sen. Burr).

Plaintiffs have alleged facts demonstrating their standing to seek injunctive and declaratory relief, and they have clearly stated legal claims that are facially "plausible." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Accordingly, the Court should deny the government's motion to dismiss.

## BACKGROUND

The origins and metastasis of the prepublication review system are described in detail at paragraphs 17 to 30 of the complaint. In summary, prepublication review originated at the CIA, which, since its establishment in 1947, has required employees to sign secrecy agreements that prohibit them from publishing manuscripts without first obtaining the agency's consent. Compl. ¶ 17. The 1980s were a critical period in the evolution of prepublication review. In 1980, a divided Supreme Court decided *Snepp*, which imposed a constructive trust on profits earned by a former CIA agent who had published a book without submitting it for review. *Id.* ¶ 19. The next year, the Reagan administration introduced—without informing Congress—Form 4193, a standard-form contract that intelligence agencies could use to impose a lifetime prepublication

review requirement on employees with access to Sensitive Compartmented Information ("SCI"). *Id.* ¶ 22. Then, in 1983, President Reagan issued National Security Decision Directive 84, requiring all intelligence-agency employees to sign a similar form as a condition of access to SCI. *Id.* ¶ 20. President Reagan suspended Directive 84's prepublication review mandate in response to congressional backlash. *Id.* ¶ 21. However, agencies continued to require employees to sign Form 4193. *Id.* ¶ 22.

Over the past five decades, the prepublication review system has expanded on every axis. First, more agencies impose prepublication review requirements on their former employees. When the Supreme Court decided *Snepp*, the only intelligence agencies that imposed prepublication review obligations on former employees were the CIA and the NSA. Today, all seventeen intelligence agencies impose lifetime prepublication review requirements on at least some subset of employees. *Id.* ¶ 24. Second, these agencies impose prepublication review obligations on more categories of people—not just, as before, on individuals with access to SCI, but now, also on employees who have never had access to SCI or to classified information of any kind. *Id.* ¶ 25. Third, the amount of information that is classified has expanded dramatically. Whereas in 1980, original and derivative classification authorities made sixteen million classification decisions, in 2017, they made more than three times that number. *Id.* ¶ 26. Fourth, agency prepublication review regimes have become increasingly complex. Whereas the CIA prepublication review obligations reviewed in *Snepp* were purely contractual, today agencies impose review obligations through a confusing tangle of contracts, regulations, and policies. *Id.* ¶ 27. Fifth, the amount of material submitted for prepublication review has steadily increased. For example, the number of pages reviewed by the CIA each year increased from about 1,000 in the mid-1970s to 150,000 in 2014. *Id.* ¶ 28. Finally, in part because so much more material is submitted to them, agencies now take

much more time to complete their review. For example, the CIA estimates that the review of book-length manuscripts will take over a year. *Id.* ¶ 29.

Defendants' prepublication review regimes reflect these trends.[1]

1. **Central Intelligence Agency**: The CIA requires all former employees who have signed the CIA's secrecy agreement to submit for review any writings that "are intelligence related," Compl. ¶ 32(c), and it requires all former employees who have signed Form 4414 to submit for review any writings that "contain any . . . description of activities that . . . relate to [Sensitive Compartmented Information]," *id.* ¶ 32(b); Form 4414 § 4. Apparently, as a matter of policy, the CIA will not provide former employees with copies of any secrecy or nondisclosure agreement they signed. Compl. ¶ 32(e). The CIA also refers certain submissions to other agencies for review based on undisclosed referral and review standards. *Id.* ¶ 33. The CIA generally does not provide authors with reasons for its decisions. *Id.* ¶ 35. The CIA's policy does not impose a deadline for review. *Id.* ¶ 36.

2. **Department of Defense**: The DOD requires all former employees and all former active or reserve military service members to submit for review "any official DoD information intended for public release that pertains to military matters, national security issues, or subjects of significant concern to [the agency]." Compl. ¶ 38(c); Instruction 5230.09 § 1.2(b). The DOD also requires all former employees who have signed Form 4414 to submit for review any writings that "contain any . . . description of activities that . . . relate to [Sensitive Compartmented Information]." Compl. ¶ 38(b); Form 4414 § 4. The DOD's censorship board reviews material for information "requiring protection in the interest of national security or other legitimate governmental interest." Instruction 5230.09 § 1.2(d). This review is not limited to classified information. Instruction 5230.09 Glossary pt. 2 (noting that DOD reviews for "classified, export-controlled, or other protected information"); Instruction 5230.29 (noting that security review "protects classified information, controlled unclassified information, or unclassified information that may individually or in aggregate lead to the compromise of classified information or disclosure of operations security"). The DOD's censorship board also refers certain submissions to other agencies for review based on undisclosed referral and review standards. Compl. ¶ 39. The DOD generally does not provide authors with reasons for its decisions. *Id.* ¶ 41. The DOD's policy does not impose a deadline for review. *Id.* ¶ 42.

3. **National Security Agency**: The NSA requires all former employees to submit material for review if it contains official NSA information that "may or may not be" unclassified and approved for public release. Compl. ¶ 44(c). This requirement appears to contemplate the review of information that is unclassified but not

---

[1] Defendants' prepublication review nondisclosure agreements, policies, and related documents are included in the appendix accompanying this brief.

"approved for release." *Id.* The NSA also requires that all former employees who have signed Form 4414 submit for review any writings that "contain any . . . description of activities that . . . relate to [Sensitive Compartmented Information]." Compl. ¶ 44(b); Form 4414 § 4. The NSA's review policy does not state what information the NSA is permitted to censor. Compl. ¶ 45. The NSA's censorship board also refers certain submissions to other agencies for review based on undisclosed referral and review standards. *Id.* The NSA generally does not provide authors with reasons for its decisions. *Id.* ¶ 47. The NSA's policy does not impose a deadline for review. *Id.* ¶ 48.

4. **Office of the Director of National Intelligence**: The ODNI requires all former employees to submit for review "all official and non-official information intended for publication that discusses the ODNI, the [Intelligence Community], or national security." Compl. ¶ 50(d). It separately requires all employees granted access to classified information to sign Form 313, which requires the submission of any writing that "contains any mention of intelligence data or activities, or which contains any other information or material that might be based upon [information or material that is classified, or is in the process of a classification determination]." *Id.* ¶ 50(c); Form 313(5). Finally, the ODNI requires all former employees who have signed Form 4414 to submit for review any writings that "contain any . . . description of activities that . . . relate to [Sensitive Compartmented Information]." Compl. ¶ 50(b); Form 4414 § 4. The ODNI's review does not state what information the ODNI is permitted to censor. The Instruction states only that "the goal of pre-publication review is to prevent the unauthorized disclosure of information, and to ensure the ODNI's mission and the foreign relations or security of the U.S. are not adversely affected by publication." Compl. ¶ 51. The ODNI's censorship board also refers certain submissions to other agencies for review based on undisclosed referral and review standards. *Id.* The ODNI generally does not provide authors with reasons for its decisions. *Id.* ¶ 53. The ODNI's policy does not impose a deadline for review. *Id.* ¶ 54.

## ARGUMENT

## I. The Court has jurisdiction over Plaintiffs' claims.

### A. Plaintiffs have standing.

Plaintiffs have standing for three reasons. First, they are subject to government licensing schemes that invest executive officers with overly broad discretion to suppress speech. Second, the vagueness and breadth of these schemes have a chilling effect on speech, including on Plaintiffs' core political speech. Third, Plaintiffs face a credible threat of sanctions if they refuse

to submit their work for prepublication review. Each of these reasons is independently sufficient to establish Plaintiffs' standing.

1. **Plaintiffs have standing because they are subject to government licensing schemes that invest executive officers with overly broad discretion to suppress speech.**

Defendants' prepublication review regimes are paradigmatic licensing schemes because they require would-be speakers to submit their proposed speech to government censors for prior approval. Plaintiffs have standing to challenge these regimes because "[i]n the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not [the speaker's] conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." *Freedman*, 380 U.S. at 56; *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). The Supreme Court has affirmed this rule repeatedly. *See, e.g.*, *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 129 (1992); *Shuttlesworth*, 394 U.S. at 150–51; *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).

