# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TIMOTHY H. EDGAR, *et al.*,

        Plaintiffs,

    v.

DANIEL COATS, Director of National
Intelligence, *et al.*,

        Defendants.

Case No. 8:19-cv-00985 (GJH)

## DEFENDANTS' REPLY BRIEF IN
## SUPPORT OF MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.      Plaintiffs' Claims Fail as a Matter of Law. ........................................................ 2

      A.      This Case Is Controlled by *Snepp*. ........................................................ 3

      B.      Plaintiffs' Prior Restraint Theories Fail as a Matter of Law. ................ 7

      C.      Plaintiffs' Overbreadth Theories Fail. ................................................... 8

            1.      Plaintiffs Lack Overbreadth Standing. ........................................ 8

            2.      Plaintiffs' Overbreadth Theories Fail as a Matter of Law. .......... 9

      D.      Plaintiffs' Vagueness Theories Fail as a Matter of Law. ..................... 16

II.     The Court Lacks Jurisdiction. ........................................................................... 18

      A.      Plaintiffs Otherwise Lack Standing. .................................................... 18

      B.      Plaintiffs' Claims Are Not Ripe. .......................................................... 21

CONCLUSION ............................................................................................................... 22

# TABLE OF AUTHORITIES

**CASES**

*Alfred A. Knopf, Inc. v. Colby,*
  509 F.2d 1362 (4th Cir. 1975) ........................................................ *passim*

*Attkisson v. Holder,*
  925 F.3d 606 (4th Cir. 2019) ................................................................ 19

*Babbitt v. Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ............................................................................. 20

*Boumediene v. Bush,*
  553 U.S. 723 (2008) ............................................................................. 21

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973) ......................................................................... *passim*

*Brockett v. Spokane Arcades,*
  472 U.S. 491 (1984) ............................................................................ 8, 9

*Bronx Household of Faith v. Bd. of Educ. of City of N.Y.,*
  492 F.3d 89 (2d Cir. 2007) .................................................................. 22

*City of Littleton v. Z.J. Gifts D-4, L.L.C.,*
  541 U.S. 774 (2004) ............................................................................. 22

*Covenant Media of SC, LLC v. City of N. Charleston,*
  493 F.3d 421 (4th Cir. 2007) .............................................................. 7, 8

*Danik v. Hous. Auth. of Baltimore City,*
  396 F. App'x 15 (4th Cir. 2010) .......................................................... 18

*Falwell v. City of Lynchburg,*
  198 F. Supp. 2d 765 (W.D. Va. 2002) ............................................... 20

*Freedman v. Maryland,*
  380 U.S. 51 (1965) ................................................................................. 1

*Griffin v. Dep't of Veterans Affairs,*
  106 F. App'x 816 (4th Cir. 2004) ....................................................... 20

*Harman v. City of New York,*
  140 F.3d 111 (2d Cir. 1998) ................................................................. 6

*Members of the City Council of Los Angeles v. Taxpayers for Vincent,*
    466 U.S. 789 (1984) ........................................................................................ 9

*Morley v. CIA,*
    508 F.3d 1108 (D.C. Cir. 2007) .................................................................... 13

*Mothershed v. Justices of the Supreme Court,*
    410 F.3d 602 (9th Cir. 2005) .......................................................................... 9

*Overbey v. Mayor of Baltimore,*
    No. 17-2444, 2019 WL 3022327 (4th Cir. July 11, 2019) ............................ 6

*Parker v. Levy,*
    417 U.S. 733 (1974) .................................................................................... 2, 6

*Sabri v. United States,*
    541 U.S. 600 (2004) .................................................................................... 1, 2

*Sec. of State of Md. v. Joseph H. Munson Co.,*
    467 U.S. 947 (1984) ........................................................................................ 9

*Snepp v. United States,*
    444 U.S. 507 (1980) .............................................................................. *passim*

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ...................................................................................... 20

*Thomas v. Chi. Park Dist.,*
    534 U.S. 316 (2002) ........................................................................................ 7

*United States v. Aguilar,*
    515 U.S. 593 (1995) ........................................................................................ 6

*United States v. Marchetti,*
    466 F.2d 1309 (1972) ................................................................... 3, 14, 15, 16

*United States v. Morison,*
    844 F.2d 1057 (4th Cir. 1988) ...................................................................... 18

*United States v. Moussaoui,*
    382 F.3d 453 (4th Cir. 2004) ........................................................................ 21

*United States v. National Treasury Employees Union,*
    513 U.S. 454 (1995) ........................................................................................ 5

*United States v. Snepp*,
   456 F. Supp. 176 (E.D. Va. 1978) ........................................................ 8

*United States v. Snepp*,
   595 F.2d 926 (4th Cir. 1979) ...................................................... *passim*

*United States v. Williams*,
   553 U.S. 285 (2008) ............................................................................. 8

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ............................................................................. 7

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................................. 8

*Weaver v. U.S. Information Agency*,
   87 F.3d 1429 (D.C. Cir. 1996) ........................................................... 6

*Wernsing v. Thompson*,
   423 F.3d 732 (7th Cir. 2005) .............................................................. 6

*Zos v. Wells Fargo Bank*,
   No. GJH-16-00466, 2017 WL 221787 (D. Md. Jan. 18, 2017) ............... 18

## OTHER AUTHORITIES

Exec. Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ........................... 12, 13

https://www.dni.gov/files/documents/CIO/ODNI%20pre-pub%20brochure.pdf ........ 10

*Snepp v. United States*, Br. of Reporters Comm. for Freedom of the Press,
   No. 78-1871, 1979 WL 257988 (U.S. June 25, 1979) ........................... 3, 4

*United States v. Snepp*, Br. for Def.-Appellant,
   No. 78-1651, 1978 WL 221457 (4th Cir. Oct. 24, 1978) ......................... 3

*United States v. Snepp*, Br. for Def.-Appellant,
   No. 78-1651, 1978 WL 221458 (4th Cir. Oct. 20, 1978) ......................... 4

*United States v. Snepp*, Br. of Ass'n of Am. Publishers,
   No. 78-1651, 1978 WL 221459 (4th Cir. Oct. 23, 1978) ...................... 3, 4

## INTRODUCTION

Plaintiffs are not the first government employees to challenge their prepublication review obligations as overbroad, vague, and a "prior restraint" under *Freedman v. Maryland*, 380 U.S. 51 (1965). Those arguments were presented at length in *Snepp v. United States*, 444 U.S. 507 (1980), and they were rejected. As the Supreme Court and the Fourth Circuit held, the prepublication review obligations at issue here do not implicate the First Amendment on their face because they apply only to individuals who voluntarily assume them as a condition of obtaining the government's trust; they are intended to protect sensitive government information; and the government's compelling interests in avoiding inadvertent disclosure of such information is not adequately safeguarded through after-the-fact penalties. Those holdings, the principles on which they are based, and the long line of cases that have applied them to reject challenges just like the ones at issue here foreclose Plaintiffs' facial challenges as a matter of law. Plaintiffs simply cannot show—in the face of *Snepp*—that "*no* application of the [regimes] could be constitutional." *Sabri v. United States*, 541 U.S. 600, 609 (2004).

