**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **TIMOTHY H. EDGAR**, *et al.*, | * | |
| **Plaintiffs,** | * | |
| v. | * | **Case No.: GJH-19-985** |
| **DANIEL COATS**, *et al.*, | * | |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Former national security professionals Timothy H. Edgar, Richard H. Immerman, Melvin A. Goodman, Anuradha Bhagwati, and Mark Fallon ("Plaintiffs") bring this action against the Director of National Intelligence, the Director of the Central Intelligence Agency, the Secretary of Defense, and the Director of the National Security Agency ("Defendants"), challenging the constitutionality of the agencies' prepublication review ("PPR") regimes, which require current and former employees to submit materials they intend to publish to the agencies if they concern certain subjects. The Complaint, ECF No. 1, alleges that the regimes are void for vagueness under the First and Fifth Amendments and violate the First Amendment by investing the agencies with excessive discretion to suppress speech and failing to include necessary procedural safeguards. Defendants have moved to dismiss the Complaint. ECF No. 30. Also pending before the Court are a motion by three Plaintiffs to omit their home addresses from the caption in their Complaint, ECF No. 8, and a third party's Motion for Leave to submit an amicus brief, ECF No. 34. No hearing is necessary. *See* Loc. R. 105.6 (D. Md.). For the following reasons, all of the pending motions will be granted and the action will be dismissed.

1

## I.    BACKGROUND[1]

In reviewing the Complaint's allegations, the Court first discusses each of the Plaintiffs before turning to the structure and operation of Defendants' PPR regimes.

### A.  Plaintiffs

Plaintiff Edgar, a Rhode Island resident, is a cybersecurity expert who was employed by the Office of the Director of National Intelligence (the "ODNI") from 2006 until his resignation in June 2013. ECF No. 1 ¶¶ 56, 58. At various points during his time at ODNI, Edgar served in roles including Deputy for Civil Liberties and Senior Associate General Counsel. *Id.* ¶ 58. In 2009 and 2010, he was detailed to the White House National Security Staff as Director of Privacy and Civil Liberties. *Id.* After signing a nondisclosure agreement with the ODNI, Edgar obtained a Top Secret/Sensitive Compartmented Information ("TS/SCI") security clearance in 2006, which he held continuously until June 2013. *Id.* ¶ 59.

During his employment, Edgar submitted for PPR official material prepared for public appearances he made on behalf of the government and syllabi for Brown University and Georgetown University Law Center courses he taught in 2012 and 2013. *Id.* ¶ 60. Since his departure from the agency, Edgar has submitted to the ODNI blog posts and op-eds that have appeared in major publications, including the *Guardian*, the *Los Angeles Times*, and the *Wall Street Journal*, and on the *Lawfare* national security blog. *Id.* ¶ 61. On October 10, 2016, Edgar submitted to the ODNI's PPR office a book manuscript entitled *Beyond Snowden: Privacy, Mass Surveillance, and the Struggle to Reform the NSA*. *Id.* ¶ 62. Some portions of the manuscript were based on his personal experiences, but Edgar relied on and cited declassified documents "for pertinent details." *Id.*

---

[1] Unless otherwise stated, these facts are taken from the Complaint, ECF No. 1, and are presumed to be true.

After Edgar submitted the manuscript, the ODNI informed him that it was referred to the Central Intelligence Agency ("CIA") and the National Security Agency ("NSA") for additional review. *Id.* ¶ 63. Edgar was unable to communicate directly with reviewing officials at those agencies despite multiple inquiries. *Id.* On January 12, 2017, the ODNI informed Edgar that he could publish the manuscript only if he redacted or excised certain material. *Id.* ¶ 64. Some of the redactions related to events that had taken place or issues that had arisen after Edgar had left government, while others related to facts that were widely discussed and acknowledged if not officially confirmed. *Id.*

Edgar disagreed with some of the redactions but decided not to challenge them. *Id.* He had already delayed his publication date, partly because of the three-month PPR process, and worried that delaying it further would make some of the analysis and insights in his book outdated or less relevant to ongoing public debates. *Id.* He also sought to maintain a good relationship with the ODNI reviewers because of concerns that future publications would be subject to greater delays if he did not. *Id.* In the future, Edgar plans to continue writing about intelligence and cybersecurity matters and anticipates submitting at least some of these materials for PPR. *Id.* ¶ 65. He expects that any manuscripts he submits may be referred to the NSA, CIA, or other agencies, as happened with *Beyond Snowden*, which has now been published. *Id.*

Edgar believes that the ODNI's PPR regime requires him to submit an excessive amount of material and finds the agency's submission requirements to be vague and confusing, leaving him uncertain of the exact scope of his submission obligations. *Id.* ¶ 66. He fears that the delay associated with PPR will hinder his career as an academic and impede his ability to participate effectively in public debates on matters involving his area of expertise. *Id.* He further alleges that the delay and uncertainty associated with PPR has dissuaded him from writing some pieces that

he otherwise would have written and caused him to write others differently than he otherwise

would have. *Id.* Finally, he believes that the ODNI, CIA, and NSA might have taken longer to

review his book if they had perceived it to be unsympathetic to the intelligence community. *Id.*

He is also concerned that "government censors will be less responsive to him if he writes books

that are perceived to be critical." *Id.*

Plaintiff Immerman, a Pennsylvania resident, is a historian with expertise in U.S. foreign

relations who retired in 2017 after holding a series of distinguished academic posts. *Id.* ¶¶ 67–68.

From 2007 to 2009, he took leave from his faculty position at Temple University to serve at the

ODNI as the Assistant Deputy Director of National Intelligence, Analytic Integrity and

Standards, and as the agency's Analytic Ombudsman. *Id.* ¶ 69. After signing a nondisclosure

agreement with the ODNI, Immerman obtained TS/SCI clearance in 2007. *Id.* ¶ 71. In 2009,

shortly after returning to Temple, Immerman accepted an invitation to serve on the U.S.

Department of State's Advisory Committee on Historical Diplomatic Documentation (referred to

as the "HAC"), of which he became chairman in 2010. *Id.* ¶ 70. In 2011 or 2012, Immerman

signed a nondisclosure agreement with the CIA related to his HAC responsibilities. *Id.* ¶ 71.

Since leaving the ODNI, Immerman has submitted book manuscripts, articles, papers,

public talks, and academic syllabi to the agency for PPR. *Id.* ¶ 72. On January 25, 2013,

Immerman emailed to the ODNI's PPR office a manuscript entitled *The Hidden Hand: A Brief*

*History of the CIA*. *Id.* ¶ 73. The manuscript did not directly or indirectly refer to any classified

information that Immerman obtained while employed with the ODNI or Department of State and

cited public sources for all factual propositions. *Id.* The ODNI acknowledged receipt three days

after Immerman's email. *Id.* ¶ 74. Nearly three months later, Immerman was informed that the

agency had referred part of the manuscript to the CIA for additional review. *Id.* Several weeks

after that, the ODNI informed him that the CIA was reviewing the entire manuscript. *Id.* Immerman contacted the CIA but was unable to obtain information about the review. *Id.*

On July 12, 2013, the ODNI informed Immerman that he could publish the manuscript only with extensive redactions mandated by the CIA, all of which related to information for which Immerman had cited public sources. *Id.* ¶ 75. Some redactions related to information that government agencies including the CIA had published previously, and many related to events that had taken place or issues that had arisen after Immerman left government. *Id.* In some instances, the ODNI directed Immerman to excise citations to newspaper articles, while in others the ODNI directed Immerman to delete passages relating to information he had obtained from public sources, including information about the CIA's use of drones. *Id.* The ODNI also instructed him to redact words communicating judgments and arguments he considered fundamental to his conclusions as a trained historian. *Id.* The agency did not provide Immerman with any explanation for the mandated redactions. *Id.* ¶ 76.

Immerman appealed the PPR office's determination to the agency's Information Management Division, which several weeks later informed him that he could publish a significant portion of the text that the PPR office had directed him to redact. *Id.* ¶ 77. In September 2013, Immerman was able to meet with two reviewing officials from the CIA. *Id.* ¶ 78. The officials agreed with Immerman that some of the redactions were unnecessary and authorized him to publish additional text with revised wording but reaffirmed their view that other redactions were required. *Id.* ¶ 78. Immerman disagreed but decided to proceed with publishing with the redactions in place to avoid further delay. *Id.* The draft that was eventually published, after a ten-month review process, included approximately eighty percent of the material that the agencies had originally redacted. *Id.*

Immerman plans to continue publishing articles, books, and op-eds, some of which will trigger his PPR obligations under the ODNI's regime. *Id.* ¶ 79. At the time the Complaint was filed, Immerman was drafting an academic article on the influence of intelligence on the policymaking process and was conducting research on the contribution of intelligence to negotiations on strategic arms limitation from the Nixon through Reagan administrations, on which he intends to write a book that he will submit for PPR. *Id.* Immerman asserts that he would publish more "[b]ut for the dysfunction of the [PPR] system." *Id.* ¶ 80. He believes that the regime requires submission of far more material than should be required, that the ODNI's and CIA's "arbitrary and unjustified redactions" will diminish the value of the work he submits, and that the time required for review will make it more difficult for him to contribute to public debates in a timely way. *Id.* Finally, he has been dissuaded by "[c]oncerns about the burdens and uncertainties associated" with PPR from writing academic articles and op-eds about research he has conducted for his book and the intelligence community and current administration. *Id.*

Plaintiff Goodman, a Maryland resident, is an expert on the former Soviet Union who spent 42 years in government, including 34 years at the CIA's Directorate of Intelligence on Soviet Foreign Policy and as a professor of international security at the National War College. *Id.* ¶¶ 81–82. Goodman held a TS/SCI clearance until he left government in 2006. *Id.* ¶ 83. When Goodman first joined the CIA in 1966 and gained his clearance, he signed a secrecy agreement that included a provision relating to PPR. *Id.* ¶ 84. Since leaving the CIA in 1986, Goodman has submitted multiple works to the agency for PPR, though in some cases he has not submitted shorter pieces, including op-eds, that were time-sensitive and that he was confident did not contain classified information or other information he obtained during his employment. *Id.* ¶¶ 82, 85–86. On at least six occasions after publishing an op-ed, Goodman received letters from the

CIA reminding him of his PPR obligations, including a 2009 letter threatening to refer him to the Department of Justice. *Id.* ¶ 86.

Goodman has published nine books and has submitted each manuscript to the CIA for PPR. *Id.* ¶ 87. One of the manuscripts was referred to other agencies for additional review, including the Department of Defense ("DOD") and the Department of State. *Id.* Despite Goodman's requests, the CIA declined to provide contact information for reviewers at the other agencies, who operated more slowly than the CIA. *Id.* In general, the CIA has mailed Goodman's manuscripts back to him with redactions, edits, and suggestions for alternative language. *Id.* ¶ 88. Goodman has frequently believed the CIA's redactions were overbroad and unjustified and has often sent the agency requests known as "reclamas" asking the agency to reconsider their redactions and edits and explaining why publication should be allowed. *Id.*

The PPR process has taken less than two months for most of Goodman's books. *Id.* ¶ 89. In 2017, however, the CIA took eleven months to review a manuscript entitled *Whistleblower at the CIA* in which Goodman provided an account of his experience as a senior CIA analyst. *Id.* In part because of the delay, Goodman's publisher at one point threatened to cancel his contract. *Id.* All of the changes to the manuscript that the CIA eventually mandated, Goodman believes, were intended to protect the agency from embarrassment rather than to protect classified information. *Id.* ¶ 90. The manuscript discussed aspects of U.S. policy, including the use of armed drones overseas, of which Goodman has no personal knowledge; his commentary in the book was based on cited press accounts. *Id.* The CIA demanded that Goodman not discuss these matters at all, however, and did not provide a written explanation. *Id.* Goodman met with a CIA official but was unable to persuade the agency to reconsider and thus decided to remove the passages to which the agency had objected. *Id.* ¶ 91.

Goodman recently submitted a manuscript in which he alleges that he self-censored and avoided discussing certain public source information about current CIA Director and Defendant Gina Haspel. *Id.* ¶ 92. Goodman learned the information at issue as a member of the public but chose not to include it in the manuscript to avoid delays and conflicts with the CIA's PPR office. *Id.* ¶ 92. Consistent with his past practice, Goodman intends to submit portions of any future manuscripts that deal with intelligence matters but remains concerned that the agency will redact material unwarrantedly and that the PPR delay will jeopardize his book contracts and render his publications less relevant to evolving public debates. *Id.* ¶ 93.