This permissive rule of standing reflects the Supreme Court's recognition that overly broad licensing schemes threaten speech by their "very existence." *Thornhill*, 310 U.S. at 97. As the Court has observed, such schemes cause would-be speakers to self-censor even if licensors do not abuse their authority. *See City of Lakewood*, 486 U.S. at 757. Moreover, the harm of self-censorship is difficult or impossible to establish in as-applied challenges. *Id*. Requiring would-be speakers to submit to a licensing scheme before challenging it would cause them to curtail their speech because of the "difficulty and delay" in obtaining judicial review, *id.* at 758, and because any judicial review ultimately obtained might be "too little and too late," *Freedman*, 380 U.S. at 57. Because requiring individuals to submit to licensing schemes before challenging them would

render those schemes "effectively unreviewable," *City of Lakewood*, 486 U.S. at 759, the courts permit those who are subject to such schemes "to bring an immediate facial challenge," *11126 Balt. Boulevard, Inc. v. Prince George's Cty.*, 58 F.3d 988, 994 (4th Cir. 1995); *see also City of Lakewood*, 486 U.S. at 758 (recognizing that "only a facial challenge" is sufficient to protect constitutional interests in this context).[2]

The government does not engage with this well settled body of law but contends that "the sole fact that Plaintiffs are subject to a prepublication review obligation is inadequate to establish their standing." Gov't Br. 13. This contention misunderstands Plaintiffs' argument. It is of course true that Plaintiffs have alleged that they are subject to Defendants' prepublication review regimes—indeed, the complaint makes clear that all but one Plaintiff have submitted work for prepublication review in the past, and that all but one intend and expect to submit work for review in the future. *See* Compl. ¶¶ 58–65 (Professor Edgar); *id.* ¶¶ 72–79 (Professor Immerman); *id.* ¶¶ 81–93 (Mr. Goodman); *id.* ¶¶ 100–19 (Mr. Fallon). The complaint also makes clear that *all* Plaintiffs intend and expect to produce work that falls within the scope of Defendants' prepublication regimes. But Plaintiffs have *also* alleged that Defendants' regimes invest government censors with overly broad discretion to deny or delay the publication of protected speech. *See id.* ¶¶ 4, 120. This allegation—which is at the core of Plaintiffs' challenge—brings this case within the rule set out in *Freedman* and *City of Lakewood* and reaffirmed in the many other cases cited above.

---

[2] For similar reasons, Plaintiffs also have standing under the overbreadth doctrine, which permits a plaintiff to challenge a statute that prohibits a substantial amount of protected speech even if the plaintiff's own speech could be validly prohibited. *See New York v. Ferber*, 458 U.S. 757, 768–69 (1982).

The government's other objections are also without merit. The government contends that Plaintiffs lack standing because courts have upheld prepublication review in other cases, *see* Gov't Br. 13, but Plaintiffs need not show that they will prevail on the merits in order to establish that they have standing to sue. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975); *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 (4th Cir. 2007) ("A plaintiff's standing to bring a case does not depend upon his ultimate success on the merits underlying his case"). In addition, the cases the government cites are distinguishable: they involved different claims, or different legal arguments, or different factual contexts than those presented here. *See infra* Part II.

The government also contends that Plaintiffs lack standing to challenge the application of Defendants' review regimes to former employees who did not have access to closely held secrets, and to material that is not reasonably likely to contain such secrets, because (in the government's view) Plaintiffs themselves were entrusted with such secrets and their future writing is likely to contain such secrets. Gov't Br. 20–21. This argument is flawed for multiple reasons. First, one Plaintiff (Ms. Bhagwati) held only a low-level clearance and never had access to closely held secrets. Compl. ¶ 96. Her presence in the suit is sufficient to satisfy Article III. *See Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").[3] Second, as discussed above, those subject to a licensing scheme that allegedly invests overly broad discretion in government censors have

---

[3] The government's argument that Ms. Bhagwati is not subject to the DOD's prepublication review regime, Gov't Br. 13–14, 20, is incorrect. The DOD's review policy requires all former service members to submit for review "any official DoD information intended for public release that pertains to military matters, national security issues, or subjects of significant concern to [the agency]." Compl. ¶ 38(c); Instruction 5230.09 § 1.2(b). The policy defines "official DoD information" to encompass "information that . . . relates to information in the custody and control of the [DOD]." *Id.* Glossary pt. 2. The government's argument relies in part on a recently issued DOD instruction, *see* Gov't Br. 22, but as explained in Part II.B.1 below, that instruction does not narrow Ms. Bhagwati's obligations.

standing to challenge the scheme even if their own speech could constitutionally be censored. *See, e.g.*, *Forsyth Cty.*, 505 U.S. at 129. Again, the government simply does not engage with the cases that established this rule. And third, Plaintiffs' complaint about Defendants' regimes is not simply that they apply to people who never had access to closely held secrets, but that they require former employees (including those who had access to closely held secrets) to submit for review even material that is highly unlikely to contain information that the government may constitutionally censor. Professors Edgar and Immerman, for example, are required to submit any material that "discusses the ODNI, the [Intelligence Community], or national security." Compl. ¶ 50(d); ODNI Instruction 80.04 § 6. That requirement would reach not just material likely to contain classified secrets but an op-ed that described medical benefits available to ODNI employees, criticized a president's choice for the director of national intelligence, or theorized about the tension between democracy and the culture of secrecy at intelligence agencies.

Finally, the government contends that Plaintiffs lack standing to challenge the NSA's prepublication review regime because "none of the Plaintiffs worked for NSA." Gov't Br. 23. The government overlooks that the NSA has reviewed Professor Edgar's writings in the past, and that it is likely to do so again in the future. Compl. ¶¶ 63–65. While Professor Edgar is a former employee of the ODNI, the ODNI has referred his submissions to the NSA in the past, and given the focus of his research and writing, it is all but certain that the ODNI will refer his future submissions to the NSA as well. *Id*. ¶ 65.[4]

---

[4] Contrary to the government's suggestion, Plaintiffs do not challenge aspects of Defendants' regimes that apply only to current employees. Gov't Br. 22. In arguing otherwise, the government points to the regimes' definitions of "official" information, but the relevant agencies define that term in a way that reaches information in the hands of former employees. *See* Compl. ¶ 38(c) (DOD definition including "information that . . . relates to information in the custody and control of the Department, or was acquired by DoD employees as part of their official duties"); *id.* ¶ 44(c)

### 2. Plaintiffs have standing because Defendants' prepublication review regimes have a chilling effect on protected speech.

As the Fourth Circuit has recognized, a plaintiff satisfies the injury-in-fact requirement if she makes a "sufficient showing of 'self-censorship, which occurs when a claimant is chilled from exercising h[er] right to free expression.'" *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)); *see also Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018). To satisfy Article III, a chilling effect must be "objectively reasonable." *Cooksey*, 721 F.3d at 236 (quoting *Benham*, 635 F.3d at 135). To determine whether a chilling effect is objectively reasonable, a court must ask whether the challenged regulation "is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* (quoting *Benham*, 635 F.3d at 135).

This question is easy to answer here. Because of the breadth and vagueness of Defendants' prepublication review regimes, the absence of time limits for completion of review, and the severity and variety of sanctions for failure to submit, an objectively reasonable speaker subject to Defendants' prepublication review regimes would be likely to submit more material than the government has constitutional authority to require authors to submit, avoid writing about subjects that the government might regard as sensitive (even if the government does not in fact have authority to censor information about those subjects), and write about these subjects differently in order to avoid provoking the government's censors. Uncertainty about the length of time required for review would also be likely to deter a reasonable speaker from attempting to write manuscripts meant to respond to breaking news, or meant to engage with fast-moving public debates, and from

---

(NSA definition including "information that . . . was obtained for or generated on NSA/CSS' behalf during the course of employment or other service . . . with NSA/CSS").

writing longer and more substantial pieces for commercial publishers, which often require authors to commit to deadlines.

Plaintiffs' speech has been chilled in exactly these ways. Plaintiffs have alleged that they are uncertain about the scope of their submission obligations and that they believe they are required to submit far more for review than is constitutionally justifiable. Compl. ¶¶ 66, 80, 118. Because of the vagueness and breadth of Defendants' regimes, uncertainty about the time required for review, and the threat of sanctions for failing to submit, Plaintiffs have submitted material that they do not believe the government has authority to require them to submit, *id.* ¶¶ 66, 78, 80, 90, 114; abstained from writing about certain topics, *id.* ¶¶ 66, 80, 92–93, 112, 118–19; been compelled to push back publication dates, *id.* ¶¶ 64, 107; had publishers threaten to cancel their book contracts, *id.* ¶¶ 89, 112; been delayed in publishing time-sensitive material, *id.* ¶¶ 64, 78, 89, 110; published material with redactions rather than contest redactions at the cost of further delaying the publication of their writing, or threatening their relations with agency censors, *id.* ¶¶ 64, 78, 110, 119; and been impeded from participating in public debate, *id.* ¶¶ 75, 78, 90, 114, 118. In other words, Plaintiffs have been deterred from exercising their First Amendment rights in precisely the ways that one would expect persons of ordinary firmness to be deterred. *See, e.g.*, *Cooksey*, 721 F.3d at 236–37; *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 708–09 (4th Cir. 1999).