But the Court need not and should not even reach the merits of Plaintiffs' theories because Plaintiffs neither possess Article III standing nor present a ripe dispute. As to standing, Plaintiffs seek to invoke relaxed rules that apply only to colorable First Amendment injuries, yet they fail to establish standing under any theory. In particular, *Snepp* forecloses the contention that their voluntary prepublication review obligations amount to a First Amendment harm. Thus, to satisfy Article III, Plaintiffs must show concrete, redressable harm arising from the specific purported deficiencies they assert. Yet they have none. They possess only abstract fear that the unspecified time frame they believe is constitutionally required for completing prepublication review will be exceeded (notwithstanding that the sole evidence they cite indicates that the government reviews the vast majority of submissions within 30 days) and that the Agencies will enforce their confidentiality obligations in a manner with which they disagree. Those speculative concerns and any subjective "chill" they may engender are not Article III harms. Moreover, they are not redressable because this Court has no mechanism, much less the authority, to remove uncertainty

1

from the functioning of the system, at least not without interfering with the flexibility necessary

for the Executive Branch to protect national security across a range of highly fact-specific contexts.

Finally, Plaintiffs' claims are not ripe because even if some possible injury could result in the

future as a result of the systematic features challenged here, it is entirely unclear what that injury

might be or how to assess the potential claim if and when it may arise.  And given that judicial

review is available if the system threatens Plaintiffs' interests with respect to a specific future

submission, there simply is no hardship to awaiting a concrete presentation of the issues.

## ARGUMENT

### I.  Plaintiffs' Claims Fail as a Matter of Law.

Plaintiffs confirm in their Opposition brief that their legal claims are purely facial.  *See*

Pls.' Opp'n at 8, 15, ECF No. 33.  Such challenges are disfavored because they "invite judgments

on fact-poor records" and "relax[] familiar requirements of standing, to allow a determination that

the law would be unconstitutionally applied to different parties and different circumstances from

those at hand."  *Sabri*, 541 U.S. at 609 (citations omitted); *see also, e.g.*, *Broadrick v. Oklahoma*,

413 U.S. 601, 610-11 (1973) ("courts are not roving commissions assigned to pass judgment on

the validity of the Nation's laws").  Therefore, to move forward on these theories, it is not enough

for Plaintiffs to show that the Agencies' prepublication review regimes could conceivably be

applied in an unconstitutional manner; they must plausibly allege that "*no application of the*

[regimes] could be constitutional." *Sabri*, 541 U.S. at 609.[1]  Moreover, they must meet that burden

in a national security context where the government may regulate "both with greater breadth and

with greater flexibility" than when regulating civilian society.  *Parker v. Levy*, 417 U.S. 733, 756-

57 (1974).  They have not done so.

---

[1] For this reason, Plaintiffs' effort to distinguish the many cases that have upheld pre-publication review against similar challenges on the basis that they brought as-applied theories, rather than facial challenges, Pls.' Opp'n at 19, makes no sense.  Plaintiffs have a *heavier* burden than the challengers in those cases, who could have prevailed *either* by showing that the obligations were facially invalid *or* that they were invalid as applied to them.

### A.    This Case Is Controlled by *Snepp.*

The Court need go no further than *Snepp* to determine that Plaintiffs' facial challenge fails as a matter of law.  There, the Supreme Court and the Fourth Circuit considered a nondisclosure agreement (the "1968 agreement"), similar to those challenged here, in which Snepp, a former CIA officer, agreed "not to publish . . . any information or material relating to the [CIA], its activities or intelligence activities generally, either during or after the term of my employment . . . without specific prior approval by the Agency."  *United States v. Snepp*, 595 F.2d 926, 930 n.1 (4th Cir. 1979) ("*Snepp II*").  When Snepp left the CIA in 1976, he signed another agreement (the "1976 agreement") reaffirming his obligation to submit for prepublication review "any information concerning intelligence or CIA that has not been made public by CIA."  *Id.* at 930.  Snepp later published a book relating to his service in Vietnam without first submitting it for review, and the Agency sued to enforce its rights.  The government stipulated, for purposes of the case, that the book did not contain any classified information.  *Id.* at 931.

In defending the lawsuit, Snepp and his *amici* made all the same arguments that Plaintiffs make here.  They asserted that prepublication review constituted a "prior restraint" on speech that came to court bearing "a heavy presumption against [its] validity."  Br. for Def.-Appellant, *United States v. Snepp*, No. 78-1651 (4th Cir. Oct. 24, 1978), 1978 WL 221457, at *57; *see also* Br. of Amicus Curiae Reporters Committee for Freedom of the Press in Supp. of Pet., *Snepp v. United States*, No. 78-1871 (U.S. June 25, 1979), 1979 WL 257988, at *1 ("Reporters Comm. Br.") ("this case asks whether, as a condition of government employment, the government may assert the most extreme sanction available to it to limit the First Amendment—the sanction of prior restraints"); *compare* Pls.' Opp'n at 1 ("Defendants' prepublication review regimes are archetypal prior restraints, . . . carrying a heavy presumption of unconstitutionality").  They attempted to distinguish the Fourth Circuit's earlier holding in *United States v. Marchetti*, 466 F.2d 1309 (1972) ("*Marchetti I*") on the ground that Snepp's obligation applied "whether or not [his writings] contain materials of a classified nature, and whether or not national security interests are implicated."  Br. of Ass'n of Am. Publishers, Inc. as Amici Curiae, in Supp. of Def.-Appellant, *United States v. Snepp*, No.