Plaintiff Bhagwati, a New York resident, is a writer, activist, and former Marine Corps officer. *Id.* ¶ 94. Bhagwati obtained a Secret security clearance in the early 2000s. *Id.* ¶¶ 95–96. As a former DOD employee, Bhagwati is subject to the PPR requirements imposed by multiple DOD policies. *Id.* ¶ 96. In March 2019, Bhagwati published a memoir discussing her experiences with misogyny, racism, and sexual violence during her military service, but only learned of her PPR obligations on the eve of publication through conversations with her counsel in this action. *Id.* ¶¶ 94, 96, 98. She has also published more than a dozen op-ed and opinion pieces about her experiences in the Marine Corps and advocacy work she has performed on issues of sexual assault and discrimination in the military. *Id.* ¶ 97. She plans to continue her advocacy through written publications and public appearances but has no plans to submit any future work for PPR because she is certain that her future publications will not contain classified information. *Id.* ¶ 99.

Finally, Plaintiff Fallon, a Georgia resident, is a counterterrorism, counterintelligence, and interrogation expert who spent more than three decades in government service, primarily with the Naval Criminal Investigative Service ("NCIS"). *Id.* ¶ 100. Fallon served at the NCIS from 1981 to 2008, including in a number of senior leadership positions, before serving two

years at the Department of Homeland Security, which he departed in 2010. *Id.* ¶ 101. Between

2011 and 2016, he served as the chair of the High-Value Detainee Interrogation Group ("HIG")

Research Committee. *Id.* ¶ 100. Fallon obtained a Top Secret security clearance in 1981 when he

joined the NCIS and held it continuously until 2010. *Id.* ¶ 102. He also obtained and held TS/SCI

clearance during his career at NCIS, obtained it again in 2011 when he began work for the HIG,

and obtained another in 2017 for consulting work he engages in with the U.S. government. *Id.*

Fallon has published op-eds, articles, columns, and a book since leaving government

service, many of which he submitted to the DOD for PPR. *Id.* ¶ 103. In 2016, Fallon completed a

book titled *Unjustifiable Means* about the George W. Bush administration's policies relating to

"interrogation and torture of prisoners" and the experiences of public servants, including Fallon,

who had opposed the policies. *Id.* ¶ 104. The book relied on information the government had

declassified and on public record materials relating to "the Bush administration's policies and

their consequences." *Id.* Fallon "was confident that the book did not contain properly classified

information." *Id.* When he began writing the book in 2014, Fallon consulted former NCIS

colleagues about PPR, one of whom stated that he had not submitted his own manuscript and the

rest of whom advised him that they did not believe he was required to submit his. *Id.* ¶ 105.

In June 2016, Fallon contacted the DOD's PPR office after discovering it through his

own research and was advised that the PPR process was voluntary and intended to aid authors.

*Id.* ¶ 106. On October 4, 2016, however, Fallon received an email from a DOD official stating

that she had noticed Fallon's forthcoming book on Amazon.com, asking if he had submitted it

for PPR, and informing him that he was required to submit his works for review. *Id.* The official

attached the DOD's PPR policies. *Id.* On January 3, 2017, the official advised Fallon by email

that while DOD policies provide that review will be completed within 30 to 45 working days,

"the truth is that in most cases it takes a bit longer." *Id.* Fallon submitted his manuscript the following day. *Id.* ¶ 107. Given the expected length of the review, Fallon and his publisher agreed to a publication date of March 7, 2017. *Id.*

On January 11, 2017, the DOD PPR office informed Fallon that its review of the manuscript was complete but that review by other agencies was necessary as well, though the reviewing official would not identify the agencies. *Id.* ¶ 108. After Fallon noted his publication date, the official assured him that the DOD "would do everything it could to complete review by that date." *Id.* Fallon emailed the reviewing official at least eight times prior to the planned publication date, stressing that delay would force the date to be pushed back, which would require cancelling book tours and speaking engagements. *Id.* ¶ 109. The DOD did not inform Fallon that review was complete until August 25, 2017. *Id.* ¶ 110. It also required Fallon to make 113 separate excisions from the book if he wished to proceed with publication. *Id.*

In Fallon's view, "the excisions were arbitrary, haphazard, and inconsistent, and, at least in some instances, seemingly intended to protect the CIA from embarrassment." *Id.* Some related to material published in unclassified congressional reports while others concerned news articles Fallon had cited. *Id.* While Fallon believed that all of the excisions were unnecessary and unjustified, he decided not to challenge them to avoid delaying publication further. *Id.* ¶ 111. Fallon had originally intended to publish the book at the start of the Trump administration after torture became a major issue during the 2016 U.S. presidential campaign and it was important to him to publish "while it was still possible to influence the public debate on this subject." *Id.* ¶¶ 107, 111. Though Fallon was forced to cancel events and travel, and his publisher at one point threatened to cancel his contract for non-delivery, the book was eventually published on October 24, 2017. *Id.* ¶¶ 111–12.

10

Fallon asserts that his PPR experience with *Unjustifiable Means* "was so time-consuming, costly, and exhausting that he is unsure whether he is willing to embark on writing another book." *Id.* ¶ 112. Cancellations of his travel and events cost him personally and he "paid a premium after the book was cleared in order for his editors to work to finalize publication on a tight timeframe." *Id.* Fallon also discontinued certain consulting work while waiting for review to be completed, and his publisher informed him that the delay in publication made it less likely that bookstores would choose to carry or promote the book. *Id.* Since the publication of *Unjustifiable Means*, however, Fallon and a co-author drafted and submitted a new manuscript entitled *The HIG Project: The Road to Scientific Research on Interrogations*, which will be a chapter in a forthcoming book. *Id.* ¶ 113.

Fallon submitted the piece for review by the DOD on August 10, 2018 and along with his co-author followed up with the PPR office repeatedly over several months. On January 14, 2019, Fallon's co-author was informed by the review board of the Defense Intelligence Agency that the DOD's review board was waiting for a response from the Federal Bureau of Investigation ("FBI"). *Id.* On February 11, 2019, PPR of the manuscript was completed and it was cleared for publication with redactions. *Id.* ¶ 114. All of the redacted material, however, was information that Fallon had heard at unclassified public meetings with the HIG Research Committee. *Id.* Fallon believes that the redactions were motivated by political disagreement with his and his co-author's perspective on torture and the HIG Research Committee's work. *Id.*

In Fallon's experience, PPR "has been haphazard and opaque, and communication from the DOD has been sporadic and unhelpful." *Id.* ¶ 116. Fallon has come to believe that the DOD's PPR officials "have no control or influence over the other agencies to which they send authors' works for review" and that there is "a lack of accountability from those offices to the DOD." *Id.*

¶ 117. While Fallon plans to continue submitting to the DOD any op-eds, articles, columns, and books he writes in the future, he alleges that his experiences with PPR "continue to negatively impact him and deny him the opportunity to contribute to the public debate over breaking news." *Id.* ¶¶ 115, 118. Specifically, because of his concerns about potential delays and unjustified agency objections that arise with PPR, Fallon has declined offers to author op-eds and write articles on breaking news and topics of public concern because they require an immediate response. *Id.* ¶ 118. He also is unsure how his PPR obligations apply in academic settings, including whether he must submit edits and additions he makes to the work of others, which hinders his work and ability to engage with his colleagues. *Id.* Finally, Fallon worries that the government will retaliate against him by stripping his security clearance, which he requires for his consulting work, if he does not strictly comply with PPR requirements. *Id.* ¶ 119.

### B.  PPR Regimes

#### 1.  Historical Background

Plaintiffs assert that since its establishment in 1947, the CIA has required employees to sign secrecy agreements when they join and leave the agency that generally prohibit publication of manuscripts without obtaining agency consent. *Id.* ¶ 17. The number of such manuscripts increased markedly in the 1970s, leading the agency to create a Publications Review Board to review manuscripts by current employees. *Id.* ¶ 18. The Board's jurisdiction was expanded to reach submissions by former employees in 1977. *Id.*

In 1980, the Supreme Court decided *Snepp v. United States*, 444 U.S. 507 (1980) (per curiam), affirming the imposition of a constructive trust on proceeds earned by a former CIA officer who had published a book without submitting it for PPR. *Id.* ¶ 19. In 1983, President Reagan issued National Security Decision Directive 84, which mandated that intelligence

agencies require all persons with access to Sensitive Compartmented Information ("SCI") sign a nondisclosure agreement with a PPR provision. *Id.* ¶ 20. The Directive received significant bipartisan criticism from Congress and was suspended after legislation that would have prohibited most agencies from imposing PPR requirements was considered in hearings by a House subcommittee. *Id.* ¶ 21. Agencies continued to require employees to sign a form imposing essentially the same PPR requirements, however. *Id.* ¶ 22.

Plaintiffs further allege that the PPR system "has expanded on every axis" over the past several decades. *Id.* ¶ 23. Specifically, every U.S. intelligence agency now imposes a lifetime PPR requirement on at least some subset of former employees, PPR obligations are imposed on broader categories of employees, including those who never had access to SCI or any other classified information, the amount of information that is classified has "expanded dramatically," PPR regimes have become increasingly complex and varied across agencies, and the amount of material submitted for PPR has steadily increased, as has the amount of time agencies take to complete their reviews. *Id.* ¶¶ 24–29.

Plaintiffs highlight that the DOD, for example, imposes PPR obligations on all 2.9 million of its employees, that classification authorities made 49.5 million classification decisions in 2017, that the CIA received 8,400 PPR submissions in 2015, including 3,400 manuscripts, and that a draft report by the CIA Inspector General suggested that book-length manuscripts were projected to require a year to review. *Id.* ¶¶ 25–26, 28–29. Plaintiffs assert that as a result of these expansions, "the prepublication review system has become dysfunctional." *Id.* ¶ 30. The Complaint notes that the House and Senate Intelligence Committees instructed the Director of National Intelligence ("DNI") in 2017 to prepare a new PPR policy that would apply to all

intelligence agencies but that the DNI had not published or formulated such a policy as of the filing of the Complaint. *Id.*

### 2. Current Regimes

The Complaint then describes the PPR policy regimes of the CIA, the DOD, the NSA, and the ODNI, each of which Plaintiffs allege "restrains far more speech than can be justified by any legitimate government interest." *Id.* ¶ 31. According to the Complaint, each agency requires employees with access to classified information to complete Standard Form 312, "Classified Information Nondisclosure Agreement." *Id.* ¶¶ 32a, 38a, 44a, 50a. The form requires all covered employees who are "uncertain about the classification status of information" to "confirm from an authorized official that the information is unclassified before [they] may disclose it." *Id.* ¶ 32a (alteration in original). Employees with access to SCI must also complete Form 4414, "Sensitive Compartmented Information Nondisclosure Agreement," which requires all covered employees to submit for PPR "any writing or other preparation in any form, including a work of fiction, that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that [the author has] reason to believe are derived from SCI." *Id.* ¶ 32b (alteration in original).[2]

Each agency also maintains additional secrecy and PPR policies. First, the CIA requires that all officers submit for PPR "any and all materials they intend to share with the public that are intelligence related," according to the agency's website. *Id.* ¶ 32c. Additionally, through Agency Regulation ("AR") 13-10, titled "Agency Prepublication Review of Certain Material Prepared for Public Dissemination," the CIA requires all "former Agency employees and contractors, and others who are obligated by CIA secrecy agreement," to submit for PPR any material "that mentions CIA or intelligence data or activities or material on any subject about

---

[2] Plaintiffs allege that DOD alternatively or additionally requires employees with access to SCI to complete form DD Form 1847-1, which is similar to Form 4414. ECF No. 1 ¶ 38b.

which the author has had access to classified information in the course of his employment or other contact with the Agency." *Id.* ¶ 32d. According to documents obtained through Freedom of Information Act litigation by Plaintiffs' counsel, the CIA "will not provide a copy of a secrecy agreement or nondisclosure agreement to an author who requests one they signed," even though such agreements "are typically not classified." *Id.* ¶ 32e.