The government says that "Plaintiffs' claims of chill are belied by the fact that they have published extensively and intend to continue doing so," Gov't Br. 17, but this argument is misguided. To establish standing, Plaintiffs need not show that they have ceased speaking "altogether." *Benham*, 635 F.3d at 135. Plaintiffs are entitled to challenge government "conduct that tends to *chill* [protected] activity, not just conduct that *freezes* it completely." *Constantine v.*

*Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005); *see also Blankenship v. Manchin*, 471 F.3d 523, 532–33 (4th Cir. 2006). In any event, the relevant test is objective, not subjective; whether or not Plaintiffs continue to speak is not itself dispositive of the "ordinary firmness" inquiry. *Blankenship*, 471 F.3d at 532–33; *see also Constantine*, 411 F.3d at 500–01 (holding that plaintiff satisfied the "ordinary firmness" standard although there was no evidence of subjective chill "[b]ecause [defendant's] conduct would tend to chill a reasonable person's exercise of First Amendment rights"); *Benham*, 635 F.3d at 139 n.7.[5]

The government is also wrong to argue that Plaintiffs' claims of chill are not objectively reasonable because they are "based on a mere preference to avoid potential disagreement, the possibility of delays in the prepublication process, or uncertainty." Gov't Br. 18. Plaintiffs are not indulging "preferences"; as described above, they are responding reasonably to the breadth and vagueness of Defendants' regimes, to uncertainty about the time required for review of manuscripts, and to the risk of sanctions for failure to submit. Licensing schemes like those challenged here are classic sources of objectively reasonable chill, as discussed above. The government describes *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006), as having rejected "similar claims of chill," Gov't Br. 18, but that case involved a reporter's assertion of chill due to "a politician's refusal to comment or answer questions on account of the reporter's previous reporting," *Balt. Sun*, 437 F.3d at 419, not one stemming from a regulatory regime encompassing administrative, civil, and criminal sanctions.

Finally, the government defies logic in suggesting that prepublication review *reduces* the chill that would otherwise flow from post-publication punishment because it allows former

---

[5] For this reason, Ms. Bhagwati also has standing to sue on the basis of a chilling effect even though she herself has not submitted material for review and does not assert that she has been chilled from publishing material that is subject to a prepublication review requirement.

employees to learn, in advance, whether the government believes their writing contains classified information. Gov't Br. 19. As an initial matter, accepting this argument would make nonsense of the entire body of case law relating to licensing schemes. The government is also wrong to suggest that prepublication review merely gives authors "advance notice of the government's view." Gov't Br. 19 (quotation marks omitted). The regimes at issue here are not elective; they are mandatory, and those who fail to submit, or who publish material that censors have instructed them not to publish, risk sanctions.[6]

### 3. Plaintiffs have standing because they face a credible threat of sanctions for non-compliance.

The Supreme Court has made clear that plaintiffs satisfy the injury-in-fact requirement where they allege that they desire or intend to engage in conduct arguably affected with a constitutional interest, that such conduct is arguably proscribed by law or policy, and that they face a credible threat of future sanctions for that conduct. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 303 (1979); *see also Kenny*, 885 F.3d at 288. Plaintiffs satisfy this standard here.

First, they have alleged a desire to speak on public issues. *See* Compl. ¶ 4; *id.* ¶¶ 61–62, 65 (Professor Edgar); *id.* ¶¶ 68, 72, 79 (Professor Immerman); *id.* ¶¶ 81, 87, 89–90, 92–93 (Mr. Goodman); *id.* ¶¶ 94, 97–99 (Ms. Bhagwati); *id.* ¶¶ 103–04, 113, 115 (Mr. Fallon). Such speech "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)).

---

[6] Moreover, the government's claim that Defendants' past redactions of Plaintiffs' manuscripts is evidence that those manuscripts contained classified information is misconceived. Four of Plaintiffs allege that Defendants redacted from their manuscripts material that was unclassified or not properly classified. Compl. ¶¶ 64, 75, 78, 88, 90, 110, 114.

Second, Plaintiffs have alleged—and the government concedes, Gov't Br. 20–21—that Plaintiffs are subject to Defendants' prepublication review regimes, and that these regimes proscribe Plaintiffs' speech. While the parties disagree about the precise scope of Plaintiffs' prepublication review obligations (in part because the regimes' submission and review standards are vague), there is no dispute here that Defendants' regimes restrict Plaintiffs' ability to speak.

Finally, Plaintiffs have alleged that they face a credible threat of sanctions. Compl. ¶¶ 4. In this circuit, there is a "presumption" that a "statute that facially restricts expressive activity by the class to which the plaintiff belongs presents such a credible threat . . . . This presumption is particularly appropriate when the presence of the statute tends to chill the exercise of First Amendment rights." *Cooksey*, 721 F.3d at 237 (quoting *Bartlett*, 168 F.3d at 710); *see also Preston v. Leake*, 660 F.3d 726, 735–36 (4th Cir. 2011); *Driehaus*, 573 U.S. at 158–59. Here, Defendants themselves emphasize their authority to seek "a court order prohibiting disclosure as well as criminal and civil sanctions" to enforce Plaintiffs' prepublication review obligations, Gov't Br. 5 (citations and quotation marks omitted). Moreover, Defendant CIA has expressly threatened to sanction Mr. Goodman for his purported failure to comply with those obligations. Compl. ¶ 86.

### 4. Plaintiffs' injuries are redressable.

Plaintiffs' injuries would be redressed by the relief they seek—that is, by a declaration that Defendants' current prepublication review regimes are unconstitutional under the First and Fifth Amendments, and an injunction prohibiting Defendants from sanctioning them for failure to comply with these regimes. If the Court were to afford Plaintiffs this relief, Defendants would presumably revise their prepublication review regimes to bring these regimes into alignment with the First and Fifth Amendments. The Court could delay or stay its judgment to afford Defendants an opportunity to do so. *Cf.* Fed. R. Civ. P. 62; *Am. Civil Liberties Union v. Clapper*, 785 F.3d

787, 826 (2d Cir. 2015) (reversing district court's denial of a preliminary injunction but declining to impose an injunction in order to permit an ongoing congressional debate about the impending expiration of a surveillance program's statutory authority).

There is no merit to Defendants' claim that the Court would "violate separation of powers principles," Gov't Br. 24, if it were to afford Plaintiffs this relief. Defendants do not contest that Plaintiffs' constitutional rights are implicated by Defendants' prepublication review regimes. It is well within the power of the courts to ensure that government policies meant to safeguard national security are consistent with the Constitution. *Boumediene v. Bush*, 553 U.S. 723, 797 (2008) ("Security subsists, too, in fidelity to freedom's first principles."); *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (The Constitution "most assuredly envisions a role for all three branches when individual liberties are at stake."); *United States v. U.S. Dist. Court* (*Keith*), 407 U.S. 297 (1972); *United States v. Moussaoui*, 382 F.3d 453, 469 (4th Cir. 2004).