78-1651 (4th Cir. Oct. 23, 1978), 1978 WL 221459, at *25 ("Publishers Br."); *see also* Reporters Comm. Br., 1979 WL 257988, at *4 (framing the question presented as whether the government could enforce prepublication review obligations "without any evidence that a . . . publication has posed a clear and present danger to the national security"); *compare* Pls.' Opp'n at 2-3, 25 (challenging the Agencies' prepublication review regimes because they apply "to material [that is not] reasonably likely to contain [classified information]" and "whether or not . . . its disclosure would actually cause harm").   They asserted that the obligation was unenforceable under *Freedman* because it was "essentially standardless" and not "accompanied by strict procedural safeguards."   Publishers' Br., 1978 WL 221459, at *25-26; *compare* Pls.' Opp'n at 1-2, 38 (challenging the Agencies' regimes because they purportedly fail to provide "explicit standards" and "robust procedural safeguards designed to mitigate the harms associated with prior restraint [under] *Freedman*").   They contended that the "delay, cost, and uncertainty" of prepublication review would "chill[], indeed stifl[e], valuable expression."   Publishers' Br. at *25-26; *compare* Pls.' Opp'n at 12-13 ("Plaintiffs' speech has been chilled" because of "uncertainty" and "delay"). They sought to demonstrate the "sweeping" overbreadth of Snepp's review obligation by emphasizing its "application to . . . an essay reflecting on the moral dilemmas of government service, and . . . a fictional short story" that did not "remotely concern[] sensitive classified matters."   Brief for Def.-Appellant, *United States v. Snepp*, No. 78-1651 (4th Cir. Oct. 20, 1978), 1978 WL 221458, at *63-64 ("Snepp Br."); *compare* Pls.' Opp'n at 23-24 (arguing that Plaintiffs' prepublication review obligations are "sweeping" and overbroad because they could apply to hypothetical scenarios that Plaintiffs believe do not implicate sensitive matters).   They contended that the courts should find the CIA's prepublication review regime invalid because it had been "sharply criticized by Members of Congress and others."   Snepp Br., 1978 WL 221458, at *36; *compare* Pls.' Opp'n at 2, 22-23 (citing critical statements of members of Congress). They contended that the CIA was using prepublication review to "suppress[] criticism[.]"   Snepp Br., 1978 WL 221458, at *40; *compare* Compl. ¶¶ 66, 90, 110 (alleging that prepublication review is used to suppress writings "perceived to be critical" and spare the Agencies from "embarrassment").

4

In short, Plaintiffs are wrong that the *Snepp* courts "did not have occasion to consider" their arguments. Pls.' Opp'n at 2. The *Snepp* courts considered the exact same arguments that Plaintiffs present here.

In the face of such arguments, both the Supreme Court and the Fourth Circuit easily concluded that the First Amendment was not implicated by Snepp's prepublication review obligation. As the Fourth Circuit explained in its majority opinion, Snepp "voluntarily agreed to be bound by the contractual provision requiring prepublication review and he can have little complaint about its being enforced." *Snepp II*, 595 F.2d at 933 (citation omitted). The concurrence put it more bluntly: "I join the majority in concluding that . . . the First Amendment claim is patently frivolous." *Id.* at 942 (Hoffman, J., concurring in part and dissenting in part). And when the case rose to the Supreme Court, that Court too rejected Snepp's "claim that his agreement is unenforceable as a prior restraint on protected speech," explaining that Snepp had "voluntarily signed the agreement," and that "even in the absence of an express agreement," the CIA could have "acted to protect [its] substantial government interests by imposing reasonable restrictions on employee activities that *in other contexts might be protected by the First Amendment*." *Snepp*, 444 U.S. at 509 n.3 (emphasis added). The majority opinion likewise rejected the contention that prepublication review amounted to CIA "'censor[ship]' [of] its employees' publications." *Id.* at 513 n.8

Nonetheless, Plaintiffs contend that, rather than apply the "reasonableness" standard the Supreme Court applied in *Snepp*, a case that is directly on point, the Court should apply the standard adopted in *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995), a case that is not on point. *See* Pls.' Opp'n at 2, 27, 34-37. They are wrong. *NTEU* concerned a provision in the Ethics in Government Act that prohibited all government employees from accepting honoraria for their speech activities; it did not involve a voluntary undertaking of confidentiality in exchange for access to classified information. And the Supreme Court has never so much as intimated that the standard in *NTEU* supersedes or displaces the rule of *Snepp*. On the contrary, just a few months after it decided *NTEU*, the Supreme Court expressly reaffirmed that

when a government employee "voluntarily assume[s] a duty of confidentiality, governmental restrictions on disclosure are *not subject to the same stringent standards that would apply to efforts to impose restrictions on unwilling*" persons. *United States v. Aguilar*, 515 U.S. 593, 606 (1995) (emphasis added) (citing *Snepp*, 444 U.S. at 507). That same rationale also led the Fourth Circuit, in a prior case, to conclude that, by executing a secrecy agreement with the CIA, and "ent[ering] into the confidential employment relationship, [a former employee] *effectively relinquishe[s] his First Amendment rights*" as to matters encompassed by the agreement. *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975) ("*Marchetti II*"); *cf. Parker*, 417 U.S. at 759 ("Speech that is protected in the civil population" may be "constitutionally unprotected" in the national security context (citation omitted)). And the Fourth Circuit reaffirmed this recognition less than one month ago, noting that the government may hold a former employee "liable for the unauthorized disclosure of confidential or sensitive information that was held by the government and to which the speaker would not have had access but for a promise of confidentiality or other fiduciary obligation to the government." *Overbey v. Mayor of Baltimore*, No. 17-2444, 2019 WL 3022327, at *5 n.9 (4th Cir. July 11, 2019) (citing *Snepp*, 444 U.S. at 510). For that reason, Plaintiffs' reliance on *Harman v. City of New York*, 140 F.3d 111 (2d Cir. 1998), *Weaver v. U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996), and *Wernsing v. Thompson*, 423 F.3d 732 (7th Cir. 2005), is misplaced. Like *NTEU*, those cases did not involve a voluntary duty of confidentiality undertaken in exchange for access to classified information. They therefore have no bearing on the standard of review to apply in this case.[2]

---

[2] The cases do, however, confirm that the prepublication review regimes at issue here satisfy even the more rigorous standard under *NTEU*. *See Weaver*, 87 F.3d at 1440, 1443 (upholding a prepublication review requirement applicable to "all agency employees—even ones without direct access to classified information" as "clearly pass[ing] muster"); *Wernsing*, 423 F.3d at 749-50 (reading *Snepp* to "suggest that pre-clearance directives such as this one are permissible" and admonishing the district court for framing the inquiry "in terms of a general proposition" based on "prior restraint" case law, rather than narrowly in the context of prepublication review).