The CIA's PPR authority is known as the Publications Review Board. *Id.* ¶ 33. Plaintiffs allege that Standard Form 312, Form 4414, the CIA secrecy agreement, and AR 13-10 collectively "give the Board discretion to censor information that it claims is classified without regard" to considerations including "whether disclosure of the information would actually cause harm to the nation's security, whether the former employee acquired the information in question in the course of employment, whether the information is already in the public domain, and whether any legitimate interest in secrecy is outweighed by public interest in disclosure." *Id.* ¶ 33. Plaintiffs also assert that when the Board refers manuscripts by former CIA employees to other agencies for review, other agencies censor the manuscripts on the basis of undisclosed review standards. *Id.*

Plaintiffs further allege that "the breadth and vagueness of the CIA's review standards invite capricious and discriminatory enforcement" and that "in practice the Board's censorship decisions are often arbitrary or influenced by the author's viewpoint." *Id.* ¶ 34. For example, Plaintiffs assert, former intelligence community employees "who wrote books criticizing the CIA's torture of prisoners apprehended in the 'war on terror' have complained publicly that their books were heavily redacted even as former CIA officials' supportive accounts of the same policies were published without significant excisions of similar information." *Id.* According to Plaintiffs, the CIA in 2012 opened an internal investigation into whether its PPR regime was

being misused to suppress speech critical of the agency, but the agency has not released or publicly described its findings. *Id.* Finally, Plaintiffs allege that: the regime does not require the Board to provide authors with reasons for its decisions and that the Board generally does not do so; that deadlines for adjudication of appeals are merely aspirational and that the regime fails to assure prompt review; and that the regime fails to require the government to initiate judicial review of PPR decisions and to guarantee that such review is prompt. *Id.* ¶¶ 35–37.

Plaintiffs' general allegations about the DOD, NSA, and ODNI regimes are similar to those about the CIA's. Plaintiffs allege that each regime "imposes submission requirements that, taken together, are vague, confusing, and overbroad," *id.* ¶¶ 38, 44, 50; that each regime "fails to meaningfully cabin the discretion" of the agency's PPR authority and instead grants to the authority "discretion to censor information" without regard to the same interests that Plaintiffs allege the CIA Publications Review Board is not required to consider, *id.* ¶¶ 39, 45, 51; that the agencies refer manuscripts to other agencies that do not disclose their review standards, *id.* ¶¶ 39, 45, 51; that the "breadth and vagueness" of the agencies' standards mean that the agencies' PPR decisions are often or frequently "arbitrary" or "invite capricious and discriminatory enforcement," *id.* ¶¶ 40, 46, 52; and that the regimes do not require the PPR authorities to provide authors with reasons for their decisions, *id.* ¶¶ 41, 47, 53; provide no assurance of prompt review, *id.* ¶¶ 42, 48, 54; and fail to require the government to initiate judicial review of PPR decisions or to guarantee that such review is prompt, *id.* ¶¶ 43, 49, 55.

The Complaint also makes additional specific allegations about each agency. According to the Complaint, the DOD maintains two relevant policies: Directive 5230.09, "Clearance of DoD Information for Public Release," and Instruction 5230.29, "Security and Policy Review of DoD Information for Public Release." *Id.* ¶ 38c. Together, the policies require all former agency

employees and all former active or reserve military service members to submit for PPR "any official DoD information intended for public release that pertains to military matters, national security issues, or subjects of significant concern to [the agency]." *Id.* (alteration in original). "[O]fficial DoD information" is defined broadly to include "[a]ll information that is in the custody and control of the Department of Defense, relates to information in the custody and control of the Department, or was acquired by DoD employees as part of their official duties or because of their official status within the Department." *Id.* (alteration in original).

Such information must be submitted if, for example, it "[i]s or has the potential to become an item of national or international interest"; "[a]ffects national security policy, foreign relations, or ongoing negotiations"; or "[c]oncerns a subject of potential controversy among the DoD Components or with other federal agencies." *Id.* (alterations in original). PPR is performed at the agency by the Defense Office of Prepublication and Security Review ("DOPSR"), which the agency's policies indicate conducts both "security review" for protecting classified information and "policy review" to ensure that materials do not conflict with DOD or government policies or programs. *Id.* ¶ 39. Plaintiffs allege that DOD components "often disagree as to what must be censored," and that review "frequently takes many weeks or even months" and can result in required redactions of readily available public information. *Id.* ¶ 40.

With respect to the NSA, Plaintiffs allege that the agency has adopted NSA/CSS Policy 1-30, "Review of NSA/CSS Information Intended for Public Release," which requires all former NSA employees to submit for PPR any material, other than a resume or job-related document, "where [it] contains official NSA/CSS information that may or may not be UNCLASSIFIED and approved for public release." *Id.* ¶ 44c (alteration in original). "Official NSA/CSS information" is defined to include "[a]ny NSA/CSS, DoD, or IC information that is in the custody and control

of NSA/CSS and was obtained for or generated on NSA/CSS' behalf during the course of employment or other service, whether contractual or not, with NSA/CSS." *Id.* (alteration in original). Plaintiffs further allege that "the censorship decisions" of "the agency's censors, known as Prepublication Review Authorities," are "often arbitrary" and can result in required redactions of publicly available facts, and that "review frequently takes many weeks or even months." *Id.* ¶¶ 45–46, 48.

Finally, with respect to the ODNI, Plaintiffs allege that the agency requires employees to sign Form 313, titled "Nondisclosure Agreement for Classified Information," as a prerequisite to accessing information or material that is classified or in the process of a classification determination. *Id.* ¶ 50c. The form directs employees to submit for PPR "any writing or other preparation in any form" that "contains any mention of intelligence data or activities, or which contains any other information or material that might be based upon [information or material that is classified, or is in the process of a classification determination, and that was obtained pursuant to the agreement]." *Id.* (alteration in original).

PPR at the ODNI is conducted by the Director of the Information Management Division. *Id.* ¶ 51. The ODNI has also adopted Instruction 80.04, "ODNI Pre-publication Review of Information to be Publicly Released," which "requires all former agency employees, regardless of their level of access to sensitive information, to submit 'all official and non-official information intended for publication that discusses the ODNI, the IC [Intelligence Community], or national security." *Id.* ¶ 50d (alteration in original). The Instruction, Plaintiffs allege, "imposes no limitations whatsoever on the Director's power to censor," stating only that "the goal of pre-publication review is to prevent the unauthorized disclosure of information, and to ensure the ODNI's mission and the foreign relations or security of the U.S. are not adversely affected by

publication." *Id.* Plaintiffs finally allege that review under the ODNI regime "frequently takes many weeks or even months." *Id.* ¶ 54.

Plaintiffs filed their Complaint on April 2, 2019. ECF No. 1. The Complaint asserts two causes of action. *Id.* ¶¶ 120–21. First, Plaintiffs assert that Defendants' PPR regimes "violate the First Amendment because they invest executive officers with sweeping discretion to suppress speech and fail to include procedural safeguards designed to avoid the dangers of a censorship system." *Id.* ¶ 120. Plaintiffs then allege that the regimes "are void for vagueness under the First and Fifth Amendments because they fail to provide former government employees with fair notice of what they must submit for prepublication review and of what they can and cannot publish, and because they invite arbitrary and discriminatory enforcement." *Id.* ¶ 121. For relief, the Complaint seeks a declaration that the PPR regimes violate the First and Fifth Amendments and an injunction barring Defendants and individuals associated with them from continuing to enforce the regimes "against Plaintiffs, or any other person." *Id.* at 41.[3]

Concurrent with the filing of their Complaint, three of the five Plaintiffs filed a Motion to omit their home addresses from the caption of the Complaint, ECF No. 8, and a supporting memorandum, ECF No. 8-1. On June 14, 2019, Defendants filed a Motion to Dismiss the Complaint. ECF No. 30. Plaintiffs filed a response in Opposition on July 16, 2019. ECF No. 33.[4] A third party, the Center for Ethics and the Rule of Law, submitted a Motion for Leave to file an amicus brief in support of Plaintiffs on July 23, 2019, ECF No. 34, accompanied by a copy of the

---

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.
[4] Plaintiffs also concurrently filed a consent motion for leave to file an opposition that exceeds the page limit set by the Local Rules. ECF No. 32. The motion will be granted.

proposed brief, ECF No. 34-1. Finally, Defendants filed a Reply in support of dismissal on

August 2, 2019. ECF No. 36. Defendants have not opposed any of the pending motions.[5]

## II.    STANDARD OF REVIEW

"A district court should grant a motion to dismiss for lack of subject matter jurisdiction

under Rule 12(b)(1) 'only if the material jurisdictional facts are not in dispute and the moving

party is entitled to prevail as a matter of law.'" *Upstate Forever v. Kinder Morgan Energy*

*Partners, L.P.*, 887 F.3d 637, 645 (4th Cir. 2018) (quoting *Evans v. B.F. Perkins Co.*, 166 F.3d

642, 647 (4th Cir. 1999)). "The burden of establishing subject matter jurisdiction rests with the

plaintiff." *Demetres v. East West Constr.*, 776 F.3d 271, 272 (4th Cir. 2015). "When a defendant

challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the

pleadings as mere evidence on the issue, and may consider evidence outside the pleadings

without converting the proceeding to one for summary judgment.'" *Evans*, 166 F.3d at 647

(quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768

(4th Cir. 1991)). Article III standing is a prerequisite to subject matter jurisdiction. *See Beyond*

*Sys., Inc. v. Kraft Foods, Inc.*, 777 F.3d 712, 715 (4th Cir. 2015).

To state a claim that survives a Rule 12(b)(6) motion, "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)). The "mere recital of elements of a cause of action, supported only by conclusory

statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v.*

*McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). To determine whether a claim has crossed "the

---

[5] The Court notes that neither Plaintiffs nor Defendants have raised that some of the named Defendants no longer hold their positions. The issue is immaterial to disposition of the pending motions, however, because all Defendants are sued in their official capacities and substitution of a public official party's successor is automatic under Federal Rule of Civil Procedure 25(d). *See Maryland v. United States*, 360 F. Supp. 3d 288, 318 (D. Md. 2019).

line from conceivable to plausible," the Court must employ a "context-specific" inquiry, drawing

on the court's "experience and common sense." *Iqbal*, 556 U.S. at 679–80 (quoting *Twombly*,

550 U.S. at 570). The Court accepts "all well-pled facts as true and construes these facts in the

light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet*

*Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court must

"draw all reasonable inferences in favor of the plaintiff." *Id.* at 253 (citing *Edwards v. City of*

*Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). "[B]ut [the Court] need not accept the legal

conclusions drawn from the facts, and . . . need not accept as true unwarranted inferences,

unreasonable conclusions or arguments." *Id.* (first alteration in original) (quoting *Giarratano v.*

*Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

## III.    DISCUSSION

Before addressing Defendants' Motion to Dismiss the Complaint, the Court first

considers the other pending motions, neither of which Defendants have opposed. First, the

Motion to Omit Home Addresses from Caption filed by Plaintiffs Edgar, Bhagwati, and Fallon

("Movants") asks the Court to waive the requirement of this District's Local Rule 102.2(a) that a

complaint include the names and addresses of all parties. ECF No. 8. As the Court noted in *Casa*

*de Maryland, Inc. v. Trump*, the Fourth Circuit has held that while the public has an important

interest in open judicial proceedings, "compelling concerns relating to personal privacy or

confidentiality may warrant some degree of anonymity." No. GJH-18-845, 2018 WL 1947075, at

*1 (D. Md. Apr. 25, 2018) (quoting *Doe v. Pub. Citizen*, 749 F.3d 246, 273 (4th Cir. 2014)).

The Fourth Circuit has identified several factors for courts to consider in balancing the

need for open proceedings against litigants' privacy concerns, including:

> Whether the justification asserted by the requesting party is merely to
> avoid the annoyance and criticism that may attend any litigation or is to

21

> preserve privacy in a matter of sensitive and highly personal nature;
> whether identification poses a risk of retaliatory physical or mental harm
> to the requesting party or even more critically, to innocent nonparties; the
> ages of the person whose privacy interests are sought to be protected;
> whether the action is against a governmental or private party: and,
> relatedly, the risk of unfairness to the opposing party from allowing an
> action against it to proceed anonymously.