**B.      Plaintiffs' claims are ripe for review.**

Plaintiffs' challenge is ripe because their claims are fit for judicial decision, and because withholding timely court consideration would cause them substantial hardship. *See South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019). As discussed above, the "very existence" of an overly broad licensing scheme causes judicially cognizable injuries, because such a scheme compels would-be speakers to self-censor. *Thornhill*, 310 U.S. at 97; *see also Cooksey*, 721 F.3d at 239–41. The government complains that Plaintiffs' challenge does not relate to any specific prepublication review decision, Gov't Br. 25, but, again, and for reasons explained above, courts routinely entertain facial challenges to licensing schemes even if the would-be speaker has not submitted an application to the licensor. Indeed, the ripeness doctrine is applied "most permissively in the First Amendment context," *Cooksey*, 721 F.3d at 240, particularly where the

case presents a facial challenge to a restraint on speech that is alleged to be overly broad or vague, *see Peachlum v. City of York*, 333 F.3d 429, 438 (3d Cir. 2003); *see also New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1503 (10th Cir. 1995).[7]

The government's argument that Plaintiffs' challenge is "abstract," Gov't Br. 25, is also misguided. Facial challenges under the First Amendment are "not normally subject to administrative finality analysis," *Peachlum*, 333 F.3d at 436, and Defendants' insistence that Plaintiffs should be required to challenge specific prepublication review decisions, rather than the scheme under which such decisions are made, misses the point explained above—that overly broad licensing schemes cause injuries even if censors never abuse their power. *See supra* Part I.A.1. Because of the deficiencies in Defendants' prepublication review regimes, Plaintiffs are faced with three options: self-censoring to avoid prepublication review; submitting to unconstitutional censorship schemes; or forgoing review and risking sanctions. That they face this choice renders their claims ripe. *See Driehaus*, 573 U.S. at 167–68.

## II.    Defendants' prepublication review regimes violate the First Amendment.

### A.    Because they are prior restraints, Defendants' prepublication review regimes are presumptively unconstitutional.

Defendants' prepublication review regimes are quintessential prior restraints because they forbid individuals from writing or speaking without first getting approval from the government. *See, e.g.*, *Alexander v. United States*, 509 U.S. 544, 550 (1993). Like all prior restraints, Defendants' regimes require "[o]ne seeking to [write or speak publicly] . . . to apply" to

---

[7] Defendants contend that the ripeness "inquiry is especially rigorous where a case involves *constitutional* questions." Gov't Br. 25. However, the case they rely on—*Lyng v. Nw. Cemetery Protective Ass'n*, 485 U.S. 439 (1988)—does not address ripeness at all, but instead stands for the general proposition that courts should avoid reaching constitutional questions when adjudication of statutory claims can provide complete relief. *See id.* at 445.

government censors, who are in turn "empowered to determine whether the applicant should be granted permission—in effect, a license or permit—on the basis of [their] review of the content of the proposed [speech]." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554 (1975). Defendants' regimes share the "special vice" of all prior restraints: they prohibit speech "before an adequate determination that it is unprotected," rather than punishing unprotected speech after it is uttered. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973); *see also United States v. Marchetti*, 466 F.2d 1309, 1313, 1317 (4th Cir. 1972) (describing CIA's prepublication review regime as "a system of prior restraint").

Because prior restraints tend to suppress protected speech and enable arbitrary or discriminatory enforcement, they "come[] to [court] bearing a heavy presumption against [their] constitutional validity," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963), and the government "carries a heavy burden of showing justification," *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). Prior restraints can overcome the presumption of unconstitutionality only if they include (1) narrow, objective, and definite standards to guide government censors, *Shuttlesworth*, 394 U.S. at 150–51, and (2) robust procedural safeguards to protect First Amendment rights, *Freedman*, 380 U.S. at 58–59. As explained below, Defendants' prepublication review regimes fail on both counts.

In an effort to avoid the analytical framework that the Supreme Court has used to evaluate prior restraints, and licensing schemes in particular, the government proposes that "prepublication review 'is not . . . a "system of prior restraints" in the classic sense'" because former employees "voluntarily assume[d] a duty of confidentiality." Gov't Br. 30 (quoting *Wilson v. CIA* (*Wilson II*), 586 F.3d 171, 183 (2d Cir. 2009)). But the Fourth Circuit characterized the CIA's review regime as a prior restraint in *Marchetti*. *See* 466 F.2d at 1317 (citing *Freedman*); *see also id.* ("Marchetti

by accepting employment with the CIA and by signing a secrecy agreement did not surrender his First Amendment right of free speech."). In addition, "it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick*, 461 U.S. at 142 (collecting cases); *see also Mansoor v. Trank*, 319 F.3d 133, 139 n.4 (4th Cir. 2003) (same); *Overbey v. Mayor of Balt.*, No. 17-2444, 2019 WL 3022327, at *4–5 (4th Cir. July 11, 2019).

The government points to cases in which courts held that specific prepublication review obligations did not amount to unconstitutional prior restraints, Gov't Br. 30, but those cases involved as-applied challenges, not facial ones. The difference between those cases and this one is the difference between a challenge to the denial of a specific parade permit and a challenge to the ordinance that empowers administrative officials to grant or deny those permits. The government is also wrong to suggest that the *Freedman* framework applies only where the government adopts a licensing scheme because of its "disagreement with the message." Gov't Br. 30 n.20 (quoting *Covenant Media of S.C.*, 493 F.3d at 431–35). The case the government relies upon says only that the *Freedman* framework may not apply to licensing schemes that are content *neutral*. *See Covenant Media of S.C.*, 493 F.3d at 431–32. The regimes that Plaintiffs challenge here, though, are content *based*, because they require former employees to submit certain material depending on its content, and they empower government licensors to censor material based on its content.

B.  **Defendants' submission and censorship standards are vague, subjective, and overly broad.**

"[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth*, 394 U.S. at 150–51. Invariably, the Supreme Court has "condemn[ed] systems in which the exercise of [the licensor's] authority was not bounded by

"[such] standards," *Se. Promotions*, 420 U.S. at 553, both for their chilling effects and because they grant government actors "discretion [that] has the potential for becoming a means of suppressing a particular point of view." *Forsyth Cty.,* 505 U.S. at 130–31 (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)). Defendants' prepublication review regimes are constitutionally deficient because they fail to provide narrow, objective, and definite standards with respect to (1) what materials former employees must submit for review ("submission standards"); and (2) what content agency officials may censor ("censorship standards").

### 1. Submission standards.

Defendants' submission standards are not narrow, objective, and definite. Defendants' prepublication review regimes impose submission requirements on *all* former employees, not just those who had access to closely held secrets, and they sweep in virtually everything that those former employees might write about government. They are not limited, as they would have to be to survive constitutional scrutiny, to (1) former employees who had access to closely held secrets, (2) material obtained while in government, and (3) material that could reasonably be expected to contain classified information. Moreover, they rely on criteria that are vague, undefined, and subjective. For these reasons, Defendants' regimes fail to overcome the heavy presumption against their constitutionality.

1. **The CIA's submission standards.** The CIA requires all former employees to submit for review any materials that are "intelligence related," Compl. ¶ 32(c), that "mention[] CIA or intelligence data or activities," *id.* ¶ 32(d), or that are "on any subject about which the author has had access to classified information in the course of his employment," *id.* ¶ 32(d).[8]

---

[8] The CIA has attached to its motion to dismiss what appears to be its current secrecy agreement; to Plaintiffs' knowledge, the agreement has not been published previously. The CIA's effort to submit evidence in support of a motion to dismiss is inappropriate. This said, the agreement only confirms the breadth of the agency's prepublication review regime. It requires all former

2. **The DOD's submission standards.** The DOD requires all former employees and service members to submit for review any information that "relates to information in the custody and control of the [DOD], or was acquired . . . as part of their official duties or because of their official status within [DOD]" if that information "pertains to military matters, national security issues, or subjects of significant concern to [the agency]." *Id*. ¶ 38(c).[9]

3. **The NSA's submission standards.** The NSA requires all former "NSA/CSS affiliates acting in a private capacity" to submit material for review whenever there is "doubt" as to whether "NSA/CSS information" in the material is "UNCLASSIFIED" *and* "approved for public release." *Id.* ¶ 44(c); NSA/CSS Policy 1-30 § 6(b). The NSA's policy states that "NSA/CSS information appearing in the public domain shall not automatically be considered UNCLASSIFIED or approved for release." NSA/CSS Policy 1-30 § 3(a).

4. **The ODNI's submission standards.** The ODNI requires all former employees to submit for review "all official and non-official information intended for publication that discusses the ODNI, the IC [Intelligence Community], or national security." Compl. ¶ 50(d). Pursuant to Form 313, the ODNI also requires former employees

---

employees to submit for review material "contain[ing] any mention of intelligence data or activities" or "that might be based on" information obtained in the course of employment that is classified or pending classification. Decl. of Antoinette B. Shiner Ex. A ¶¶ 3, 5, ECF No. 30-2.