### B.    Plaintiffs' Prior Restraint Theories Fail as a Matter of Law.

Plaintiffs also contend that, notwithstanding *Snepp*, prepublication review is a prior restraint for purposes of the First Amendment because the Fourth Circuit in *Marchetti I* stated as much. Pls.' Opp'n at 18.  That aspect of the holding in *Marchetti I*, however, is plainly overtaken by the subsequent decision in *Snepp*, where the Supreme Court held that Snepp's prepublication review obligation was enforceable because it was "reasonable," notwithstanding the absence of procedural protections that would have been required under *Freedman*.  Indeed, the Supreme Court held that even *without* a written nondisclosure agreement (*i.e.*, with no written standards or criteria at all), a prepublication review requirement could have been imposed on Snepp as a matter of fiduciary duty.  *See Snepp*, 444 U.S. at 509 n.3 & 515 n.11.  The reference in *Marchetti I* to prepublication review as a "prior restraint" cannot survive that holding.  Thus, although Plaintiffs are correct that the government cannot generally condition civilian employment on grounds that infringe the employee's freedom of expression, Pls.' Opp'n at 19, the government unquestionably possesses the ability to enforce the fiduciary duties of its employees in furtherance of its compelling interest in protecting national security.  *Snepp*, 444 U.S. at 515 n.11; *see also Snepp II*, 595 F.2d at 938 (Hoffman, J., concurring).

Plaintiffs' invocation of *Freedman* also fails on its own terms.  Since *Marchetti I*, the Fourth Circuit has clarified that, "not all prior restraint permitting schemes must provide *Freedman's* procedural safeguards," and that "to determine whether *Freedman* . . . governs," the "'principal inquiry . . . is whether the government has adopted a regulation of speech *because of disagreement with the message it conveys*."  *Covenant Media of SC, LLC v. City of N. Charleston*, 493 F.3d 421, 431-32 (4th Cir. 2007) (emphasis added) (citing *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322 (2002) and *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also, e.g.*, *Broadrick*, 413 U.S. at 616 (a "censorial" law is one "directed at particular groups or viewpoints").  That circumstance is not present here: the Agencies possess no ability to prevent publication except as it pertains to government information that Plaintiffs have no right to disclose.  *See, e.g.*, Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mot.") at 19 n.15, 30 n. 20, ECF No. 30-1.  Such review

therefore is not "censorial" or "a regulation of speech because of disagreement with the message it conveys," *Covenant Media*, 493 F.3d at 432, and *Freedman* is inapplicable.

### C.      Plaintiffs' Overbreadth Theories Fail.

Plaintiffs' overbreadth theories are similarly misguided.  As the Supreme Court has time and again cautioned, the overbreadth doctrine is "manifestly, strong medicine" to be employed "sparingly and only as a last resort."  *Broadrick*, 413 U.S. at 613.  The doctrine does not apply unless (1) a plaintiff possesses standing through an injury attributable to the alleged overbreadth he seeks to challenge, and (2) the law's overbreadth is "substantial, not only in an absolute sense, but also relative to [its] plainly legitimate sweep."  *United States v. Williams*, 553 U.S. 285, 292-93 (2008).  Plaintiffs fail to make either showing here.

### 1.      Plaintiffs Lack Overbreadth Standing.

As a threshold matter, Plaintiffs have not established standing to vindicate the alleged injuries of third parties not before the Court through a First Amendment overbreadth claim.  Overbreadth is an exception to the prudential standing requirement that a plaintiff generally "must assert his own legal rights and interests."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  For such claims, courts may relax prudential standing requirements to allow a party to challenge a statute on its face because it threatens the rights of others not before the court.  *Brockett v. Spokane Arcades*, 472 U.S. 491, 503 (1984).  But to the extent the claimed overbreadth concerns a plaintiff's *own* circumstances—such as the submission and review standards to which Plaintiffs are subject here—the overbreadth doctrine does not apply, because the plaintiff is the one "who desire[s] to engage in . . . speech that the overbroad statute purports to punish," and in such a circumstance, there is "no want of a proper party" to raise the challenge.  *Brockett*, 472 U.S. at 503-04; *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 802-03 (1984) (overbreadth does not apply where ordinance would potentially abridge the rights of the plaintiff in the same manner as third parties not before court).  In such a case, the court should address only the specific application to the plaintiff at issue, while otherwise leaving the regulations intact.  *Brockett*, 472 U.S. at 504.  Conversely, to the extent a plaintiff seeks to vindicate a distinct injury

to the rights of third parties not before the court, the plaintiff must still establish his own Article III standing with respect to the alleged overbreadth claim. *Sec. of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984). That is, while the overbreadth doctrine permits a plaintiff to assert the First Amendment rights of a third party, he must still demonstrate that he has suffered an *injury to himself* related to the claimed overbreadth. *See id.*; *see also Mothershed v. Justices of the Supreme Court*, 410 F.3d 602, 610-11 (9th Cir. 2005).[3]

Here, in addition to failing to establish their standing generally, *see infra* at 18-21, Plaintiffs fail to establish overbreadth standing. To the extent they challenge submission and review standards that apply to them, those are not overbreadth claims for which facial invalidation of the system would be appropriate because there is "no want of a proper party" to raise the challenge. *Brockett*, 472 U.S. at 503-04. To the extent they assert that prepublication review could apply to former "employees who have never had access to [Sensitive Compartmented Information ("SCI")] or to classified information of any kind," Pls.' Opp'n at 4, they fail to demonstrate any injury stemming from that fact. They have all had access to classified information and they suffer no injury by virtue of the alleged fact that a third party who has not received such information could also be subject to a prepublication review obligation.

### 2.     Plaintiffs' Overbreadth Theories Fail as a Matter of Law.

In any event, even if Plaintiffs could establish standing to raise their overbreadth theories, those theories fail on the merits. With respect to the claim that the regimes are overbroad because prepublication review could hypothetically apply to individuals who have never received access

---

[3] In *Munson*, the plaintiff had standing to challenge on overbreadth grounds a requirement that charitable organizations pay no more than 25% of receipts for expenses, even though plaintiff was not a charitable organization, since the activity that plaintiff sought to protect was "at the heart of the business relationship" between himself (as a fundraiser) and his clients, who were charitable organizations. *See* 467 U.S. at 958. Thus, the plaintiff in *Munson* alleged a personal injury attributable to the requirement being challenged, and he could, therefore, seek to vindicate the First Amendment rights of charities that he did not personally share. *See also Mothershed*, 410 F.3d at 611 (plaintiff who did not allege a First Amendment harm to himself had Article III standing to bring overbreadth claim on behalf of third parties because the challenged rules injured his ability to practice law).