*Pub. Citizen*, 749 F.3d at 273 (quoting *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993)). In

*Casa de Maryland*, the Court found that these factors favored allowing the plaintiffs, who

challenged a federal immigration policy decision that resulted in rescission of their lawful

immigration status, to omit their addresses. 2018 WL 1947075 at *1–*2. The Court also found

that the plaintiffs' addresses had no bearing on the merits of their action and that shielding them

from public view would not prejudice the government defendants. *Id.* at *2.

Here, Movants assert that they reasonably fear for their physical safety and that of their

family members "in light of the passion that may be inflamed by this lawsuit against high-

ranking government actors." ECF No. 8-1 at 2. Bhagwati notes that she is an activist who

conducts public advocacy on issues of misogyny, racism, and sexual violence in the military and

has been subject to stalking and repeated online attacks, which she asserts are common responses

to advocacy on such issues. *Id.* at 2–3. Fallon states that his professional history as a senior

official investigating al-Qaeda members and terrorist attacks creates heightened dangers of

physical harm to him and his family if his home address is made public. *Id.* at 3. Finally, Edgar

asserts that he resides with young children and fears for their safety if his address is disclosed. *Id.*

While the Movants' rationales for withholding their addresses align with the *Public*

*Citizen* factors to varying degrees, the Court finds that granting the motion is warranted given the

limited countervailing public interests at play. As in *Casa de Maryland*, Plaintiffs' addresses "are

of minimal import to furthering the openness of judicial proceedings." 2018 WL 1947075 at *2.

Given that the Complaint extensively describes each Movant's professional background and identifies their state of residence, there can be little if any confusion about their identities, and any ambiguity that did exist would not be remedied by ordering disclosure of their home addresses. Further, there is no indication of any prejudice to Defendants from allowing Movants to withhold their addresses, which is underscored by Defendants' lack of any opposition to the motion. Nor is it apparent that the addresses are relevant to any questions before the Court. *See Casa de Maryland*, 2018 WL 1947075, at *2. For these reasons, the Court will grant the motion.

Also pending is the unopposed motion by non-party the Center for Ethics and the Rule of Law ("CERL") for leave to file an amicus brief in support of Plaintiffs. ECF No. 34. "Decisions about whether and how to allow amicus participation in federal district court are left to the discretion of the trial judge." *Md. Restorative Justice Initiative v. Hogan*, No. ELH-16-1021, 2017 WL 467731, at *8 (D. Md. Feb. 3, 2017) (citing *Finkle v. Howard Cty.*, 12 F. Supp. 3d 780 (D. Md. 2014)). "Amicus briefs have been 'allowed at the trial level where they provide helpful analysis of the law, they have a special interest in the subject matter of the suit, or existing counsel is in need of assistance.'" *Wheelabrator Balt., L.P. v. Mayor & City Council of Balt.*, No. GLR-19-1264, 2020 WL 1491409, at *1 n.1 (D. Md. Mar. 27, 2020) (quoting *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 728 (D. Md. 1996)).

CERL states that it is a non-partisan institute at the University of Pennsylvania Law School "dedicated to preserving and promoting ethics and the rule of law in national security, democratic governance, and warfare." ECF No. 34 at 2.[6] Among other activities, it holds conferences and events and publishes various academic materials "at the intersection of national security and ethics." *Id.* CERL asserts that these activities and others demonstrate that it has a

---

[6] CERL states that Plaintiff Fallon is a member its Advisory Council but was not involved in drafting the proposed amicus brief. ECF No. 34 at 2 & n.2.

"special interest in the outcome of [this] suit" and expertise in the subject matter at issue. *Id.* (alteration in original) (quoting *Bryant*, 923 F. Supp. at 728). Finally, CERL states that its brief "would provide the Court with important background information about the chilling effect of Defendants' prepublication regimes on academics, national security professionals and the general public." *Id.* at 3–4.

CERL's motion for leave is compliant with this Court's Standing Order 2018-07, which prescribes that such motions must state the movant's interest, the reason why the brief is desirable and why the matters asserted are relevant to disposition of the case, and whether a party's counsel authored the brief in whole or in part or contributed money to fund its preparation or submission. The proposed brief is also compliant with the requirements of the Standing Order in that it is fewer than 15 pages, complies with other applicable Local Rules, and was filed within seven days after the principal brief of the party being supported. For these reasons, and because the motion is unopposed, the Court will grant the Motion for Leave and accept the proposed amicus brief, ECF No. 34-1. Having considered the non-dispositive motions, the Court now turns to Defendants' Motion to Dismiss.

### A. Standing

Defendants first move to dismiss the Complaint under Rule 12(b)(1) on the ground that Plaintiffs lack standing and that the Court therefore lacks subject matter jurisdiction. "Article III of the U.S. Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.' " *Beck v. McDonald*, 848 F.3d 262, 269 (4th Cir. 2017) (quoting U.S. Const. art. III, § 2). "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). "To invoke federal jurisdiction, a plaintiff bears the burden of establishing the three 'irreducible

minimum requirements' of Article III standing." *Id.* (quoting *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013)). The plaintiff must demonstrate "(1) an injury in fact (i.e., a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (i.e., a 'fairly . . . trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is 'likely' and not merely 'speculative' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *David*, 704 F.3d at 333 (alterations in original) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273–74 (2008)). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

The parties dispute standing in somewhat divergent terms. Defendants argue that Plaintiffs have failed to identify any future concrete harm that they are likely to encounter as a result of the deficiencies they claim exist in the PPR regimes at issue. ECF No. 30-1 at 23–24. Discerning two theories of standing in the Complaint – one based on potential for publication delays and the other based on chill to Plaintiffs' speech – Defendants assert that neither identifies an adequately concrete harm. *Id.* at 24. Plaintiffs' Opposition makes clear that Plaintiffs do not pursue a theory based entirely on delayed publication, however, and the Court therefore does not discuss it further. Plaintiffs instead advance three theories of standing: that they are subject to government licensing schemes that invest executive officers with overly broad discretion, which by itself confers standing; that Defendants' PPR regimes have a chilling effect on protected speech; and that Plaintiffs face a credible threat of sanctions if they refuse to submit their work for PPR. ECF No. 33 at 13–14.

Plaintiffs' licensing scheme theory argues that the PPR regimes are akin to prior restraint statutes that place "unbridled discretion in a government official over whether to permit or deny expressive activity" and are thus subject to facial challenges. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988). Under that doctrine, "a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.* at 759. Such schemes give rise to "two major First Amendment risks": "self-censorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the licensor's action." *Id.* On the basis of this doctrine, the Supreme Court has permitted facial challenges to, for example, an ordinance giving a mayor "unfettered discretion" to deny or condition permits for newspaper display racks on public property, *id.* at 772, and a Maryland statute requiring submission of films to a state review board before exhibiting them, *Freedman v. Maryland*, 380 U.S. 51, 56 (1965).

While there is some superficial resemblance between the provisions challenged in these cases and the PPR regimes at issue here, Plaintiffs' attempt to fit their Complaint under this doctrine in order to demonstrate standing is unconvincing. First, PPR as Plaintiffs have described it cannot plausibly be understood as a licensing scheme. Plaintiffs have not alleged that the PPR schemes at issue require them to obtain licenses to engage in any expressive conduct at all, as is the case in the typical licensing challenge that tests "the states' and municipalities' longstanding authority to license activities within their borders." *Am. Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707, 719 (4th Cir. 2018). Rather, they must submit for review materials that discuss the subjects of their work as former federal intelligence professionals pursuant to

agreements they have signed. While Plaintiffs might validly question whether the scope and extent of that requirement is proper, the established concept of a "licensing scheme" does not capture the constraints under which Plaintiffs allege that they operate.

Underscoring this point is that Plaintiffs are not plausibly comparable to the paradigmatic newspaper publishers and theater owners that have brought challenges to licensing regimes. *See Midwest Media Prop., L.L.C. v. Symmes Township*, 503 F.3d 456, 473 (6th Cir. 2007) (noting the Supreme Court's observation that "newspapers, radio stations, movie theaters and producers" are "often those with the highest interest and the largest stake in a First Amendment controversy" (quoting *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 505 n.11 (1981)). Such entities would have no interaction with the government with respect to their expressive activities but for the challenged regulations. In contrast, Plaintiffs here are former government employees who voluntarily took on their PPR obligations as a condition of their employment and their access to protected government information. *Cf. John Doe, Inc. v. Mukasey*, 549 F.3d 861, 877 (2d Cir. 2008) (rejecting an analogy between PPR requirements for former CIA employees and a statute barring telecommunications firms from disclosing that they received subpoenas from the FBI, explaining that unlike the former employees the firms "had no interaction with the Government until the Government imposed its nondisclosure requirement upon [them]"). And Plaintiffs do not dispute the government's basic power to restrict release of classified information by those entrusted with it. For these reasons, Plaintiffs' attempt to fit PPR under licensing scheme doctrine for standing purposes is unavailing.

Plaintiffs' chilling effect theory, in contrast, stands on firmer ground. As a key initial note, because Plaintiffs seek prospective relief, their standing burden is different from the typical case. "Because '[p]ast exposure to illegal conduct does not in itself show a present case or

controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects,' a plaintiff seeking 'declaratory or injunctive relief . . . must establish an ongoing or future injury in fact.'" *Davison v. Randall*, 912 F.3d 666, 677 (4th Cir. 2019) (alterations in original) (quoting *Kenny v. Wilson*, 885 F.3d 280, 287–88 (4th Cir. 2018)). Plaintiffs' burden is lessened here, however, because of the nature of their claims. "Significantly, [the Fourth Circuit]—along with several other circuits—has held that 'standing requirements are somewhat relaxed in First Amendment cases,' particularly regarding the injury-in-fact requirement." *Id.* at 678 (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)).

"In First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of 'self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression.'" *Cooksey*, 721 F.3d at 235 (alterations in original) (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)). "Although '[s]ubjective or speculative accounts of such a chilling effect are not sufficient . . . a claimant need not show he ceased those activities altogether to demonstrate an injury in fact.'" *Kenny*, 885 F.3d at 289 n.3 (alterations in original) (quoting *Cooksey*, 721 F.3d at 236). "Instead, '[g]overnment action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights,'" rendering the chilling effect "objectively reasonable." *Id.* (alterations in original) (quoting *Cooksey*, 721 F.3d at 236). If the government conduct meets that threshold, "there is an ongoing injury in fact." *Kenny*, 885 F.3d at 288.

Plaintiffs assert that the alleged breadth and vagueness of the PPR regimes, "the absence of time limits for completion of review, and the severity and variety of sanctions for failure to submit" would likely lead an objectively reasonable speaker "to submit more material than the government has constitutional authority to require authors to submit, avoid writing about

28

subjects that the government might regard as sensitive . . . and write about these subjects differently in order to avoid provoking the government's censors." ECF No. 33 at 18. Plaintiffs further claim that uncertainty about the time required for review "would also be likely to deter a reasonable speaker from attempting to write manuscripts meant to respond to breaking news, or meant to engage with fast-moving public debates," and from writing longer pieces for commercial publishers that require authors to commit to deadlines. *Id.* at 18–19.

These allegations are facially plausible. Importantly, beyond mere hypotheticals, Plaintiffs partly premise the likelihood of such objective effects on the fact that some of them have self-censored in precisely these ways. Most notably, as Plaintiffs describe, the Complaint alleges that some Plaintiffs, including Edgar, Immerman, Goodman, and Fallon, have simply decided not to write about certain topics as a result of their past experiences with PPR. *Id.* at 19 (citing ECF No. 1 ¶¶ 66, 80, 92–93, 112, 118–19). They have also elected to accept required redactions and publish their work in altered and limited form rather than proceed with appeals of the redactions out of concern for further delaying publication or risking their relationships with PPR officials whom they may encounter again the future. *Id.* (citing ECF No. 1 ¶¶ 64, 78, 110, 119). These allegations demonstrate that Plaintiffs have been deterred from exercising their First Amendment rights in ways persons of ordinary fitness who are subject to the PPR regimes at issue plausibly would be.