[9] Plaintiffs' complaint cited DOD Directive 5230.09, which was recently superseded by DOD Instruction 5230.09. The Instruction states that all "[r]etired and separated Service members, former DoD employees and contractors, and non-active members of the Reserve Components must use the DoD prepublication review process to ensure that information they intend to release to the public does not compromise national security as required by their nondisclosure agreements." Instruction 5230.09 § 1.2(g). Focusing on the last words, the government argues that this reaches only former employees who signed non-disclosure agreements. A more natural reading of the Instruction, however, is that "as required by their nondisclosure agreements" refers to the obligation of all former employees not to compromise national security. Consistent with that understanding, a DOD "FAQ" document states that the DOD's submission obligation applies to "[a]ll current, former, and retired DoD employees, contractors, and military service members (whether active or reserve) who have had access to DoD information or facilities." Compl. ¶ 38(c) (quoting *Frequently Asked Questions for Department of Defense Security and Policy Reviews*, DOD (Mar. 2012), https://perma.cc/5AH3-S3RV).

The government's contrary interpretation is based on the unspecified interplay between Instruction 5230.09 and former employees' nondisclosure agreements. *See* Gov't Br. 22. And it is further muddied by the fact that Instruction 5230.09 superseded Directive 5230.09, but not Instruction 5230.29, which continues to purport to implement the old directive. In any event, even if the DOD's prepublication review is limited to those who signed nondisclosure agreements, countless DOD employees—including Mr. Fallon and Ms. Bhagwati—have.

who had access to classified information to submit any material that "might be based upon [information that is classified or is in the process of a classification determination]." *Id.* ¶ 50(c); Form 313(5).

5. **Defendants' shared submission standards.** Through Form 4414, all Defendants require former employees who had access to SCI to submit any material "that contains or purports to contain any . . . description of activities that . . . relate to SCI." Compl. ¶¶ 32(b), 38(b), 44(b), 50(b). In addition, all of the Defendants' regimes contemplate that the agencies will coordinate review with other agencies— but none of them specifies when they will do so and what censorship standards the other agencies will apply. *Id.* ¶¶ 33, 39, 45, 51.

These submission standards are sweeping, subjective, and vague. With the exception of Form 313 and the shared standard imposed by Form 4414, Defendants' submission standards apply to all former employees, whether or not they had access to closely held secrets. They all require submission of materials without regard to whether they contain information that the author obtained through government service. And they all require review of sweeping categories of information that could not plausibly be expected to contain classified information. In addition, many of the standards rely on criteria that are subjective or vague: "intelligence related" (CIA); "relates to," "pertains to," and "subjects of significant concern to [the agency]" (DOD); "might be based upon" and "in the process of a classification determination" (ODNI); and "relate to" (Form 4414). The Supreme Court has held that terms such as these "provide[] insufficient guidance because [they are] classic terms of degree" and offer "no principle for determining when remarks pass from the safe harbor . . . to the forbidden sea." *Gentile v. State Bar*, 501 U.S. 1030, 1048–49 (1991) (holding that standard for what lawyer can discuss hinging on "relates to" is unconstitutionally vague).

Any prepublication review regime will sweep in *some* speech that goes beyond what the government may constitutionally punish after the fact, but the submission criteria summarized here reach a vast amount of material that Defendants have no legitimate interest in reviewing. *Cf.* 115 Cong. Rec. H3300 (daily ed. May 3, 2017) (statement of Rep. Nunes) (congressional intelligence

committees recommending that agencies "limit[] the information subject to pre-publication review . . . to only those materials that might reasonably contain or be derived from classified information obtained during the course of an individual's association with the [Intelligence Community]"); 115 Cong. Rec. S2750 (daily ed. May 4, 2017) (statement of Sen. Burr) (same). For example, under the CIA's requirement that former employees submit anything "intelligence related," a former agency employee must submit for review virtually anything related to the CIA, to the intelligence agencies, or to national security. The DOD's standards are comparably sweeping and vague, with the added complication that they require former employees to retain a sense of, or speculate as to, whether the subjects of their writing are "of significant concern to" the DOD. The NSA's standard turns on whether information has been "approved for public release," but the agency does not say who decides whether something is approved for public release, when, or according to what standards. And the ODNI's sweeping baseline requirement—that former employees submit everything that "discusses" the agency, the intelligence community, or national security—is made incurably vague by the requirement that those who had access to classified information submit anything that "might be" based upon that information (or information pending a classification determination). *Cf. Nat'l Fed'n of Fed. Emps. v. United States*, 695 F. Supp. 1196, 1202–03 (D.D.C. 1988) ("On its face, 'classifiable' has not readily discernible meaning" and could ensnare "information that does not become classified until its disclosure piques the concerns of the Executive.").

Under these standards, a CIA officer employed in the 1970s to analyze U.S. foreign policy toward Vietnam would today have to submit for review any pieces opining on the implications of President Trump's visit to North Korea, discussing the NSA's bulk collection of Americans' call records, or commenting on the popular television show "The Americans." A former DOD

employee would have to submit for review a piece about the agency's hiring practices, social-media banter with veterans of other branches about whose training was most rigorous, or an academic article on public understanding of artificial intelligence and machine learning technologies. A former NSA employee would have to submit for review any discussion of unclassified documents about the NSA's surveillance of civil rights leaders in the 1960s, to ensure they had been "approved for public release." A former ODNI employee would have to submit literally every piece of public writing discussing any aspect of the ODNI, or discussing national security—social media posts commenting on salaries of ODNI employees, for example, or emails to friends encouraging them to apply to the agency, or even op-eds about the ODNI's prepublication review requirements. Under Form 4414, a former employee running for public office would need to submit for review any campaign speech concerning U.S. foreign policy, surveillance law, or counterterrorism policy.

The complaint explains the implications of all of this for Plaintiffs themselves. For example, because Mr. Goodman's work at the CIA several decades ago focused on the former Soviet Union and its Cold War foreign policy toward developing countries not aligned with either the Western or Eastern Bloc, he must submit to the CIA for approval anything he writes about Russia and large parts of the Middle East, Asia, and Africa—all "subject[s] about which [he] has had access to classified information in the course of his employment"—no matter how unlikely his writings are to contain censorable information. *See* Compl. ¶¶ 32(d), 81–82. The DOD's standards would encompass Ms. Bhagwati's writings about her experiences with misogyny, racism, and sexual violence in the military, even though this work does not discuss classified information, *id.* ¶¶ 94, 99, and Mr. Fallon's writings about the interrogation and torture of

prisoners, even if scrupulously sourced to declassified information and materials in the public record, *id.* ¶ 104.

### 2. Censorship standards.

The standards under which Defendants determine which information to censor are not narrow, objective, and definite. Several of Defendants' regimes do not specify censorship criteria at all. Even the narrowest of them invest agency officials with the power to censor information, (1) whether or not it was obtained by the author in the course of employment, (2) whether or not it is properly classified (that is, whether or not its disclosure would actually cause harm), (3) whether or not it is already in the public domain, and (4) whether or not the public interest in its disclosure outweighs the government's interest in secrecy. For these reasons, Defendants' regimes fail to overcome the heavy presumption against their constitutionality.

1. **The CIA's censorship standards.** The CIA reviews submissions by former employees "solely to determine whether [they] contain[] any classified information." AR 13-10 § 2(f)(2); *see also* Compl. ¶ 33.

2. **The DOD's censorship standards.** The DOD subjects the submissions of former employees to "security review," which "protects classified information, controlled unclassified information, or unclassified information that may individually or in aggregate lead to the compromise of classified information or disclosure of operations security." Instruction 5230.29, Encl. 3 § 1; *see also* Compl. ¶ 39. The DOD also appears to review submissions for information "requiring protection in the interest of national security or other legitimate governmental interest," Instruction 5230.09 § 1.2(d), and for "any classified, export-controlled or other protected information," *id.* Glossary pt. 2.

3. **The NSA's censorship standards.** The NSA's policies do not set forth any censorship standard for submissions by former employees. Compl. ¶ 45.

4. **The ODNI's censorship standards.** The ODNI's policies do not set forth any censorship standard for submissions by former employees. However, they state that "the goal of pre-publication review is" not only to "prevent the unauthorized disclosure of information," but also to "ensure the ODNI's mission and the foreign relations or security of the U.S. are not adversely affected by publication." *Id.* ¶ 51.

5. **Defendants' shared censorship standards.** All Defendants review submissions of former employees who had access to SCI for the presence of SCI. *Id.* ¶¶ 33, 39, 45, 51.