to classified information, Plaintiffs have not shown that such an application of prepublication review obligations is likely, much less that it would implicate a substantial amount of protected speech if it did occur. Indeed, Plaintiffs themselves contend that the CIA and NSA only apply prepublication review to former employees whose writings relate to "intelligence," SCI, and material that "'may not be' unclassified"—all of which assumes that the individual has had exposure to classified information. Pls.' Opp'n at 5. Moreover, implicit in all of the Agencies' review regimes is the premise that a former employee subject to the requirement generally will have signed a non-disclosure agreement in order to receive access to classified information. *See* Abdo Decl., Ex. H (NSA/CSS Policy 1-30), at 1, ECF No. 33-1 (describing the policies governing prepublication review as reflecting "*obligations agreed to in non-disclosure agreements*"); *id.* Ex. A (CIA Agency Regulation 13-10) § 2 (setting forth the prepublication review "policies and procedures" applicable to "individuals *obligated by the CIA secrecy agreement*" (emphasis added)); ODNI Pre-publication Review Brochure ("Generally, anyone who signs a Non-Disclosure Agreement (NDA) is required to submit to a Pre-Pub review")[4]; Abdo Decl. Ex. E (DoDI 5230.09) § 1.2(g) ("former DoD employees . . . will use the DoD prepublication review process . . . *as required by their nondisclosure agreements*." (emphasis added)).[5] Thus, although it is possible that the Agencies' prepublication review regimes could apply to a former employee who has never received classified information—because, for example, the employee signed a nondisclosure agreement but never actually received any classified information—Plaintiffs do not show that such an outcome is, in fact, *likely*. That failure is fatal to their overbreadth theory. *See Broadrick*, 413 U.S. at 615, 618 (mere fact that a law "*may* be susceptible of some other improper applications" does not permit a court to "discard[] it in toto because some persons' arguably protected conduct may or may not be caught or chilled by the statute"; rather, plaintiff must demonstrate that the overbroad application is "substantial" relative to the law's "legitimate sweep" (emphasis added)).

---

[4] *See* https://www.dni.gov/files/documents/CIO/ODNI%20pre-pub%20brochure.pdf

[5] The version of DoDI 5230.09 that Plaintiffs have provided to the Court at Exhibit D of the Abdo Declaration, ECF No. 33-1, is outdated and has been superseded by the version at Exhibit E.

Likely because this is so, Plaintiffs double down on their erroneous interpretation of DoD's prepublication review regulations as applying to "million[s]" of DoD employees that "have never had access to . . . . classified information of any kind." Compl. ¶ 25; *see* Pls.' Opp'n at 1 & 21 n. 9.[6] As the Agencies clarified in their opening brief, however, Plaintiffs' interpretation confuses the prepublication review requirements for current employees with the narrower requirement applicable to former employees under DoDI 5230.09 § 1.2(g), which applies only to employees who have signed nondisclosure agreements. *See* Defs.' Mot. at 22.

Plaintiffs should be mollified by that narrower reading (given that a central premise of their lawsuit is overbreadth), yet they resist it, contending that theirs is the "more natural reading" of the Instruction. Pls.' Opp'n at 21 n.9. In fact, Plaintiffs' reading makes no sense. Even if the phrase "as required by their nondisclosure agreements" in subsection 1.2(g) modified the phrase "to ensure that information they intend to release to the public does not compromise national security," as Plaintiffs argue, it still indicates that the category of people to whom the provision applies is former employees *who have signed a nondisclosure agreement*.[7] Moreover, even if a broader interpretation were "natural," the Court would be obligated to endeavor a narrower reading to avoid any constitutional difficulties, especially in light of DoD's own narrower interpretation. *See Broadrick*, 413 U.S. at 613, 618 (holding that facial overbreadth may not be "invoked when a limiting construction has been or could be placed on the challenged statute" and that "a court cannot be expected to ignore [the government's] authoritative pronouncements in determining the breadth of" a law claimed to be unconstitutional). The Court is not permitted to read DoD's

---

[6] Again, while a plaintiff subject to the DoD prepublication review regime who has never received access to classified information might have standing to raise this as an as-applied claim, none of the Plaintiffs has standing to raise this challenge on behalf of such a hypothetical individual. Indeed, only a plaintiff *subject to the DoD system* could even attempt to raise such an overbreadth challenge—here, Ms. Bhagwati and Mr. Fallon—but both of those individuals possessed access to classified information and therefore can claim no injury stemming from the fact that some third party that did not have such access might also be subject to prepublication review.

[7] As a case in point, Ms. Bhagwati did not obtain a security clearance that would have required her to sign a nondisclosure agreement and given rise to a post-service prepublication review obligation until she was "assigned to her first unit as a platoon commander." Compl. ¶ 96.

Instruction broadly for the very purpose of striking it down as overbroad, where a narrower interpretation is possible (again, even assuming that overbreadth standing exists).

Plaintiffs also characterize the "secret" and "confidential" designations for classified information as "low-level" and assert that such information should not be encompassed within the prepublication review obligation. *See* Pls.' Opp'n at 9 (describing Ms. Bhaghati's secret-level clearance as "only a low-level clearance" that did not involve "access to closely held secrets").[8] This characterization is both factually wrong and legally irrelevant. Information classified at the "secret" level indicates that its disclosure could be expected to cause serious damage to the national security. *See* Exec. Order 13,526 § 1.2(2), 75 Fed. Reg. 707 (Dec. 29, 2009). And in *Snepp*, the only question was whether Snepp had been given access to *any* "classified" information, not whether he had access to SCI or "closely held" secrets. 444 U.S. at 508. Thus, the fact that an employee may not have access to SCI has no bearing on the employee's duty of confidentiality or the Agencies' compelling interest in enforcing it.[9]

Plaintiffs also invoke a series of hypotheticals intended to illustrate that the Agencies' submission standards would apply to scenarios they do not believe implicate national security, such as "social media banter with veterans of other branches about whose training was most rigorous" and commentary by a former CIA officer "on the popular television show 'The Americans.'" Pls.' Opp'n at 23-24. But no plaintiff alleges that they were ever injured by these scenarios in any way that could possibly support standing to raise an overbreadth or as-applied claim. And in any event, far from advancing Plaintiffs' claims, these hypotheticals illustrate why the Agencies' submission standards are fully reasonable. "Social media banter" discussing military

---

[8] Again, no standing exists to support such an overbreadth claim because Ms. Bhagwati received such "low-level" classified information and therefore could challenge any purported "overbreadth" on an as-applied basis.