Defendants respond that Plaintiffs' claims of chill are belied by the fact that Plaintiffs have published extensively and intend to continue doing so despite the inadequacies they allege in the PPR regimes. *Id.* (citing ECF No. 1 ¶¶ 61, 65, 72, 79, 85, 93, 103, 115). This argument is unpersuasive. As the Court has noted, "a claimant need not show [he] ceased [First Amendment] activities altogether to demonstrate an injury in fact" as long as the claimed chill to those

activities is objectively reasonable. *Cooksey*, 721 F.3d at 236 (first alteration in original) (quoting *Benham*, 635 F.3d at 135). Defendants next argue that Plaintiffs' claims of chill are not objectively reasonable because Plaintiffs' decisions not to write about certain topics or to accept redactions they disagree with are "based on a mere preference to avoid potential disagreement, the possibility of delays in the publication process, or uncertainty." ECF No. 30-1 at 28. Plaintiffs contend that their decisions are reasonable responses to the breadth and vagueness of the PPR regimes, uncertainty about the time required for manuscript review, and the risk of sanctions for failure to submit. ECF No. 33 at 20.

Defendants rely on *The Baltimore Sun Co. v. Ehrlich*, in which the Fourth Circuit affirmed the dismissal of a First Amendment claim by two reporters challenging the Governor of Maryland's ban on state staff speaking with them. 437 F.3d 410, 413 (4th Cir. 2006).  The ban in that case was imposed because the Governor's press office felt the reporters were not "objectively" reporting on the administration. *Id*. at 413. The court explained that "[i]t would be inconsistent with the journalist's accepted role in the 'rough and tumble' political arena to accept that a reporter of ordinary firmness can be chilled by a politician's refusal to comment or answer questions on account of the reporter's previous reporting." *Id.* at 419 (quoting *Eaton v. Menely*, 379 F.3d 949, 956 (10th Cir. 2004)). It is unclear how that reasoning bears on Plaintiffs' claims here. Plaintiffs are not journalists claiming viewpoints in their reporting will be "chilled" because politicians refuse to engage with them in response to perceived unfair criticisms. *Id.* at 417. Rather, Plaintiffs allege that they are former public servants who seek to engage in public discourse surrounding the topics of their expertise but whose writings are subject to redactions and who face threats to their livelihood and potentially severe sanctions for failure to comply

with PPR requirements. Their decisionmaking therefore is plausibly premised on more than a preference to avoid mere "disagreement[s]." ECF No. 30-1 at 28.

Defendants next assert that because of the presumption that government officials properly discharge their duties absent clear evidence to the contrary, Plaintiffs' alleged concerns about PPR reviewers being less responsive if Plaintiffs' writings criticize the government are misplaced. While such a presumption exists in some contexts, *see Nardea v. Sessions*, 876 F.3d 675, 680 (4th Cir. 2017), its application here would not undermine Plaintiffs' other alleged reasons for self-censorship, which stem from the structure of the PPR regimes rather than conduct by individual reviewers. Finally, Defendants make the peculiar argument that Plaintiffs are not chilled but rather benefitted by PPR because review of their work prior to publication protects them from punishment for having published classified information. ECF No. 30-1 at 29. Even if Defendants were correct that the existence of a PPR system provides this counterintuitive incidental benefit to authors, however, that does not negate the other sources of chill caused by the alleged flaws in the specific PPR regimes at issue here.

Because Plaintiffs have plausibly alleged that features of the PPR regimes result in a chilling effect on the exercise of First Amendment rights, Plaintiffs have made a sufficient showing of an injury in fact to proceed.[7] With respect to the redressability prong of standing, Defendants' only argument is that a judicial order could not set time limits for review in a way that would remedy the harms Plaintiffs allege. ECF No. 30-1 at 28. This claim is unconvincing

---

[7] Because Plaintiffs' theory based on chilling effect is sufficient to demonstrate standing, the Court need not consider at length Plaintiffs' alternative "credible threat of enforcement" theory. Under such a theory, plaintiffs can demonstrate standing by showing that "they intend to engage in conduct at least arguably protected by the First Amendment but also proscribed by the policy they wish to challenge, and that there is a 'credible threat' that the policy will be enforced against them when they do so." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) (quoting *Kenny*, 885 F.3d at 288). The Court notes, however, that like Plaintiffs' licensing scheme argument, credible threat of enforcement is an awkward fit for this case because Plaintiffs do not state a desire to engage in conduct that is specifically proscribed by government policy, but rather express confusion and uncertainty about PPR policies with which Plaintiffs are willing to comply but for the regimes' alleged vagueness and other flaws.

for two reasons. First, the redressability requirement is met "when the court's decision would reduce 'to some extent' plaintiffs' risk of additional injury." *Carter v. Fleming*, 879 F.3d 132, 138 (4th Cir. 2018) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007)). Additionally, the lack of certainty about the duration of review is only one factor contributing to the chill Plaintiffs allege, the remainder of which Defendants do not directly address.

To be sure, Plaintiffs' arguments supporting redressability are somewhat nebulous. In their Opposition, Plaintiffs assert that they seek a declaration that the PPR regimes violate the First and Fifth Amendments and "an injunction prohibiting Defendants from sanctioning them for failure to comply with these regimes." ECF No. 33 at 22.[8] Plaintiffs then state that "[i]f the Court were to afford Plaintiffs this relief, Defendants would presumably revise their prepublication review regimes to bring these regimes into alignment with the First and Fifth Amendments." ECF No. 33 at 22. Unspecified as that prediction is, a declaration that features of the PPR regimes are unconstitutional would necessitate that Defendants implement reforms to the regimes to remedy their potential constitutional defects. Because the court's decision need only reduce "'to some extent' plaintiffs' risk of additional injury" to satisfy the redressability prong, Plaintiffs' allegations are generally sufficient to proceed. *Carter*, 879 F.3d at 138 (quoting *Massachusetts*, 549 U.S. at 526).

The speculative nature of Plaintiffs' redressability arguments, however, relates to other alleged deficiencies that Defendants raise in Plaintiffs' claims and the relief Plaintiffs request. Defendants first argue that Plaintiffs lack standing to assert that PPR must apply only to narrow categories of former employees and only to material reasonably likely to contain "the most closely held government secrets" because Plaintiffs and their written work fall into those

---

[8] That statement notably differs from the Complaint's request for injunctive relief barring enforcement of the regimes against anyone, an issue to which the Court returns below. *See* ECF No. 1 at 41.

categories and therefore would not be impacted by the limitations Plaintiffs seek. ECF No. 30-1 at 30–31. Elsewhere in their brief, however, Defendants argue that *all* classified information is considered "closely held" under Executive Orders establishing the classification system. *Id.* at 38. This apparent conflict indicates that Defendants' argument here is essentially an attempt to derail Plaintiffs' standing through a grammatical technicality rather than a substantive objection.

Defendants then assert that Plaintiffs' works are reasonably likely to contain classified information, as indicated by the fact that Plaintiffs' past works have been redacted. *Id.* at 31. A core claim of Plaintiffs' suit, however, is that those redactions were frequently without basis, and further that the regimes require submission of more than just materials likely to contain classified information. Defendants' argument is therefore unpersuasive. Next, Defendants argue that Plaintiffs lack standing to challenge features of the regimes that apply only to current employees. *Id.* at 32. Plaintiffs make clear in their Opposition that they do not intend to do so, though they acknowledge Defendants' correct assertion that one of the DOD policies the Complaint cites, Directive 5230.09, has been replaced by a new policy, Instruction 5230.09. ECF No. 33 at 16 n.3, 17 n.4. Finally, Defendants assert that Plaintiffs lack standing to challenge a provision of the NSA policy relating to information "in the custody and control of NSA/CSS," because none of the Plaintiffs alleges that they were employed by the NSA. ECF No. 30-1 at 33. Given that the ODNI has referred Plaintiff Edgar's writings to the NSA in the past, however, *see* ECF No. 1 ¶¶ 63–65, Plaintiffs have adequately alleged that they are impacted by that agency's PPR regime.

Defendants also argue that Plaintiffs lack standing to bring their vagueness claim because Plaintiffs have identified no circumstance in which uncertainty about the scope of their PPR obligations has caused or is likely to cause them any tangible harm, and that they rather are well aware of their need to submit materials for PPR and have adhered to those obligations. *Id.* at 33.

As the merits portion of Plaintiffs' brief notes, however, a provision may be impermissibly vague "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)). Plaintiffs allege that their works have been arbitrarily redacted and excised, in part because of discrimination against the viewpoints they contain. *See* ECF No. 1 ¶¶ 75, 77, 90, 110–11, 114. Because Plaintiffs have plausibly alleged a resulting chilling effect on future expression, Plaintiffs have drawn a sufficient link between the harms they assert and their vagueness claim.

Defendants' final standing argument is that Plaintiffs lack standing to seek an injunction barring enforcement of the PPR regimes "against Plaintiffs, or any other person." ECF No. 30-1 at 34 (quoting ECF No. 1 at 41). As Defendants note, the Supreme Court has recently reaffirmed that "a plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (alteration in original) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). That "a plaintiff [has] demonstrated harm from one particular inadequacy in government administration" does not authorize a court "to remedy *all* inadequacies in that administration." *Lewis*, 518 U.S. at 357. Defendants also raise the separation of powers concerns inherent in reviewing government policies for protecting national security. Generally, "[a]bsent a clear expression by Congress to the contrary, courts should not 'intrude upon the authority of the Executive in military and national security affairs.'" *Clarke v. DynCorp Int'l, LLC*, No. JFM-12-03267, 2014 WL 4269075, at *3 (D. Md. Aug. 28, 2014) (quoting *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988)).

In response, Plaintiffs note several cases in which courts have nonetheless reviewed executive action concerning national security when the government's conduct has implicated fundamental individual liberties. ECF No. 33 at 23 (citing *Boumediene v. Bush*, 553 U.S. 723,

797 (2008); *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004); *United States v. U.S. Dist. Court*

(*Keith*), 407 U.S. 297 (1972); *United States v. Moussaoui*, 382 F.3d 453, 469 (4th Cir. 2004)).

The Court need not wade into the interplay between these weighty principles, however, because

as noted previously, Plaintiffs have retreated from the maximal relief requested in their

Complaint and now characterize the remedy they seek as a declaration that the PPR regimes are

constitutionally flawed and "an injunction prohibiting Defendants from sanctioning [Plaintiffs]

for failure to comply with these regimes." *Id.* at 22. Equitable relief that barred penalties solely

against these Plaintiffs and that granted Defendants time to address any constitutional

deficiencies the Court identified with the PPR regimes would not substantially implicate the

separation of powers concerns Defendants raise. The Court will accordingly proceed.

### B.  Ripeness

Before addressing the merits of Plaintiffs' Complaint, Defendants also raise the

additional justiciability challenge that Plaintiffs' claims are unripe. "The question of whether a

claim is ripe 'turns on the fitness of the issues for judicial decision and the hardship to the parties

of withholding court consideration.'" *South Carolina v. United States*, 912 F.3d 720, 730 (4th

Cir. 2019) (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,

461 U.S. 190, 201 (1983)). "As with standing, ripeness is a question of subject matter

jurisdiction." *Id.* (citing *Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013)).

Defendants here assert that "Plaintiffs do not take issue with any current prepublication review

decision, and their abstract fears about how the system might operate in the future are therefore

divorced from any immediate, concrete factual setting." ECF No. 30-1 at 35–36. Defendants'

argument thus essentially reduces to the claim that no challenge to PPR should be allowed to

proceed except for after-the-fact appeals in individual cases of agency review.

As the Fourth Circuit has explained, however, "[m]uch like standing, ripeness requirements are also relaxed in First Amendment cases." *Cooksey*, 721 F.3d at 240 (citing *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500 (10th Cir. 1995)). "Indeed, 'First Amendment rights . . . are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss. In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill.'" *Id.* (quoting *Gonzales*, 64 F.3d at 1500). Plaintiffs' standing here is premised on precisely such a chill, and "standing and ripeness should be viewed through the same lens." *Id.* As discussed previously, Plaintiffs have plausibly alleged that they have declined to write about certain topics as a result of past experiences with PPR and have accepted redactions rather than challenged them in the interest of timely contributing to public debates. *See* ECF No. 1 ¶¶ 64, 66, 78, 80, 92–93, 110, 112, 118–19. In other words, Plaintiffs are currently subject to PPR regimes that they reasonably allege require them to self-censor. Accordingly, Plaintiffs' claims challenging the alleged constitutional infirmities in those regimes are ripe for adjudication.