These censorship standards are sweeping, subjective, and vague. First, the NSA's and the ODNI's policies do not actually set out a censorship standard. This deficiency is fatal. "A long line of cases in th[e Supreme] Court makes it clear that [the government] cannot require all who wish to disseminate ideas to present them first to [government] authorities for their consideration and approval, with a discretion in the police to say some ideas may, while others may not, be disseminate[d]." *Cox v. Louisiana*, 379 U.S. 536, 557 (1965) (quotation marks omitted) (collecting cases invalidating licensing schemes that lacked standards to cabin official discretion).

Second, Defendants' standards reach an immense amount of material that the government has no legitimate interest in censoring. The DOD, for example, asserts the authority to censor several categories of unclassified information. The ODNI asserts the categorical authority to censor information that is already in the public domain. *See* ODNI Instruction 80.04 § 6(A)(2) (stating that former employees must in all circumstances "not use sourcing that comes from known leaks, or unauthorized disclosures of sensitive information"). And all Defendants assert the authority to censor information that former employees obtained outside of the course of employment. The government has no legitimate interest in censoring this information. *See, e.g.*, *Marchetti*, 466 F.2d at 1316–17 (noting that "the Government's need for secrecy in this area lends justification" to censorship only of "information obtained during the course of employment"); *McGehee v. Casey*, 718 F.2d 1137, 1141 (D.C. Cir. 1983) (explaining that "[t]he government may not censor [information obtained from public sources]" and "has no legitimate interest in censoring unclassified materials").

Third, Defendants' standards do not limit censorship to information that is properly classified, ignoring Plaintiffs' "strong first amendment interest in ensuring that [the] censorship of

[their writings] results from a *proper* classification." *McGehee*, 718 F.2d at 1148. Moreover, the government lacks any legitimate interest in censoring information whose disclosure would not cause harm. *N.Y. Times Co. v. United States* (*Pentagon Papers*), 403 U.S. 713, 730 (1971) (Stewart, J., concurring) (Even where questions of allegedly urgent national security interests are involved, the government must show that "disclosure . . . will surely result in direct, immediate, and irreparable damage to our Nation or its people."). Nor do Defendants' standards limit censorship to instances where the government's interest in secrecy outweighs the public's interest in disclosure. But as the Supreme Court has held, restraints on public-employee speech are permissible only where the interests of prospective speakers and their audiences are outweighed by the expression's actual impact on the government's interests. *See NTEU*, 513 U.S. at 468.

Fourth, the DOD's censorship criteria are impermissibly vague and subjective—as are the ODNI's, to the extent the ODNI has a censorship standard at all. For example, the DOD asserts the authority to censor not just classified information but also information "requiring protection in the interest of national security or other legitimate governmental interest," Instruction 5230.09 § 1.2(d), and the ODNI seems to assert the authority to censor information whose disclosure is "unauthorized" or whose disclosure might "adversely affect[]" the ODNI's mission, ODNI Instruction 80.04 § 3. These terms are unconstitutionally vague. *See McGehee*, 718 F.2d at 1143; *cf. Keith*, 407 U.S. at 320 (noting the "inherent vagueness of the domestic security concept"); *Pentagon Papers*, 403 U.S. at 719 (Black, J., concurring) (noting that "security" is a "broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment"); *Shuttlesworth*, 394 U.S. at 150–51 (invalidating scheme allowing censorship of speech that would harm "public welfare, peace, safety, health, decency, good order, morals or convenience"); *Zweibon v. Mitchell*, 516 F.2d 594, 653 (D.C. Cir. 1975) (en banc) ("[T]he concept

27

of 'affecting foreign relations' is . . . vague and . . . subject to abuse."); *Sanjour v. EPA*, 56 F.3d 85, 96–97 (D.C. Cir. 1995) (similar for "within the mission of the agency").

Fifth, while the CIA's and Form 4414's censorship standards are limited to classified information, they reach a sweeping amount of protected speech by, as summarized above, permitting censorship of information without regard to (1) whether it was obtained by the author in the course of employment, (2) whether it is properly classified, (3) whether it is already in the public domain, and (4) whether the public interest in its disclosure outweighs the government's interest in secrecy. Thus, the CIA's standards permit it to censor a former employee's writings about a major news story based on an unauthorized disclosure of classified information, even if the employee had no access to that information while at the CIA and even if she expressly disclaims any such knowledge in her writings. It was presumably pursuant to this authority that the CIA demanded that Mr. Goodman redact publicly available information from his writing about the CIA's drone program, even though he left the CIA decades before that program was established, Compl. ¶ 90, and demanded that Professor Immerman redact information that was derived from public sources, that concerned issues that arose after he left government, and that the CIA itself had published previously, *id.* ¶ 75; *see also id.* ¶¶ 110, 114 (similar for Mr. Fallon).

Finally, Defendants' practice of cross-agency referrals exacerbates the system's constitutional deficiencies, because the agencies refer publications to other agencies, and review publications referred to them, based on referral and censorship standards that are undisclosed. Defendants' regimes allow the agencies to refer submissions to other agencies for review, but none of them specifies the standards according to which the works will be shared and reviewed. *Id.*

¶¶ 33, 39, 45, 51; *see also id.* ¶¶ 63, 74, 87, 108 (describing Plaintiffs' experience with cross-agency referrals).[10]

### C. Defendants' prepublication review regimes lack constitutionally required procedural safeguards.

Defendants' prepublication review regimes also lack the procedural safeguards required by *Freedman*. In *Freedman*, the Supreme Court held that (1) a restraint prior to judicial review can be imposed only for a specified, brief period; (2) prompt judicial review of the decision must be available; and (3) the censor must bear both the burden of instituting judicial proceedings and the burden of proof once in court. 380 U.S. at 58–60; *see also Se. Promotions*, 420 U.S. at 560. Defendants' regimes lack these safeguards.

### 1. The policies do not require review within a specified, brief period.

Time limits are an "essential procedural safeguard" in licensing schemes, *Chesapeake B & M, Inc. v. Harford Cty.*, 58 F.3d 1005, 1011 (4th Cir. 1995), as delays in decision making "create[] the possibility that constitutionally protected speech will be suppressed . . . indefinitely." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226–27 (1990). In *Marchetti*, notably, the Fourth Circuit stated that prepublication review of a former employee's speech should take place within thirty days. 466 F.2d at 1317. Here, Defendants' prepublication review regimes do not require that submissions be reviewed within any specific time period at all. They provide at most *aspirational* timeframes within which Defendants will seek to complete review. *See supra* Background. The government maintains that these "benchmarks" satisfy constitutional requirements, Gov't Br. 32–24, but definite time limits are mandatory in this context; that government officials "might" make

---

[10] For reasons similar to those discussed in Part I.A, Defendants' prepublication review regimes are facially unconstitutional because they are substantially overbroad. *See United States v. Williams*, 553 U.S. 285 (2008).

decisions within reasonable time frames is insufficient. *Chesapeake B & M*, 58 F.3d at 1011 (holding that a licensing scheme is unconstitutional if it does not "*ensure* a prompt administrative decision" (emphasis added)).

Nor can the government evade constitutional requirements by arguing that review in this context requires time-consuming coordination among multiple agencies. *FW/PBS*, 493 U.S. at 226–27 (observing that excusing coordinated reviews from *Freedman* requirements would "allow[] indefinite postponement of the issuance of a license"). The government may be correct that the length of time required for review may depend on the nature and length of the submission, Gov't Br. 33, but this fact cannot excuse regimes that fail to impose any firm deadlines at all. *FW/PBS*, 493 U.S. at 239 (Brennan, J., concurring) (stating that the Supreme Court has "never suggested" that applicability of *Freedman* requirements "might vary with the particular facts of the prior restraint"). It certainly cannot excuse regimes that routinely result in delays of many months or even years. *See, e.g.*, Compl. ¶ 36. Plaintiffs themselves have experienced delays of many months and would have faced further delays had they contested redactions that they believed to be unjustified. *See, e.g.*, *id.* ¶¶ 75, 89, 110.

## 2. The policies do not ensure prompt judicial review.

The First Amendment also requires that licensing schemes ensure "expeditious judicial review" of administrative decisions, *FW/PBS*, 493 U.S. at 227, and that the government bear the burden of initiating such review, *Freedman*, 380 U.S. at 59. Defendants' regimes ensure neither. *See* Compl. ¶¶ 37, 43, 49, 55. Thus, "the [censor's] determination in practice may be final," *Se. Promotions*, 420 U.S. at 561, particularly for intended speech that is time-sensitive. Plaintiffs' experiences are illustrative: All who have submitted pieces for review have accepted censorship decisions they believe were unjustified to avoid further delays. *See* Compl. ¶¶ 64, 78, 91, 111.