[9] Moreover, Plaintiffs' invitation to adopt a new category of protected information based upon an unspecified authority's assessment that it is "closely held" would wreak havoc upon the government's carefully calibrated systems for classifying and protecting sensitive information, *see, e.g.*, Exec. Order 13,526, and create the very subjectivity problems that Plaintiffs themselves decry.

training might well implicate classified information if, for example, that training reflects specialized research or methods. *See* Exec. Order No. 13,526 § 1.4(a) (identifying military "operations" as one topic for classification). Commentary on intelligence methods depicted in the television show "The Americans" (or any other dramatization of the Intelligence Community) likewise could reveal classified information if, for example, the commentary confirmed by contrast what methods are actually used by the Intelligence Community. *See id.* § 1.4(c) (identifying "intelligence activities[,] . . . sources or methods, or cryptology" as a topic for classification). And despite Plaintiffs' assumption that a discussion of "hiring practices" could not be sensitive, such practices also could implicate national security. *Cf. Morley v. CIA*, 508 F.3d 1108, 1129 (D.C. Cir. 2007) (holding "self-evident that information revealing [CIA's security clearance procedures] could render those procedures vulnerable and weaken their effectiveness at uncovering background information on potential candidates"). Moreover, even if Plaintiffs' hypotheticals show that the Agencies' submission standards might apply to certain writings that do not contain classified information, that was equally true of the submission standards in *Snepp*, yet the Supreme Court found no impediment to enforcing them as written over Snepp's strenuous objections that they did not implicate national security. *See supra* at 3-5; *see also Broadrick*, 413 U.S. at 609-10 (rejecting argument that law was constitutionally overbroad merely because it "has been construed as applying to such allegedly protected political expression as the wearing of political buttons or the displaying of bumper stickers"). Thus, the fact that prepublication review obligations may be capable of application to circumstances that do not implicate national security is not grounds to facially invalidate them, particularly considering that review in such a hypothetical circumstance would necessarily be streamlined and uncomplicated (and if it was not, the author could seek judicial review).

Plaintiffs also are wrong that the constitutionality of prepublication review hinges on "whether . . . the author obtained [the information] through government service." Pls.' Opp'n at 22, 26. Plaintiffs rely for this theory on *Marchetti I*, but the Fourth Circuit's discussion in that case appears to have been based on the fact that the secrecy agreement *itself* limited Marchetti's

duty of confidentiality to matters that had "come to [his] attention by virtue of [his] connection with the [CIA]." *Marchetti I*, 466 F.2d at 1312 n.1; *see also Marchetti II*, 509 F.2d at 1371 ("The *agreement*, of course, covers only information learned by [employees] during their employment" (emphasis added)). The Fourth Circuit did not hold that such a limitation was *constitutionally* required. Moreover, in *Marchetti II*, the Fourth Circuit construed that very contractual language loosely to apply to all information that "was in the Agency and [to which Marchetti] had access" during his employment, even if Marchetti believed he had learned of it independently. *Marchetti II*, 509 F.2d at 1371. The Fourth Circuit explained that any other interpretation would not adequately protect the government's interests because memory is "fallible" and "one in Marchetti's high position in the CIA should be presumed to have been informed of all important items of information to which he had access." *Id.* Any ambiguity on this point is removed by *Snepp*, where the prepublication review obligation was not limited to information obtained through government service but was easily upheld and enforced nevertheless. *See Snepp II*, 595 F.2d at 930 (applying to "any information" relating to specified topics, whether or not obtained through government service).

Moreover, the premise of Plaintiffs' theory—that the government cannot have any valid interest in reviewing information that was not obtained in the course of the employment—is inaccurate. Even if an author has obtained information independent of his government service, the government may possess a substantial interest in avoiding even the appearance that the author is drawing on government information or confirming unofficial disclosures. *See Marchetti II*, 509 F.2d at 1370 (observing that "republication by strangers to it lends no additional credence to it," but "Marchetti and Marks are quite different, for their republication of the material would lend credence to it").

Plaintiffs' contention that the Agencies may not "censor information that is already in the public domain," Pls.' Opp'n at 26, 31, is similarly misdirected. They again rely on *Marchetti I*, 466 F.2d at 1317, but in *Marchetti II*, the Fourth Circuit clarified that when it referred to the "public domain" in *Marchetti I*, it meant information that had been *officially* acknowledged by the CIA.

14

*See Marchetti II*, 509 F.2d at 1370 ("The District Judge properly held that classified information . . . was not in the public domain *unless there had been official disclosure of it*" because "security of all official secrets would break down if speculative and unattributed reports were held to have removed all of their protection" (emphasis added)).  This is consistent with the uniform body of law cited in the Agencies' opening papers—which Plaintiffs fail to address—recognizing that only official disclosure can remove the continued protection of otherwise classified information.  Defs.' Mot. at 36.

Plaintiffs also take issue with the fact that the review standards "do not limit censorship to information that is *properly* classified" or assess whether the "public interest in its disclosure outweighs the government's interest in secrecy."  Pls.' Opp'n at 25-26 (emphasis added).  These arguments are similarly insubstantial.  First, there is a presumption that information "classified under the guidelines of [an] applicable Executive Order" is properly classified, *Marchetti II*, 509 F.2d at 1369, and any objection that it is not so classified may be raised in a prepublication review proceeding.  *See* Defs.' Mot. at 8.  Second, to the extent that a classification challenge is not resolved in the review proceeding, the author has a judicial remedy in which the government must show that the information at issue is properly classified.  *Id.* (citing cases).  Given this plainly adequate and judicially-recognized remedy, facial invalidation of the system on the ground that information might not be properly classified would be wholly improper.  Third, balancing is not part of the analysis when determining whether such government information should be disclosed,[10] and Plaintiffs cite no authority to suggest that it is.

Finally, Plaintiffs cite to factual developments in the past five decades that they believe warrant a reexamination of *Snepp*, such as the fact that more agencies now impose prepublication review obligations and more materials are submitted for such review.  Pls.' Opp'n at 4.  But it is not for this Court to reexamine binding Supreme Court precedent based on changed circumstances, and in any event, the changed circumstances that Plaintiffs invoke—essentially, the advent of an

---

[10] *See, e.g.*, *Marchetti I*, 466 F.2d at 1315-16 ("nothing in the Constitution requires the government to divulge information").

information age—only make the importance of a robust prepublication review process *more*, not less, compelling than it was in *Snepp*.

### D.    Plaintiffs' Vagueness Theories Fail as a Matter of Law.

Plaintiffs' vagueness claims also fail as a matter of law.  As to the Agencies' standards governing whether a particular publication or disclosure must be submitted for review ("submission standards"), their theories cannot be reconciled with *Snepp*, where the Supreme Court upheld and enforced submission standards substantially similar to those at issue here.  A side-by-side comparison of the submission standards upheld in *Snepp* with those challenged here proves the point:

- *Compare* Pls.' Opp'n at 22 (challenging "related to" and "pertains to") *with* 1968 agreement in *Snepp* ("any information or material *relating to* the [CIA], its activities or intelligence activities generally") *and* 1976 agreement ("any information *concerning* intelligence or CIA"); *see Snepp II*, 595 F.2d at 930 n.1, n.2.