### C. Merits

#### 1. First Amendment Claim

The Court thus turns to the merits of Plaintiffs' claims, beginning with the primary claim that features of Defendants' PPR regimes violate the First Amendment. While Plaintiffs discuss several ways in which they allege the regimes contravene constitutional speech protections, the overarching theme is that the regimes constitute "a far-reaching system of prior restraints" that invest reviewing agencies with excessive discretion, allowing them to require submission of materials that do not include classified information and unwarrantedly demand redactions and excisions. ECF No. 33 at 8; *see also* ECF No. 1 ¶ 120. Defendants argue that the PPR regimes

are not prior restraints and that the sole reason PPR authorities require changes to submissions is that they contain classified material. ECF No. 30-1 at 44. To the extent that the regimes require submission and redaction of materials that may not include classified information, Defendants contend, the Supreme Court in *Snepp v. United States* found such requirements fully consistent with the First Amendment. *See id.* at 38–39 (citing *Snepp*, 444 U.S. at 511–13). The Court first discusses *Snepp* before turning to its implications for Plaintiffs' claim.

 *Snepp* involved a former CIA agent who published a book about his experiences without submitting it to the agency for PPR, violating agreements he had signed when he joined and departed the agency. 444 U.S. at 507–08. In the first agreement, Snepp promised "that he would 'not . . . publish . . . any information or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of [his] employment . . . without specific prior approval by the Agency." *Id.* at 508. In the departure agreement, Snepp "reaffirmed his obligation 'never' to reveal 'any classified information, or any information concerning intelligence or CIA that has not been made public by CIA . . . without the express written consent of the Director of Central Intelligence or his representative.'" *Id.* at 508 n.1.

 The government brought suit to enforce the agreements after Snepp published his book. *Id.* at 508. In ruling for the government, the trial court "enjoined future breaches of Snepp's agreement" and "imposed a constructive trust on Snepp's profits," finding that Snepp had breached fiduciary obligations to the agency. *Id.* (citing 456 F. Supp. 176, 180–82 (E.D. Va. 1978)). The Fourth Circuit affirmed in part and reversed in part, lifting the imposition of the trust based on the government's concession that the book contained no classified intelligence and the court's finding that Snepp had a First Amendment right to publish unclassified information. *Id.* at 509–10 (citing 595 F.2d 926, 935–36 (4th Cir. 1979)). "In other words," the Supreme Court

explained, the Fourth Circuit "thought that Snepp's fiduciary obligation extended only to preserving the confidentiality of classified material." *Id.* at 510.

The Supreme Court ruled in favor of the government and reinstated the constructive trust, concluding that the agreement Snepp signed when he joined the CIA made clear that he "was entering a trust relationship" and "specifically imposed the obligation not to publish *any* information relating to the Agency without submitting the information for clearance." *Id.* at 510–11 (emphasis in original). Whether Snepp violated that trust, the Court explained, did not depend on "whether his book actually contained classified information." *Id.* at 511. The Court noted that the lower courts "found that a former intelligence agent's publication of unreviewed material relating to intelligence activities can be detrimental to vital national interests even if the published information is unclassified." *Id.* at 511–12.

"When a former agent relies on his own judgment about what information is detrimental," the Court further noted, "he may reveal information that the CIA—with its broader understanding of what may expose classified information and confidential sources—could have identified as harmful." *Id.* at 512. In view of these principles, and unchallenged evidence in the record that "Snepp's book and others like it [had] seriously impaired the effectiveness of American intelligence operations," the Court approved the lower courts' conclusions that "Snepp's breach of his explicit obligation to submit his material—classified or not—for prepublication clearance has irreparably harmed the United States Government." *Id.* at 512–13. The Court concluded that in order to deter future breaches of trust similar to Snepp's, a constructive trust was the appropriate remedy. *Id.* at 515–16.

While it was not the primary focus of its opinion, the Court also addressed and rejected Snepp's argument that the agreement he signed when he joined the CIA was "unenforceable as a

prior restraint on protected speech." *Id.* at 509 n.3. The Court agreed with the Fourth Circuit that

the agreement was "an 'entirely appropriate' exercise of the CIA Director's statutory mandate to

'protec[t] intelligence sources and methods from unauthorized disclosure, 50 U.S.C. §

403(d)(3)." *Id.* (alteration in original) (citing 595 F.2d at 932).[9] The Court also explained that

"even in the absence of an express agreement . . . the CIA could have acted to protect substantial

government interests by imposing reasonable restrictions on employee activities that in other

contexts might be protected by the First Amendment." *Id.* (citing *U.S. Civil Serv. Comm'n v.*

*National Ass'n of Letter Carriers AFL-CIO*, 413 U.S. 548, 565 (1973)).

      Finally, the Court declared that "[t]he Government has a compelling interest in protecting

both the secrecy of information important to our national security and the appearance of

confidentiality so essential to the effective operation of our foreign intelligence service," and

concluded that "[t]he agreement that Snepp signed is a reasonable means for protecting this vital

interest." *Id.* In responding to arguments made in a dissent, the Court described the logic of PPR,

explaining that while "neither the CIA nor foreign agencies would be concerned" if information

that "in fact . . . is unclassified or in the public domain" is published, "[t]he problem is to ensure

in advance, and by proper procedures, that information detrimental to national interest is not

published." *Id.* at 513 n.8. "Without a dependable prepublication review procedure, no

intelligence agency or responsible Government official could be assured that an employee privy

to sensitive information might not conclude on his own—innocently or otherwise—that it should

be disclosed to the world." *Id.* The Court finally rejected the suggestion that its holding would

"allow[] the CIA to 'censor' its employees' publications," finding that Snepp's agreement

"requires no more than a clearance procedure subject to judicial review." *Id.*

---

[9] That statutory duty is now vested in the Director of National Intelligence and codified at 50 U.S.C. § 3024(i)(1).

Defendants argue persuasively that *Snepp* controls this case. ECF No. 37 at 8–11. In short, Defendants maintain that *Snepp* established a reasonableness standard for evaluating federal employee speech restrictions that further the government's compelling interest in protecting classified information, and that the PPR regimes here satisfy that standard in both their scope and the procedures they utilize. ECF No. 30-1 at 36–37; ECF No. 37 at 8–9. Defendants' position is supported by case law from the D.C. and Second Circuits recognizing that *Snepp* confirmed both the constitutionality of PPR generally and that federal employees' agreements not to disclose classified information waive First Amendment rights to publish that material. *See Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) (holding that a former employee of a federal laboratory who signed a PPR agreement had "no first amendment right to publish" classified information"); *Wilson v. CIA*, 586 F.3d 171, 183–84 (2d Cir. 2009) (accepting and applying the holding of *Stillman* to a former CIA agent).

Both Circuits have also held, echoing *Snepp*, that the CIA's PPR requirement "is not . . . a 'system of prior restraints' in the classic sense." *Wilson*, 586 F.3d at 183 (quoting *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971)); *McGehee v. Casey*, 718 F.2d 1137, 1147–48 (D.C. Cir. 1983) (holding that "neither the CIA's administrative determination nor any court order in this case constitutes a prior restraint in the traditional sense upon [the plaintiff] or any other party"). The Second Circuit in *Wilson* also noted two key additional Supreme Court precedents, both of which cite generally to *Snepp* in discussing the permissibility of restrictions on government employee speech. *See* 586 F.3d at 183. In *United States v. Aguilar*, the Court stated that when a government employee "voluntarily assume[s] a duty of confidentiality, governmental restrictions on disclosure are not subject to the same stringent standards that would apply to efforts to impose restrictions on unwilling members of the public." 515 U.S. 593, 606

(1995) (citing *Snepp*, 444 U.S. 507). Similarly, in *United States v. National Treasury Employees Union* ("*NTEU*"), the Court noted that it has "recognized that Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." 513 U.S. 454, 465 (1995) (citing *Snepp*, 444 U.S. 507).

Plaintiffs ask the Court to disregard this body of case law and treat Defendants' PPR regimes as presumptively unconstitutional prior restraints under the framework established by the Supreme Court in 1965 in *Freedman v. Maryland*. ECF No. 33 at 24–25. As mentioned previously, the Court in that case rejected a Maryland statute that required approval from a state board before publicly exhibiting films but set no time limit for the board's review and did not assure prompt judicial review. 380 U.S. at 54–55, 58. The Court held that to comply with the First Amendment, a system requiring prior submission of films must include "procedural safeguards" that both place on the censoring authority the burden of proving the film is unprotected expression and require the censor to either grant a license or file a court action to "assure a prompt final judicial decision." *Id.* at 58–59. Plaintiffs also argue, citing the Supreme Court's rejection of a parade permit ordinance in *Shuttlesworth v. City of Birmingham*, that the PPR regimes must include "narrow, objective, and definite standards to guide the [reviewing] authority." ECF No. 33 at 25 (citing 394 U.S. 147, 150–52 (1969)).

Plaintiffs' position is simply untenable in light of *Snepp*. The Court there unquestionably rejected the argument that the CIA's PPR regime was a prior restraint and upheld the validity of Snepp's agreements "not to divulge *classified* information and not to publish *any* information without prepublication clearance." 444 U.S. at 508, 509 n.3. Multiple courts of appeals have recognized and applied that holding, *see Wilson*, 586 F.3d at 183; *McGehee*, 718 F.2d at 1147–48 (D.C. Cir. 1983); *see also Stillman v. CIA*, 517 F. Supp. 2d 32, 38 (D.D.C. 2007) (citing

*Snepp* and stating that "[t]he Supreme Court has already decided that a prepublication review requirement imposed on a government employee with access to classified information is not an unconstitutional prior restraint."). Plaintiffs make several arguments here to attempt to persuade the Court to depart from these precedents. None are persuasive.

First, Plaintiffs observe that the Fourth Circuit characterized the CIA's PPR regime as a "prior restraint" in *United States v. Marchetti*, a 1972 decision upholding the secrecy agreement of a former CIA employee and affirming an injunction barring him from violating it by publishing materials discussing his work without submitting them for PPR. 466 F.2d 1309, 1311–13 (4th Cir. 1972). While that is an accurate summary of the decision, it is at best doubtful whether *Marchetti*'s reasoning survived *Snepp*, given the Supreme Court's rejection of Snepp's argument to that effect and its conclusion that the CIA could have imposed restrictions on disclosure "even in the absence of an express agreement." 444 U.S. at 509 n.3. Moreover, even if *Marchetti* does remain intact, the court there upheld the CIA's PPR system, noting that under *Freedman*, "some prior restraints in some circumstances are approvable of course" and that "the Government's need for secrecy in this area lends justification to a system of prior restraint against disclosure." 466 F.2d at 1316–17 (citing *Freedman*, 380 U.S. 51).

Plaintiffs next attempt to distinguish the D.C. and Second Circuit cases that Defendants cite on the ground that they involved as-applied challenges to PPR while Plaintiffs' challenge here is facial. ECF No. 33 at 26. Plaintiffs neglect to explain the significance of that distinction, however, and as Defendants correctly observe, plaintiffs bringing facial challenges have a *greater* burden than those merely challenging application of a provision to themselves. *See United States v. Stevens*, 559 U.S. 460, 472–73 (2010); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008) (citing *United States v. Salerno*, 481 U.S.

739 (1987)). Plaintiffs also attempt to undermine *Snepp* by characterizing its First Amendment analysis as "a cursory footnote" and by noting that the Court decided the case without oral argument or briefing on the merits. ECF No. 33 at 40–41. This Court will decline to discard a controlling Supreme Court precedent on such grounds.

More substantively, Plaintiffs argue that *Snepp* was decided on narrow grounds specific to Snepp's role as a former CIA agent with access to "some of the government's most closely held secrets," thus leaving open questions about whether PPR requirements could constitutionally be applied to other CIA employees or employees of other agencies. *Id.* at 40–41. Plaintiffs further argue that the Court in *Snepp* "had no occasion to consider the constitutionality of the specific features of the CIA's regime at issue here, let alone the specific features of the other agencies' regimes," nor "the scope of the CIA's submission requirement" or of its "review standards." *Id.* at 40. In essence, Plaintiffs ask the Court now to limit *Snepp* to its facts. The Court will decline to do so for three reasons.