The government also argues that the Fourth Circuit has rejected the need for government-initiated judicial review of prepublication review decisions. *See* Gov't Br. 35–36. The caselaw it cites, however, was based upon the assumption that "in most instances, there ought to be no practical reason for judicial review," given the "limited nature" of the government's power to censor—a power that, on the court's description, extended only to classified information obtained in the course of employment and not already in the public domain. *Marchetti*, 466 F.2d at 1317. As Plaintiffs' complaint alleges, however, the regimes at issue here extend much further, and Defendants rely on those regimes to censor much more.[11]

## D.    *Snepp* does not change this analysis.

Relying on *Snepp*, the government argues that Defendants' prepublication review regimes are constitutional because they are a "'reasonable means for protecting' the government's compelling interest in protecting classified information." Gov't Br. 27 (quoting *Snepp*, 444 U.S. at 509 n.3). But *Snepp* cannot fairly be understood to have sanctioned the prepublication review regimes challenged here, and, while the regimes challenged here cannot survive even reasonableness review, the Supreme Court has made clear in more recent cases that prior restraints imposed on public employees must be evaluated under essentially the same level of scrutiny applied to prior restraints in other contexts.

In *Snepp*, a former CIA agent signed "an agreement promising that he would 'not . . . publish . . . any information or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of [his] employment . . . without specific prior

---

[11] In other contexts involving national security, some courts have endorsed a "reciprocal notice" procedure, in which the would-be speaker bears the burden of notifying the government that she intends to challenge the restraint on her speech, but the government bears the burden of initiating judicial process. *See John Doe, Inc. v. Mukasey*, 549 F.3d 861, 879 (2d Cir. 2009); *see also* 28 C.F.R. § 17.18(i) (2019) (DOJ reciprocal notice procedure for prepublication review).

approval by the Agency." 444 U.S. at 508. Shortly after resigning from the agency, however, he published a book without first submitting it for review, and the government sued. *Id.* at 507. The district court found that Snepp had "willfully, deliberately and surreptitiously breached his position of trust with the CIA and [his] secrecy agreement," that he had deliberately misled CIA officials into believing that he would submit his book for review, and that publication of the book had "caused the United States irreparable harm and loss." *United States v. Snepp*, 456 F. Supp. 176, 179–80 (E.D. Va. 1978). Relying on these findings, the court enjoined Snepp from violating his agreement in the future and imposed a constructive trust on the proceeds of his book. Under the terms of the injunction, however, the court imposed additional safeguards not imposed by the CIA's prepublication review regime: Snepp was required to submit writings only if they contained "information [he] gained during the course of or as a result of his employment," the CIA was required to complete its review within thirty days, and the CIA could censor only information that was classified. Order, *United States v. Snepp*, No. 78-92-A (E.D. Va. 1978), 1979 U.S. S. Ct. Briefs LEXIS 6, at *45–46. On appeal, the Fourth Circuit affirmed this injunction, but reversed the order imposing a constructive trust. *Snepp v. United States*, 595 F.2d 926 (4th Cir. 1979).

In his petition for certiorari, Snepp challenged the injunction, arguing that his secrecy agreement was unenforceable as a prior restraint. *Snepp*, 444 U.S. at 509 n.3. The Supreme Court granted Snepp's petition, as well as a conditional cross-petition by the government. But in a highly unusual move, it decided the case summarily. It did not have the benefit of oral argument. It did not even take any adversarial briefing on the merits. The Court's *per curiam* opinion focuses almost entirely on the Fourth Circuit's decision to reverse the order for a constructive trust. It disposes of Snepp's First Amendment claim in a cursory footnote, concluding that the CIA has "a compelling interest in protecting both the secrecy of information important to our national security

and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service," and that the "agreement Snepp signed is a reasonable means for protecting this vital interest." *Id.* at 509 n.3.

*Snepp* does not control this case.

First, *Snepp* addressed only the narrow question of whether the CIA could impose a prepublication review requirement on a former intelligence agent with access to the Agency's most closely held secrets. The Court had no occasion to consider the constitutionality of the specific features of the CIA's regime at issue here, let alone the specific features of the other agencies' regimes. "[I]t would therefore be inaccurate to say that [*Snepp*] upheld [those] features." *Freedman*, 380 U.S. at 54 (observing that *Times Film Corp. v. City of Chicago*, 365 U.S. 43 (1961), had not decided the constitutionality of the licensing scheme at issue because it addressed only the "narrow" question "whether a prior restraint was necessarily unconstitutional under all circumstances" and did not consider "the specific features" of the licensing scheme).

*Snepp* did not, for example, consider the categories of speakers to which a prepublication review requirement may constitutionally extend. Snepp himself was a former CIA agent who had been granted access to some of the government's most closely held secrets. 444 U.S. at 511. The Court emphasized this in concluding that his prepublication review requirement was constitutional: "Few types of government employment involve a higher degree of trust than that reposed in a CIA employee with Snepp's duties." *Id.* at 511 n.6. Thus, the Court did not consider whether the prepublication review obligation the CIA had imposed on Snepp could be imposed on other CIA employees, or on employees of different agencies. Indeed, the Court's analysis rests in large part on the CIA's status and function as the nation's "foreign intelligence service." *Id.* at 509 n.3; *see also id.* at 512 n.7, 513 n.8.

In addition, *Snepp* did not consider the permissible scope of a submission requirement, the permissible purposes of review, or what procedural protections might be constitutionally required. Because Snepp failed to submit a manuscript that was so clearly based on his access to sensitive government information, the Court had no occasion to consider the scope of the CIA's submission requirement. Moreover, because Snepp's manuscript was not subjected to the CIA's prepublication review process, the Court did not have occasion to consider the scope of the CIA's review standards, or the absence of procedural safeguards.

Second, at the time *Snepp* was decided, the CIA's prepublication review regime was much narrower than the ones that now exist. In 1980, the processes and practices surrounding prepublication review were relatively new. Moreover, lifetime prepublication review was confined to the two agencies with the most direct role in intelligence gathering: the CIA and the NSA. Compl. ¶ 24. Prepublication review applied, in practice, to relatively few people and publications. *Id.* ¶¶ 27–28. For example, in 1977, the year Snepp published his book, the CIA received only forty-three submissions for prepublication review. *Id.* ¶ 28. Since then, prepublication review has expanded on nearly every axis: the number of agencies that impose prepublication review requirements on former employees, the categories of former employees subject to prepublication review, the amount of information that is classified, the complexity of prepublication review regimes, the amount of material that is submitted for review, and the time taken to complete reviews. *Id.* ¶¶ 23–29. For example, in 2015 the CIA received 8,400 submissions (or 150,000 pages). *Id.* ¶ 28. That same year, the CIA's Inspector General predicted that the review of book-length manuscripts by the agency would take over a year. *Id.* ¶ 29.

Third, *Snepp* predates *NTEU*, in which the Supreme Court made clear that prior restraints imposed on public employees—even on current ones—must be subject to essentially the same

scrutiny as prior restraints imposed in other contexts. The *Snepp* Court is generally understood to have applied *Pickering v. Board of Education*, 391 U.S. 563 (1968), a case that adopted a "reasonableness" test for evaluating the First Amendment claims of government employees. *See, e.g.*, *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996); *McGehee v. Casey*, 718 F.2d, 1141–42. Under *Pickering*, courts must attempt "to arrive at a balance between the interests of [a public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Although *Snepp* does not explicitly engage in this balancing, its analysis rests on the core assumption behind *Pickering*—that governments have greater latitude to regulate the speech of their employees than of the public at large. *Snepp*, 444 U.S. at 509 n.3 (noting that the CIA was entitled to "impos[e] reasonable restrictions on employee activities" (citing *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548 (1973))); *see U.S. Civil Serv. Comm'n*, 413 U.S. at 564–67 (applying *Pickering*).

But fifteen years after *Snepp*, the Supreme Court recognized that *Pickering* analysis should not automatically be applied to prior restraints, even where the speech of *current* government employees is concerned. In *NTEU*, the Court invalidated a statute that prohibited federal employees from accepting compensation for making speeches or writing articles. *See* 513 U.S. at 457. The Court modified its *Pickering* test because, "[u]nlike *Pickering* and its progeny, th[e] case d[id] not involve a *post hoc* analysis of one employee's speech and its impact on that employee's public responsibilities," but, rather, a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *Id.* at 466–67 (citations omitted). Because the impact of the speech restriction was "widespread" and "chill[ed] potential speech before it happen[ed]," the Court held that "[t]he Government must show that the interests of both potential audiences and a

vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *Id.* at 468 (quotation marks omitted). The Court also held that the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475 (quotation marks omitted).