- *Compare* Pls.' Opp'n at 22 (challenging "intelligence related") *with* 1976 agreement in *Snepp* ("any information *concerning intelligence*") *and* 1968 agreement in *Snepp* ("any information or material *relating to . . . intelligence activities generally*"); *see Snepp II*, 595 F.2d at 930 n.1, n.2.

- *Compare* Pls.' Opp'n at 23 (challenging "approved for public release") *with* 1976 agreement in *Snepp* ("information . . . that has *not been made public by CIA*"); *see Snepp II*, 595 F.2d at 930 n.2.

- *Compare* Pls.' Opp'n at 23 (challenging phrase "'discusses' the agency, the intelligence community, or national security") *with* 1968 agreement in *Snepp* ("relating to the Agency, its activities or intelligence activities generally") *and* 1976 agreement in *Snepp* ("concerning intelligence or CIA"); *see Snepp II*, 595 F.2d at 930 n.1, n.2.[11]

Plaintiffs' challenges to the standards by which the Agencies review materials submitted for prepublication review ("review standards") are similarly deficient and foreclosed by precedent. Indeed, they admit that the CIA reviews submissions by former employees only to determine whether they contain any classified information, Pls.' Opp'n at 25, a standard they can hardly find vague or objectionable given their agreement not to disclose classified information.  As to DoD,

---

[11] The parties in *Snepp II* disagreed as to whether the 1968 or the 1976 agreement was controlling, but the Fourth Circuit concluded that the issue was "academic."  595 F.2d at 932.

they continue to cite subsections of DoD regulations that apply to current, not former, employees (and are not, in any event, vague), even though DoD has clarified that the submissions of Plaintiffs are governed by the separate subsection applicable to "former DoD employees." *See* Defs.' Mot. at 22. That provision unambiguously provides that former employees are only required to "use the DoD prepublication review process to ensure that information they intend to release to the public does not compromise national security *as required by their nondisclosure agreements*." Abdo Decl., Ex. E (DoDI 5230.09) § 1.2(g) (emphasis added)). And, although Plaintiffs fault NSA and ODNI for "not set[ting] forth any [review] standards," *id.* at 25, that reading simply would put those agencies in the same position the CIA occupied in *Snepp*, where the Supreme Court easily upheld and enforced the CIA's prepublication review regime against arguments that it was "essentially standardless." *See supra* at 4-5.

Most fatally, however, Plaintiffs fail to address the precise review standards set forth in the nondisclosure agreements themselves. *See* Defs.' Mot. at 31; Abdo Decl. Ex. L (Form 4414) § 5 ("the purpose of [prepublication] review . . . is to give the United States a reasonable opportunity to determine whether the preparation submitted . . . sets forth any SCI"); *id.* Ex. I (Form 313) §§ 3(a)-(b), 5, 6 ("the purpose of [prepublication] review . . . is to give the U.S. Government an opportunity to determine whether the [submission] . . . . contains" any "information . . . that is marked as classified or that I have been informed or otherwise know is classified" or "that I have been informed or otherwise know is in the process of a classification determination"); Shiner Decl. Ex. A, ECF No. 30-2 (CIA Secrecy Agreement) §§ 3, 5, 6 (setting substantially the same purpose and criteria as Form 313).[12]

---

[12] Plaintiffs take issue with the Agencies supplying the Court with a copy of the CIA's Secrecy Agreement. Pls.' Opp'n at 20 n.8. The Agreement is cited extensively (and inaccurately) in the Complaint. *See Danik v. Hous. Auth. of Baltimore City*, 396 F. App'x 15, 16 (4th Cir. 2010) ("'the complaint is deemed to include any . . . documents incorporated in it by reference.'" (citations omitted)). The Agreement also is integral to evaluating Plaintiffs' claims; without knowing what it says, the Court could not assess whether Plaintiffs have stated a claim as to the CIA. Thus, it may be considered in deciding this Motion. *See, e.g.*, *Zos v. Wells Fargo Bank*, No. GJH-16-00466, 2017 WL 221787, at *3 (D. Md. Jan. 18, 2017) (considering legal instrument attached to motion to dismiss "because it is integral to the Complaint and Plaintiff has not disputed its authenticity").

Finally, Plaintiffs' challenges to other phrases, such as "national security," "adversely affected," "relating to," and "might be based on," are equally untenable.  *See* Pls.' Opp'n at 22-23, 25.  As the Fourth Circuit has held, this language must be assessed, not as to ordinary civilians, but as to "experienced intelligence officer[s] . . . instructed on all the regulations concerning the security of secret national defense materials."  *United States v. Morison*, 844 F.2d 1057, 1073 (4th Cir. 1988); *see also id.* at 1072-74 (rejecting contention that phrases such as "potentially damaging," "national security," and "relating to the national defense" were unconstitutionally vague).  Thus, in *Marchetti II*, the Fourth Circuit interpreted, upheld, and enforced prepublication review determinations grounded in similar language without so much as intimating that the standards were vague.  *See Marchetti II*, 509 F.2d at 1368-69 (upholding CIA's deletions of information that, even if unclassified, "*may relate* to intelligence sources or methods . . . [or] sensitive intelligence operations and to scientific and technological developments useful, if not vital, to national security" (emphasis added)).  Indeed, the Supreme Court in *Snepp* suggested that under common law principles (*i.e.*, without specific written criteria), the government could review Snepp's work for *any* confidential information.  *Snepp*, 444 U.S. at 515 n.11 ("We have thought that the common-law obligation [to preserve confidential information] was considerably more expansive [than classified information]." (citation omitted)).  Plaintiffs' various vagueness challenges therefore must fail as a matter of law.

## II.    The Court Lacks Jurisdiction.

### A.    Plaintiffs Otherwise Lack Standing.

Notwithstanding the manifest legal inadequacy of Plaintiffs' theories, the Court should not even reach their claims on the merits because, in addition to their failure to establish overbreadth standing, *see supra* at 8-9, there is no other basis for Article III standing here.  Plaintiffs assert that they possess Article III standing on three grounds: (1) they are subject to a government licensing scheme, (2) they face a credible threat of sanctions if they fail to submit their work for review, and (3) they have alleged that "the vagueness and breadth" of the Agencies' prepublication review regimes "has a chilling effect on speech."  Pls.' Opp'n at 1.  Each theory is deficient.