First, it is apparent that for the Court in *Snepp*, the structure of the CIA's PPR regime and the scope of its requirements were irrelevant in light of the obligations contained in the agreements Snepp had voluntarily signed, both of which the Court took care to quote in their entirety. *See* 444 U.S. at 507–08 & n.1. The Court was plainly aware that Snepp's secrecy agreements barred him from publishing *any* information about the CIA or his employment there, classified or not, but nonetheless found those requirements consistent with the First Amendment. *Id.* at 508. The Court emphasized that the government's concessions that Snepp had a general right to publish unclassified information and that his book contained no classified material did not "undercut[] [the government's] claim that Snepp's failure to submit to prepublication review was a breach of his trust." *Id.* at 511. In short, the Court's analysis indicates that it took into

account the broad scope of the agency's submission and review requirements and found they created no obstacle to enforcing the PPR agreements Snepp had entered.

Second, Plaintiffs offer little basis to distinguish between Snepp and other CIA employees or employees of other agencies. Plaintiffs assert that in his role at CIA, Snepp had access to some of the government's "most closely held secrets," a phrase Plaintiffs use repeatedly in their briefing but fail to define. ECF No. 33 at 40. While Plaintiffs correctly note the Court's statement that "[f]ew types of governmental employment involve a higher degree of trust than that reposed in a CIA employee with Snepp's duties," that statement served to support the possibility that Snepp's trust relationship with the CIA would exist even without a written agreement. ECF No. 33 at 40 (quoting 444 U.S. at 511 n.6). The primary focus of the decision, however, was Snepp's breach of his secrecy agreements, and there is no indication that the ruling was intended to be limited to CIA employees in Snepp's position. *See Nat'l Fed'n of Fed. Emps. v. United States*, 695 F. Supp. 1196, 1201 (D.D.C. 1988) ("That the agreement in *Snepp* covered only 'secret' information and was executed only by CIA employees does not change the gravity of the government's interest in assuring the secrecy of national security information, nor do these distinctions render the [federal employee nondisclosure] agreements [challenged in this action] a less reasonable means for protecting that interest").

Finally, even if Plaintiffs were correct that *Snepp* was a narrow decision that concerned only high-level CIA employees, the considerations that Plaintiffs assert the Court failed to address in the case have little bearing on the constitutionality of other PPR regimes unless they qualify as prior restraints under *Freedman* and its progeny. Those considerations include the permissible scope of a submission requirement, permissible purposes of review, and "procedural protections that might be constitutionally required." ECF No. 33 at 41. Because Plaintiffs derive

those concerns from prior restraint doctrine, and because *Snepp* found that doctrine does not

apply in this context, that *Snepp* did not raise them is not a distinguishing limitation of the

decision but rather an expected feature.

Because none of Plaintiffs' arguments distinguishing *Snepp* or limiting its reach are

persuasive, Plaintiffs remain bound by its holding that prior restraint doctrine does not apply to

PPR regimes imposed to prevent publication of classified information. Accordingly, Plaintiffs'

arguments that the regimes at issue here do not meet the requirements of prior restraint doctrine

must fail. Such arguments constitute the majority of Plaintiffs' Opposition to Defendants'

Motion to Dismiss: Plaintiffs assert that Defendants' "submission and censorship standards are

vague, subjective, and overly broad" – as opposed to the "narrow, objective, and definite"

requirement set by the Supreme Court in *Shuttlesworth* – and "lack constitutionally required

procedural safeguards" that the Court established in *Freedman*. *See* ECF No. 33 at 26–27, 36.

Because those requirements are inapplicable or irrelevant in light of *Snepp*, Plaintiffs' many

arguments relying on them cannot support their First Amendment claim.

Plaintiffs are therefore left with demonstrating that the PPR regimes fail the

reasonableness test that the Court established in *Snepp*. They attempt to do so unconvincingly

and in conclusory fashion by citing to considerations discussed in *Marchetti*, the continued

viability of which this Court has already questioned. *Id.* at 43–44. Plaintiffs alternatively turn to a

separate body of First Amendment doctrine concerning restrictions on the speech of public

employees. In *Pickering v. Board of Education of Township High School District 205*, the

Supreme Court explained that if the speech of public employees "is of public concern, courts

[assessing such restrictions under the First Amendment] must balance 'the interests of the

[employee], as a citizen, in commenting upon matters of public concern and the interest of the

State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Liverman v. City of Petersburg*, 844 F.3d 400, 406–07 (4th Cir. 2016) (second alteration in original) (quoting 391 U.S. 563, 568 (1968)).

In its subsequent decision in *NTEU*, the Court "addressed how courts should apply Pickering when a generally applicable statute or regulation (as opposed to a post-hoc disciplinary action) operates as a prior restraint on speech." *Id.* at 407. As the Fourth Circuit has explained,

> NTEU involved a statute that prohibited federal employees from accepting any compensation for giving speeches or writing articles, even when the topic was unrelated to the employee's official duties. See [513 U.S.] at 457. Emphasizing that the honoraria ban impeded a "broad category of expression" and "chills potential speech before it happens," the Court held that "the Government's burden is greater with respect to this statutory restriction on expression than with respect to [the] isolated disciplinary action[s]" in Pickering and its progeny. Id. at 467, 468. Accordingly, "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." Id. at 468, (quoting Pickering, 391 U.S. at 571). Further, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Id. at 475.

*Id.*

Citing case law from the Seventh and Second Circuits, Plaintiffs here assert that *NTEU* "effectively limits *Snepp* to its facts" and that Defendants' PPR regimes fail the test that case establishes. ECF No. 33 at 43. Plaintiffs' arguments fail on both counts. First, both of the cases on which Plaintiffs rely specifically note *Snepp* and the distinct concerns at play with the speech of individuals who have access to classified information and are subject to PPR, such as Plaintiffs in this case, as opposed to government personnel generally. In *Wernsing v. Thompson*, the Seventh Circuit noted that *Snepp* was decided in a "context[] where the government presumably has a heightened interest in preempting certain types of speech." 423 F.3d 732, 749

(7th Cir. 2005). While the court noted that *Snepp* "predated the Supreme Court's more exacting pronouncements on prior restraints in *NTEU*" and another case, that dictum does not purport to make a definitive statement about how *Snepp* may have been modified in a way that would support Plaintiffs' claim. *Id.*

Plaintiffs also point to the Second Circuit's decision in *Harman v. City of New York*, in which that court held that a city policy restricting public comments by certain agency employees was inconsistent with *Pickering* and *NTEU*. 140 F.3d 111, 124–25 (2d Cir. 1998). In rejecting the defendants' claim that the challenged policies were necessary to protect the confidentiality of the agencies' cases and clients, the court distinguished *Snepp*, stating "that case concerned materials 'essential to the security of the United States and—in a sense—the free world.'" *Id.* at 122 (quoting 444 U.S. at 512 n.7). The court also observed that "[c]ourts traditionally grant great deference to the government's interests in national defense and security." *Id.* (citing *Brown v. Glines*, 444 U.S. 348 (1980)). Because the issues at play here deal with matters of national defense and security and not local agencies, *Harman* provides little support for Plaintiffs' position.

Plaintiffs' argument that the PPR regimes fail the *NTEU* test is similarly unpersuasive. Quoting from *NTEU*, Plaintiffs state that the regimes implicate the core political speech of "a vast group of present and future employees," although incidentally no Plaintiff here is a member of that group. ECF No. 33 at 44 (quoting *NTEU*, 513 U.S. at 468). Plaintiffs then draw on a D.C. Circuit opinion adding detail to the *NTEU* test, stating that "the public's interest in hearing this speech is 'manifestly great,' because 'government employees are in a position to offer the public unique insights into the workings of government.'" *Id.* (quoting *Sanjour v. EPA*, 56 F.3d 85, 94 (D.C. Cir. 1995) (en banc)). Finally, Plaintiffs state that "Defendants' regimes are not 'narrowly

tailored to serve the government's asserted interest,'" noting that courts have applied such a requirement in *NTEU* analysis. *Id.* (quoting *Wolfe v. Barnhart*, 446 F.3d 1096, 1106–07 (10th Cir. 2006)).

In support of this tailoring claim, Plaintiffs argue that "[t]he only legitimate interest served by [PPR] is the prevention of inadvertent disclosures by employees who submit to review," which Plaintiffs assert would be "served most directly" by statutes criminalizing disclosure of sensitive information and by "the availability of administrative and civil sanctions for those who mishandle such information." *Id.* at 44–45. "Any residual need for prepublication review can be served by a system far more tailored than Defendants' current regimes," Plaintiffs conclude. *Id.* at 45. Plaintiffs fail to describe the nature of such a system, however, except perhaps by unstated reference to their prior restraint arguments. Moreover, this argument appears to at least suggest, if not outright assert, that no PPR regime could be sufficiently narrowly tailored to satisfy the First Amendment. That claim cannot be correct unless *NTEU* effectively abrogated *Snepp*, a holding that the Court has no basis to reach here.

Further, Plaintiffs' argument that Defendants have only a narrow interest in preventing inadvertent disclosure ignores the Supreme Court's pronouncements in *Snepp* about the government's "compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality" that justifies PPR. 444 U.S. at 509 n.3; *see also Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1441 (D.C. Cir. 1996) (upholding a PPR regime for employees of the State Department and related agencies and noting this component of *Snepp* as speaking to the government's interests). Plaintiffs' assertion that penalties for unauthorized disclosures are adequate to serve the government's interest similarly ignores *Snepp*'s explanation that "[t]he problem is to ensure *in advance*, and by proper procedures, that

information detrimental to national interest is not published" and that "[w]ithout a dependable

prepublication review procedure, no intelligence agency or responsible Government official

could be assured that an employee privy to sensitive information might not conclude on his

own—innocently or otherwise—that it should be disclosed to the world." 444 U.S. at 513 n.8

(emphasis in original); *see also Weaver*, 87 F.3d at 1442 (citing *Snepp* and stating that "advance

review is plainly essential to preventing dissemination" of classified information).

In short, as with their prior restraint arguments, accepting Plaintiffs' position under

*NTEU* requires the Court to essentially treat *Snepp* as obsolete. Plaintiffs' desire for the Court to

do so is clear in their additional argument that the Court should look past *Snepp* because of the

expansion and evolution of PPR over the last four decades. *See* ECF No. 33 at 41. But as

Plaintiffs are of course aware, while the Supreme Court may question and reexamine its

precedents in light of societal change and the passage of time, this Court has no such power.

While the allegations Plaintiffs have made about the inadequacies and breadth of the challenged

PPR regimes do not appear inaccurate or implausible, *Snepp* remains the precedent governing the

Court's evaluation of Plaintiffs' First Amendment claim, and Plaintiffs have failed to

demonstrate that the regimes do not meet its low threshold of reasonableness. Accordingly,

Plaintiffs' First Amendment claim will be dismissed.[10]

### 2. Vagueness Claim

The Court finally turns to Plaintiffs' vagueness claim, which asserts that the PPR regimes

are void for vagueness under the First and Fifth Amendments because they fail to provide former

---

[10] It also bears mention that the wholesale reforms to PPR that Plaintiffs seek to obtain from the Court in this claim strain at the limits of the judiciary's role, particularly given the national security context. *See Egan*, 484 U.S. at 530 (1988). Both that concern and the Court's inability to sidestep *Snepp* limit the force of arguments made in the amicus brief submitted by CERL, which describes how lengthy PPR delays chill contributions to public discourse by former officials and discourage national security experts from entering the government. ECF No. 34-1. Whatever the merits of these assertions, they are more properly directed to the branches of government empowered to create and execute public policy rather than to simply evaluate its consistency with the Constitution.

government employees with fair notice of what they must submit for PPR and what they can and

cannot publish, and because they invite arbitrary and discriminatory enforcement. ECF No. 1 ¶

121. "[T]he void for vagueness doctrine addresses at least two connected but discrete due

process concerns: first, that regulated parties should know what is required of them so they may

act accordingly; second, precision and guidance are necessary so that those enforcing the law do

not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S.