The holding of *NTEU* effectively limits *Snepp* to its facts. *See, e.g.*, *Wernsing v. Thompson*, 423 F.3d 732, 749 (7th Cir. 2005) (recognizing that *Snepp* "predate[s] the Supreme Court's more exacting pronouncements on prior restraints [in *NTEU*]"); *Harman v. City of N.Y.*, 140 F.3d 111, 119 (2d Cir. 1998) (concluding, in reliance on *NTEU*, that "the general presumption against prior restraints on speech" applies in the public-employment context). As the Court recently explained, *NTEU*'s test is a "more rigorous form of *Pickering* analysis." *Janus v. AFSCME*, 138 S. Ct. 2448, 2477 (2018). Under *NTEU* the government carries a far "heav[ier] burden" and "is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights." *Id.* at 2472. Moreover, "[t]he end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis." *Id.*[12]

Defendants' prepublication review regimes cannot survive "reasonableness" review, and they certainly cannot survive any more exacting form of scrutiny. Even in *Marchetti*, where the Fourth Circuit held that a secrecy agreement would be a reasonable means for an agency to protect internal secrets, the court's holding was premised on the agency acting promptly upon the submissions it received and censoring only classified information obtained in the course of employment that was not already in the public domain. 466 F.2d at 1317–18. And in *Snepp*, the

---

[12] For similar reasons, *Marchetti*'s reasonableness framework does not control either.

Supreme Court affirmed an injunction that complied with these dictates. Defendants' prepublication review regimes, however, do not.

Defendants' regimes are therefore bound to fail under any more stringent standard of review. For reasons already explained, Defendants' regimes fail to survive under traditional prior restraint analysis. *See supra* Part II.A–C. They also fail under *NTEU*.[13] Defendants' regimes implicate the core political speech of "a vast group of present and future employees." *NTEU*, 513 U.S. at 468. The public's interest in hearing this speech is "manifestly great," because "government employees are in a position to offer the public unique insights into the workings of government." *Sanjour*, 56 F.3d. Meanwhile, Defendants' regimes are not "narrowly tailored to serve the government's asserted interest." *Wolfe v. Barnhart*, 446 F.3d 1096, 1106–07 (10th Cir. 2006) (collecting cases applying *NTEU*'s tailoring requirement). It bears emphasis that prepublication review cannot deter those who leak classified information intentionally. Those individuals will not submit their leaks for review in the first place. The only legitimate interest served by prepublication review is the prevention of inadvertent disclosures by employees who submit to review. That interest is served most directly by the laws criminalizing the disclosure of sensitive information, and by the availability of administrative and civil sanctions for those who mishandle such

---

[13] In fact, review here should be *more* stringent than the review afforded in *NTEU*. First, *NTEU* involved a prior restraint on the speech of *current* employees, not on *former* employees, as here. Second, *NTEU* involved an indirect burden on speech: a ban on accepting honoraria. 513 U.S. at 469–70. Defendants' prepublication review regimes, by contrast, are outright prohibitions on speaking without government approval. Third, the *NTEU* test "was developed in the context of commercial speech, another area where the government has traditionally enjoyed greater-than-usual power to regulate speech." *Janus*, 138 S. Ct. at 2477–78. Defendants' prepublication review regimes, by contrast, implicate speech on public issues, which "is entitled to special protection." *Connick*, 461 U.S. at 145. Fourth, the prior restraint at issue in *NTEU* was explicitly authorized by statute, and the Court recognized that congressional judgments are generally afforded "a stronger presumption of validity" than agency ones. *See* 513 U.S. at 468.

information. Any residual need for prepublication review can be served by a system far more tailored than Defendants' current regimes.

## III. Defendants' prepublication review regimes are void for vagueness under the Fifth Amendment.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). This principle applies to administrative, civil, and criminal prohibitions. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile*, 501 U.S. at 1048–51 (state bar rule); *United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997) (environmental regulations). And where First Amendment rights are at stake, the requirement of clarity is especially stringent. *See Fox Television Stations, Inc.*, 567 U.S. at 253–54; *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1228–29 (2018) (Gorsuch, J., concurring).

Governmental prohibitions "can be impermissibly vague for either of two independent reasons," *Hill v. Colorado*, 530 U.S. 703, 732 (2000), and Defendants' prepublication review regimes fail on both counts. First, Defendants' prepublication review regimes fail to "give fair notice of conduct that is forbidden or required." *Fox Television Stations, Inc.*, 567 U.S. at 253. As explained at length above, the regimes are vague with respect to what former employees must submit for review. *See supra* Part II.B.1 (discussing standards such as "intelligence related," "relates to," "pertains to," "subjects of significant concern," and "might be based upon"). Second, the regimes fail to provide "explicit standards for those who apply them," inviting "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108. As explained at length above, the regimes are vague with respect to what the agencies may censor, *see supra* Part II.B.2, and that vagueness

has facilitated arbitrary and discriminatory application to the writings of Plaintiffs and others, Compl. ¶¶ 34, 40, 46, 52, 75, 77, 90, 110–11, 114.

The gravamen of the government's response is that these terms are not vague, that Plaintiffs understand them, and that even if they do not, they can seek clarification. Gov't Br. 38–39. These responses fail to engage with the facts of this case and the law of vagueness. Contrary to the government's claims, Plaintiffs do identify and explain the "specific contractual [and] regulatory language they believe is impermissibly vague," Gov't Br. 38; *see* Part II.B, and Plaintiffs have alleged that they find the requirements vague, *see, e.g.*, Compl. ¶¶ 66, 105–06, 118. It is true that most Plaintiffs have submitted their works for review in the past, Gov't Br. 38, but that demonstrates only self-censorship, in that Plaintiffs have "restrict[ed] their conduct to that which is unquestionably safe." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *see, e.g.*, Compl. ¶ 115 (Mr. Fallon plans to submit "*any* draft op-eds, articles, columns, and books that he writes." (emphasis added)).

The hypothetical ability of former employees to "'clarify the meaning of' their contractual obligations 'by [their] own inquiry, or by resort to an administrative process,'" Gov't Br. 38 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)), does not cure the vagueness of Defendants' regimes. In the case the government principally relies on, the Supreme Court dealt with an "economic regulation" and expressly distinguished the "less strict vagueness test" it applied in that context from the "stringent" test applicable to prohibitions that "interfere[] with the right of free speech." *Vill. of Hoffman Estates*, 455 U.S. at 498–99. Additionally, here, the informal guidance that Defendants purport to offer, *see* Gov't Br. 6–7, is not sufficient. For example, the government argues that the censorship standard contained in former CIA employees' secrecy agreements is clear, *see id.* at 31, but does not dispute the fact that

the CIA "will not provide a copy of a secrecy agreement or nondisclosure agreement to an author who requests one they signed," Compl. ¶ 32(e). Nor does the government address Plaintiffs' allegation that Defendants' guidance is inconsistent from one censor to the next. For example, when Mr. Fallon attempted to seek clarification about his submission requirements, one DOD official advised him that prepublication review was "voluntary," but, months later, another told him submission was mandatory. *Id.* at 106.

For these reasons, Defendants' submission and censorship standards are unconstitutionally vague.

## CONCLUSION

The Court should deny Defendants' motion to dismiss.

Dated: July 16, 2019

Brett Max Kaufman[*]
Vera Eidelman[*]
Naomi Gilens[*]
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: 212.549.2500
F: 212.549.2654
bkaufman@aclu.org
veidelman@aclu.org
ngilens@aclu.org

 /s/ *David R. Rocah*
David R. Rocah (Bar No. 27315)
American Civil Liberties Union Foundation
  of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
T: 410.889.8555
F. 410.366.7838
rocah@aclu-md.org

Respectfully submitted,

Jameel Jaffer[*]
Alex Abdo[*]
Ramya Krishnan[*]
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: 646.745.8500
jameel.jaffer@knightcolumbia.org
alex.abdo@knightcolumbia.org
ramya.krishnan@knightcolumbia.org

[*] admitted *pro hac vice*

*Counsel for Plaintiffs*