18

First, Plaintiffs cannot invoke the relaxed standing rules relating to "censorship" and "licensing" of speech because, as the Agencies have shown, prepublication review is not a "censorship" or "licensing" scheme. *See supra* at 5-6; Defs.' Mot. at 30. Rather, it is a means for enforcing a voluntary obligation undertaken as a condition of access to classified and sensitive information, and the only speech "censored" is confidential government information that Plaintiffs have no First Amendment right to disclose. The Supreme Court and the Fourth Circuit have thus been clear that such schemes simply do not implicate the First Amendment on their face. *Snepp*, 444 U.S. at 509 n.3; *Snepp II*, 595 F.2d at 931-32. Nor is it sufficient that Plaintiffs have "*alleged* that Defendants' regimes invest government censors with overly broad discretion to deny or delay the publication of protected speech." Pls.' Opp'n at 8 (emphasis added). Courts do "not accept legal conclusions" in evaluating a motion to dismiss. *Attkisson v. Holder*, 925 F.3d 606, 619 (4th Cir. 2019). If Plaintiffs seek to invoke the "permissive rule of standing" applicable to such a theory, Pls.' Opp'n at 7-10, they must show, at a minimum, that such a theory is plausible. For the many reasons set forth above, it is not.

Plaintiffs also have not shown standing based on a "credible threat" of prosecution. Pls.' Opp'n at 14-15. To satisfy this test, a plaintiff must allege "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citing *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Plaintiffs meet none of these requirements. Their desire to disregard prepublication review obligations repeatedly upheld by the Supreme Court and the Fourth Circuit is not conduct "arguably affected with a constitutional interest." *Id.* Their prepublication review obligations are not imposed "by a statute," *id.*, but rather arise as a matter of private law between the government and Plaintiffs. *See Snepp II*, 595 F.2d at 933 ("[Snepp] voluntarily agreed to be bound by the contractual provision requiring prepublication review and he can have little complaint about its being enforced."). And although Plaintiffs could be prosecuted for *disclosing classified information* (the very harm that prepublication review seeks to avoid), they have not shown a credible threat that they will be

19

prosecuted for disregarding their contractual and fiduciary prepublication review obligations. *See Falwell v. City of Lynchburg*, 198 F. Supp. 2d 765, 775 n.9 (W.D. Va. 2002) ("Plaintiffs face no credible threat of prosecution, because the challenged provisions are not criminal."). In fact, unlike in the "credible threat of prosecution" context, where a pre-enforcement challenge is the plaintiff's *only* mechanism to test the validity of a criminal law, Plaintiffs can test their theories by availing themselves of judicial review if and when prepublication review has caused them any concrete harm. *See Griffin v. Dep't of Veterans Affairs*, 106 F. App'x 816, 822 (4th Cir. 2004) (holding that the plaintiffs lacked standing because even if the government intended to enforce certain requirements against them in the future, the availability of an alternative review "procedure ensures that the plaintiffs will not be forced to subject themselves to criminal prosecution as the only means of seeking relief").

Plaintiffs' assertions of "chill" also are inadequate. Indeed, because Plaintiffs have not plausibly alleged a First Amendment violation to begin with, they cannot demonstrate that such a chill is caused by the Agencies, as opposed to their own voluntary contractual undertaking. But in any event, their theory of chill is based largely on fears that permission to publish will either be improperly denied or delayed in the future. *See* Pls.' Opp'n at 11-14. The first theory is not objectively reasonable because it assumes that government officials will act improperly, contrary to the presumption that government officials will "properly discharge[] their official duties." *Marchetti II*, 509 F.2d at 1368. The second theory is speculative and abstract because Plaintiffs fail even to specify the time frame they believe is constitutionally required for the completion of prepublication review, much less that it will likely be exceeded in the future to their detriment. Defs.' Mot. at 14-16.

Moreover, even if Plaintiffs had identified a cognizable injury, they fail to grapple with the immensely difficult separation of powers issues posed by the system-wide injunction that they seek, which would hamstring the Agencies' ability to protect national security interests of the highest order. Instead, they cite wholly inapposite case law regarding military detention and the writ of habeas corpus. Pls.' Opp'n at 16. But case law concluding that "in extraordinary times,"

the judiciary can review the legality of the detention of enemy combatants (which is a binary decision in any event), *Boumediene v. Bush*, 553 U.S. 723, 798 (2008), does not stand for the proposition that a court can accept a plaintiff's invitation to micromanage and reorganize the Executive Branch's carefully crafted system for protecting classified information simply because a plaintiff—who voluntarily signed onto that system—later decides that it is inconvenient. *Compare United States v. Moussaoui*, 382 F.3d 453, 469 (4th Cir. 2004) (noting "separation of powers problem" arising "from the burden the actions of the district court place on the Executive's performance of its duties").  Indeed, if anything, those cases show that, where national security is at stake, courts satisfy their limited roles by ensuring that case-by-case review exists, which it does here.

        **B.**     **Plaintiffs' Claims Are Not Ripe.**

        Finally, Plaintiffs fail to show that any of their disputes are ripe.  As to the "fitness" prong of the ripeness inquiry, rather than engage with the reality that prepublication review processes must be applied across a wide range of highly fact-specific circumstances, and the numerous cases demonstrating the consequent difficulty of considering such theories in the abstract, Defs.' Mot. at 25-26, they merely fall back on the same inapposite licensing and "censorship" cases that represent a departure from the ordinary restrictions of Article III, and which the Agencies already have shown do not apply here.  Pls.' Opp'n at 17.  As to "hardship," Plaintiffs circle back to the same abstract injuries discussed above and suggest that being forced to await a concrete injury before seeking judicial review constitutes hardship because it would prolong their uncertainty and subjective "chill."  But that would be true any time a plaintiff seeks an advisory opinion on matters that have not yet ripened into a judicial dispute.  And that is why the Supreme Court has recognized that "ordinary court procedural rules and practices . . . provide reviewing courts with judicial tools *sufficient to avoid delay-related First Amendment harm*" once a dispute becomes ripe.  *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 782 (2004).  Given the allegedly extensive nature of Plaintiffs' publication activities that manifestly have not been chilled in any significant respect, *see* Defs.' Mot. at 17, Plaintiffs will have ample opportunity to present their claims if and when

they suffer a concrete harm.  In the meantime, "[t]he principle of constitutional avoidance is an integral part of the ripeness analysis . . . and tilts the balance in favor of finding a constitutional issue unripe for review." *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 492 F.3d 89, 114 (2d Cir. 2007)

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Defendants' Motion to Dismiss, ECF No. 30-1, the Complaint should be dismissed.

Dated: August 2, 2019                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ANTHONY COPPOLINO
Deputy Director
Federal Programs Branch

*/s/ Serena Orloff*
SERENA M. ORLOFF
California Bar No. 260888
Trial Attorney
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street NW, Room 12512
Washington, D.C. 20005
Telephone: (202) 305-0167
Fax: (202) 616-8470
Serena.M.Orloff@usdoj.gov

*Attorneys for Defendants*