239, 253 (2012) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)). "When

speech is involved, rigorous adherence to those requirements is necessary to ensure that

ambiguity does not chill protected speech." *Id.*

Plaintiffs assert that the PPR regimes at issue here fail on both counts because language

used in describing what former employees must submit for review is ambiguous and because the

regimes "are vague with respect to what the agencies may censor," which "has facilitated

arbitrary and discriminatory application to the writings of Plaintiffs and others." ECF No. 33 at

45–46. The Court considers these arguments in turn. First, in arguing that the regimes fail to give

fair notice of former employees' PPR obligations, Plaintiffs point to several phrases in the

agency policies at issue that they allege are impermissibly vague in describing the subjects or

content that render a work subject to PPR. ECF No. 33 at 27–29. For the CIA, these include the

requirement in its AR 13-10 policy mandating submission of materials that: are "intelligence

related;" that "mention[] CIA or intelligence data or activities; or that are "on any subject about

which the author has had access to classified information in the course of his employment." *Id.* at

27 (citing ECF No. 1 ¶¶ 32c, 32d); *see* ECF No. 33-1 at 8.

For the DOD, Plaintiffs quote submission requirements for any information that "relates

to information in the custody and control of the [DOD], or was acquired . . . as part of their

official duties within [DOD]" if the information "pertains to military matters, national security issues, or subjects of significant concern to [the agency]." ECF No. 33 at 28 (alterations in original) (quoting ECF No. 1 ¶ 38c); *see* ECF No. 33-1 at 23, 29, 41.[11] Plaintiffs next raise the NSA's Policy 1-30, pointing to the requirement that former NSA/CSS affiliates "acting in a private capacity" must submit material for PPR whenever there is "doubt" as to whether "NSA/CSS information" in the material is "UNCLASSIFIED" and "approved for public release." ECF No. 33 at 28 (quoting ECF No. 1 ¶ 44c); *see* ECF No. 33-1 at 57, 61. Plaintiffs note that the policy states that "Official NSA/CSS information appearing in the public domain shall not be automatically considered UNCLASSIFIED or approved for public release." ECF No. 33 at 28 (quoting ECF No. 1 ¶ 44c); *see* ECF No. 33-1 at 58.

Plaintiffs also raise two ODNI policies. The agency's Instruction 80.04 requires former employees to submit "all official and non-official information intended for publication that discusses the ODNI, the IC, or national security." ECF No. 33 at 28 (quoting ECF No. 1 ¶ 50(d)); *see* ECF No. 33-1 at 76–77. Additionally, the ODNI's Form 313 requires former employees who had access to classified information to submit any material that "might be based upon [information that is classified or is in the process of a classification determination]." ECF No. 33 at 28–29 (alteration in original) (quoting ECF No. 1 ¶ 50(c)); *see* ECF No. 33-1 at 70–71. Finally, Plaintiffs point to the obligations in Form 4414, in which all of the agencies require former employees who had access to SCI to submit any material "that contains or purports to

---

[11] As mentioned previously, Plaintiffs acknowledge that one of the two DOD policies quoted by the Complaint was replaced and superseded in January 2019. ECF No. 33 at 28 n.9. Plaintiffs have included both versions of the policy, as well as copies of each of the other policies at issue, as exhibits to their Opposition. *See* ECF No. 33-1 at 21–39. The DOD language at issue, however, has not changed between the prior and current policies. *Compare id.* at 23, 29 *with id.* at 33, 36.

contain any . . . description of activities that . . . relate to SCI." *Id.* at 29 (alterations in original) (quoting ECF No. 1 ¶¶ 32b, 38b, 44b, 50b); *see* ECF No. 33-1 at 86.

Plaintiffs assert that phrases in these policies, including "intelligence related" in the CIA policy, "relates to," "pertains to," "subjects of significant concern to [the agency]" in the DOD's policies, "might be based upon" and "in the process of a classification determination" in the ODNI's policy, and "relate to" in Form 4414, are impermissibly vague. ECF No. 33 at 29–31, 45. Beyond case law generally describing vagueness doctrine, Plaintiffs cite only one controlling authority in support of their position, *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991). The Supreme Court there rejected a state professional responsibility rule on pretrial publicity, which allowed lawyers to speak only to the "general" nature of a claim or defense "without elaboration," on the ground that "general" and "elaboration" were "both classic terms of degree." 501 U.S. at 1048–49, 1061–62. Plaintiffs' contention that the phrases at issue here are similarly vague terms of degree is simply incorrect as a grammatical matter.

Instead of case law, Plaintiffs focus on describing the wide body of material that the policies currently require Plaintiffs to submit and on offering hypothetical examples of works by former employees that would be subject to the submission requirements despite a low likelihood of containing classified information. *See* ECF No. 33 at 30–32. These arguments indicate that Plaintiffs' primary objection to the policies is their breadth rather than any difficulties Plaintiffs have in understanding what they require. While the policies do appear to reach a wide range of publications by Plaintiffs and other former employees, Plaintiffs fail to persuasively demonstrate how that leads to a constitutional concern outside of the prior restraint context.[12] Plaintiffs'

---

[12] The Court notes Defendants' arguments with respect to overbreadth doctrine, ECF No. 36 at 14–21, but aside from a brief footnote, ECF No. 33 at 36 n.1,  the Court does not read Plaintiffs' Opposition to assert such a theory separate from Plaintiffs' prior restraint argument.

objections thus appear best directed at efforts to amend the policies administratively or legislatively rather than to invalidate them under the First or Fifth Amendments.

Two further points raised by Defendants further demonstrate the lack of merit to Plaintiffs' claim. First, courts have recognized that a regulated party's ability to obtain prospective guidance from an agency before penalties are imposed mitigates concerns about a policy's "allegedly unconstitutional vagueness." *U.S. Telecomm. Ass'n v. FCC*, 825 F.3d 674, 738–39 (D.C. Cir. 2016) (citing *DiCola v. FDA*, 77 F.3d 504, 508 (D.C. Cir. 1996)). As Plaintiffs' own allegations demonstrate, Plaintiffs have such an ability by contacting the PPR office of their former employing agency to inquire about submission requirements. *See* ECF No. 1 ¶ 106; *see also* ECF No. 33-1 at 7–8, 16, 53. Second, the Fourth Circuit has found that statutory language describing protected government information in broad or general terms presents a lessened vagueness concern when individuals responsible for understanding the statute's meaning are intelligence professionals. *See United States v. Morison*, 844 F.2d 1057, 1074 (4th Cir. 1988) (rejecting a vagueness challenge to the phrase "relating to the national defense" in an Espionage Act prosecution on the ground that the defendant was an "experienced intelligence officer" who had "expertise in the field of governmental secrecy and intelligence operations" and had been instructed on "regulations concerning the security of secret national defense materials"). That principle squarely applies to Plaintiffs here.

In support of their second claim that the regimes' vagueness facilitates arbitrary and discriminatory enforcement, Plaintiffs cite provisions from agency policies describing standards for review of submissions. The CIA's AR-10 policy provides that the agency's review board will review material "solely to determine whether it contains any classified information." ECF No. 33 at 32; *see* ECF No. 33-1 at 10. It is difficult to see how that clear standard invites arbitrary and

discriminatory enforcement given its narrowness and specificity. With respect to the DOD, Plaintiffs note provisions of Instruction 5230.09 and Instruction 5230.29, which according to Plaintiffs together provide that DOD will conduct PPR of former employees' submissions through both "security review," which "protects classified information, controlled unclassified information, or unclassified information that may individually or in aggregate lead to the compromise of classified information or disclosure of operations security," as well as through an additional review for information "requiring protection in the interest of national security or other legitimate governmental interest" and for "any classified, export-controlled or other protected information." ECF No. 33 at 32; *see* ECF No. 33-1 at 33–34, 37, 46.

As the Court noted in discussing Plaintiffs' standing, Defendants contend that some of these requirements apply only to current DOD personnel, while Plaintiffs insist that they apply to former employees as well. ECF No. 30-1 at 32; ECF No. 33 at 28 n.9, 32; ECF No. 36 at 16–17. The Court need not settle this dispute, however, because if Plaintiffs are correct, their vagueness argument is in fact weakened because the disputed policies give additional guidance to DOD PPR reviewers and further cabin their discretion. In other words, if these provisions indeed apply to Plaintiffs and other former employees as Plaintiffs ask the Court to conclude, the risk of "arbitrary and discriminatory enforcement" is reduced because the policies increase the degree to which the DOD has "provide[d] explicit standards for those who apply them." *Hill v. Coggins*, 867 F.3d 499, 513 (4th Cir. 2017) (quoting *Grayned*, 408 U.S. at 108–09).

Plaintiffs then assert that neither the NSA nor the ODNI policies provide any standard of review for submissions by former employees, though they note the statement in ODNI's policy that "[t]he goal of [PPR] is" not only to "prevent the unauthorized disclosure of information" but also to "ensure the ODNI's mission and the foreign relations or security of the U.S. are not

adversely affected by publication." ECF No. 33 at 32 (quoting ECF No. 1 ¶ 51); *see* ECF No. 33-1 at 76. Plaintiffs appear to overlook, however, that a section of the ODNI policy titled "Policy" states that "[t]he ODNI has a security obligation and legal responsibility" under Executive Orders governing intelligence and classification "to safeguard sensitive intelligence information and prevent its unauthorized publication." ECF No. 33-1 at 77. Also, as Defendants observe and Plaintiffs reference elsewhere in their filings, the ODNI nondisclosure agreement for classified information, Form 313, states that the purpose of PPR is "to give the U.S. Government an opportunity to determine whether the information or material that I contemplate disclosing publicly contains any information" that "is marked as classified or that I have been informed or otherwise know is classified" or "is in the process of a classification determination." ECF No. 36 at 22 (quoting ECF No. 33-1 at 70–71). Taken together, these materials appear to set out reasonable limitations and guidance for PPR by the ODNI.

Plaintiffs also appear to overlook NSA policy language. The first paragraph of NSA/CSS Policy 1-30 states that "[t]he public release of official NSA/CSS information shall be limited only as necessary to safeguard information requiring protection in the interest of national security or other legitimate Government interest," which is followed by a citation to DOD Directive 5230.09. ECF No. 33-1 at 57, 66. The paragraph further explains that PPR "includes both a classification review" and a review for consistency with NSA "policies and programs" and specifically identified "information security standards" and "corporate messaging standards." *Id.* To be sure, these policies set out an expansive scope of considerations for PPR reviewers to consider. But given their relative specificity, they cannot plausibly be read as so vague that they impermissibly facilitate arbitrary and discriminatory enforcement. Finally, Plaintiffs cite the fact that all of the agencies review submissions for the presence of SCI if the

author had access to it as an employee. ECF No. 33 at 33.[13] In no way can that requirement be construed as vague or allowing for the unchecked exercise of discretion.

Plaintiffs have thus fallen short of plausibly demonstrating that the challenged policies raise constitutional concerns under either of the two vagueness frameworks. The Court notes that they have also failed to link the redactions and excisions from their own works that they allege were arbitrary and discriminatorily motivated to a challenge to the PPR regimes as a whole. *See* ECF No. 1 ¶¶ 66, 80, 88, 89, 110, 114. Nor have they responded to Defendants' observation that no Plaintiff has pursued judicial review of a PPR decision, as they are entitled to do. *See, e.g.*, *Berntsen v. CIA*, 618 F. Supp. 2d 27 (D.D.C. 2009). While the Court appreciates the delay in publication that judicial review could entail, Plaintiffs have not demonstrated that such a delay on its own renders the PPR regimes constitutionally infirm, nor that review in a specific case would not be a more effective means of reviewing the alleged vagueness of a given PPR policy than a facial challenge. In any event, because none of the avenues that Plaintiffs have pursued for their vagueness claim are viable, the claim will be dismissed.

---

[13] While Plaintiffs do not cite the specific policy imposing this requirement, Defendants appear to be correct in speculating that Plaintiffs are referring to Form 4414, the SCI nondisclosure agreement, which provides that "the purpose of [PPR] . . . is to give the United States a reasonable opportunity to determine whether the preparation submitted . . . sets forth any SCI." ECF No. 36 at 22 (quoting ECF No. 33-1 at 86).

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Plaintiffs' Motion for Permission to Omit

Home Addresses From Caption, ECF No. 8, Defendants' Motion to Dismiss, ECF No. 30,

Plaintiffs' Unopposed Motion for Leave to File Excess Pages, ECF No. 32, and CERL's Motion

for Leave to File Brief as Amicus Curiae, ECF No. 34. A separate Order shall issue.


Date: <u>April    15, 2020</u>                                    <u>    /s/                             </u>
                                                                    GEORGE J. HAZEL
                                                                    United States District Judge